# EXHIBIT "A"

**IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA**

**CIVIL DIVISION**

Plaintiff(s) & Address(es):

OCTAVIO G. PENA
5835 Upper Mountain Road
New Hope, PA  18938

vs.

Defendant(s) & Address(es):

KATHY COKUS
1816 Polo Run Drive
Morrisville, PA  19067

File No. _____

Civil Action - 0708068  29.1

**PRAECIPE FOR SUMMONS**

TO THE PROTHONOTARY/CLERK OF SAID COURT:

Issue summons in   Civil Action (Assumpsit)
in the above case.

___X___  Writ of Summons shall be issued and forwarded to Attorney/Sheriff.

Date:  September 28th, 2007

_____
Signature of Attorney

Print Name: ARNOLD I. KALMAN, ESQ.

Address:  245 So. Hutchinson Street
             Philadelphia, PA  19107

Telephone: 215-829-9613

Supreme Court ID No.:  17593

* * * * *

**SUMMONS IN CIVIL ACTION**

TO:   KATHY COKUS
_____

YOU ARE NOTIFIED THAT THE ABOVE-NAMED PLAINTIFF(S) HAS/HAVE COMMENCED AN ACTION
AGAINST YOU.

**PATRICIA L. BACHTLE,
PROTHONOTARY**

Date:  9-28-07                          by: _____
                                                              Deputy

**SEAL
OF THE
COURT**

E-4F-1                                                     (Rev. 9/00)

# COURT OF COMMON PLEAS
## OF BUCKS COUNTY
## OFFICE
## OF
## COURT ADMINISTRATOR
### DOYLESTOWN, PA 18901

## CIVIL COVER SHEET

The information provided herein is for case flow and calendar management purposes only.  It does not replace or supplement the filing and service of pleadings or other papers as required by law or rules of court.  This sheet will <u>not</u> be used as a source for making docket entries except to note the type of action commenced.  This is <u>not</u> a substitute from documents for commencement of actions

Case No. _____ 0708068 -29- 1

| PLAINTIFFS | vs. | DEFENDANTS |
|---|---|---|
| OCTAVIO G. PENA | | KATHY COKUS |

**Attorney Name & ID #** 17593
Arnold I. Kalman, Esq.

**Attorney Name & ID #**

## NATURE OF SUIT

(Check one classification only)

**ASSUMPSIT** (Contracts)
_____ Mechanics Lien 057
_____ Employment 525
_____ Insurance 526
_____ No-Fault Insurance 527
_____ Negotiable Instrument 528
_____ Product Liability 529
_____ Warranty 530
_____ Mortgage Foreclosure 060
_____ Replevin (With Order) 054
_____ Assumpsit 046
_____ Other 531

X WRIT OF SUMMONS
(112)

**TRESPASS**
_____ Motor Vehicle 047
_____ Non-Motor Vehicle 048
_____ Other Personal Injury 049
_____ Assault 532
_____ Libel/Slander 533
_____ Medical/Malpractice 534
_____ Legal Malpractice 535
_____ Professional Malpractice 816
_____ Product Warranty Liability 536
_____ Other 537

**APPEALS**
_____ DJ Appeal - Assumpsit 025
_____ DJ Appeal - Trespass 337
_____ Award of Viewers 501
_____ Board of Assessment 301
_____ Pa. Labor Relations Board 369
_____ Board of Elections 319
_____ Local Agency 262
_____ Zoning Hearing Board 030
_____ Suspension of Operator's License 134
_____ Suspension of Registration 694
_____ Other 538

**EQUITY**
_____ Ejectment 053
_____ Partition 309
_____ Quiet Title 062
_____ Labor Dispute 540
_____ Mandamus 055
_____ Declaratory Judgment 061
_____ Equity 051
_____ Quo/Warrants 056
_____ Other 539

RECEIVED
PROTHONOTARY
OF BUCKS COUNTY

RECEIVED
PROTHONOTARY
OF BUCKS COUNTY

**DEMAND**
_____ over $50,000
XX under $50,000
_____ Not Applicable

**JURY DEMAND**
(Check only if demanded in Complaint.)
XX Yes    _____ No

## THIS FORM SHOULD BE RETURNED TO THE PROTHONOTARY'S OFFICE

REV 02/2004

DATE _____ Sept. 28, 2007 _____ XXX

PROTHY. NO. _____

0708068

TO:  SHERIFF OF BUCKS COUNTY

FROM:  Arnold I. Kalman, Esq.
       Attorney for Plaintiff
       245 So. Hutchinson Street
       Philadelphia, PA  19107
       215-829-9613
       Atty. I.D. # 17593

WRIT AND OR
COMPLAINT
ASSUMPSIT
TRESPASS
EQUITY
DIVORCE

OCTAVIO G. PENA

_____
                                Plaintiff

Vs.

KATHY COKUS

_____
                                Defendant

SERVE AT:  (If R.D. Address must include specific instructions, also must have Apt. Number and Apt. Bldg. Number)

STREET _____ 1816 Polo Run Drive _____

POST OFFICE _____ Morrisville, PA  19067 _____

TOWNSHIP _____ Morrisville/Yardley _____

SPECIAL INSTRUCTIONS:    (Use other side if necessary)

   Please serve as soon as possible.

SERVICE WAS NOT MADE BECAUSE

SD—50

5M-10-13-76

# EXHIBIT "B"

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY
### CIVIL DIVISION

Octavio Pena

**Plaintiff**                                    :       No. 07-08068-29-1
    **vs.**                                      :
                            :       Breach of Contract
Kathy Cokus                                       :       _____
                            :       **Form of Action**
                            :
**Defendant**                                     :       **Complaint**

### NOTICE

     **You have been sued in court.** If you wish to defend against the claims set forth in the following pages you must take action within twenty (20) days after this complaint and notice are served by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

     **YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE GO TO OR TELEPHONE THE OFFICES SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

**Bucks County Bar Association**
**135 East State Street**
**Doylestown, PA 18901**
**Phone (215) 348-9413, 1-800-479-8585**
**www.bucksbar.org**

**PA Bar Association: www.pabar.org**

Arnold I. Kalman, Esquire

**Attorney for** Plaintiff

**Attorney I.D. #** 17593
**Please type or print name and address**

245 South Hutchinson Street

Philadelphia, PA 19107

ARNOLD I. KALMAN, ESQUIRE
Identification No.  17593
245 South Hutchinson Street                  **ATTORNEY FOR PLAINTIFF**
Philadelphia, PA 19107
(215) 829-9613

---

Octavio Pena                                :        BUCKS COUNTY
5835 Upper Mountain Road                    :        COURT OF COMMON PLEAS
New Hope PA. 18938                          :        TRIAL DIVISION
                                            :
                            Plaintiff.      :
                                            :
            VS.                             :
                                            :
Kathy Cokus                                 :        Civil Action No. 07-08068-29-1
1816 Polo Run Drive                         :
Morrisville, PA 19067                       :
                            Defendant.      :

---

**Complaint In Civil Action**

## Plaintiffs' Complaint In Civil Action

Plaintiff, Octavio Pena, by his attorney, files this complaint against defendant, Kathy Cokus, and alleges:

### I. The Parties

**A. Plaintiff**

1.      Plaintiff, Octavio Pena ("Mr. Pena"), is a Pennsylvania citizen and resides, in Bucks County, at 5835 Upper Mountain Road, New Hope, PA 18938.

2.      Mr. Pena is a professional investigator with almost 40 years of experience in this field.

3.      Mr. Pena offers his investigative services and capabilities to the public, including individuals, corporations and the United States Government.

4.      The United States District Court for the Eastern District of New York, the Federal Bureau of Investigation, the Organized Crime Strike Forces of the Unites States Department of Justice and the United States Attorneys' Offices for the Southern District of New York, Eastern District of New York and Southern District of California, have used Mr. Pena's investigative capabilities to serve the United States. See Exhibit 1.

5.      And representatives of the United States Customs Service, United States Drug Enforcement Agency and Criminal Investigation Division of the Internal Revenue Service have collaborated with Mr. Pena and drawn on his expertise to serve the United States. See Exhibit 2.

1

6.      Mr. Pena's career, in private investigation, through 1996, is the subject of extensive coverage in the book he co-authored, entitled <u>The Pena Files: One Man's War Against Federal Corruption and the Abuse of Power</u>, published, August 1996, by Harpercollins.

### B. Defendant

7.      Defendant, Kathy Cokus ("Cokus"), is a Pennsylvania citizen and resides, in Bucks County, at 1816 Polo Run Drive, Morrisville, Pa 19067.

## II. Jurisdiction and Venue

8.      Jurisdiction in Pennsylvania and venue in Bucks County are proper in because the Cokus is found, resides, lives and regularly conducts business there, and the facts, circumstances and events giving rise to Mr. Pena's claims occurred in Bucks County, Pennsylvania.

## III. Summary of Complaint

9.      A <u>qui tam</u> or "whistleblower" suit, under the False Claims Act, 31 U.S.C. §3729-3733, permits a private person to sue on behalf of the United States, and if the Government is successful in resolving or litigating the claim, the <u>qui tam</u> plaintiff or "whistleblower" may receive a share of the proceeds the Government recovers.

10.      Cokus retained Mr. Pena to investigate the basis for a <u>qui tam</u> claim, on behalf of the United States Government, against her former employer, Bristol Myers-Squibb Company, and thereafter retained the Manhattan, New York-law of firm of Zeichner, Ellman & Krause LLP to prosecute such a claim against the

2

company, along with Mr. Pena, on the basis of the fraudulent business practices of the company which Mr. Pena uncovered during the course of his investigation.

11.    On July 13, 2001, Cokus contracted, in writing, with Mr. Pena to share with him the proceeds she would receive from the United States Government arising out of the qui tam lawsuit. See Exhibit 3.

12.    Cokus agreed with Mr. Pena to have him receive 12½% of the proceeds she would receive from the Government stemming from the qui tam lawsuit. See Exhibit 3.

13.    Cokus reaffirmed her agreement with Mr. Pena, on July 17, 2001, when she signed a similar contract with the law firm of Zeichner, Ellman & Krause LLP, promising the law firm that it would receive 37½% of the proceeds she would receive from the United States Government as a result of the qui tam lawsuit. See Exhibit 4.

14.    And again, on January 11, 2007, Cokus reaffirmed the agreement she made with Mr. Pena for him to receive 12½% of the proceeds she would receive from the Government stemming from the qui tam lawsuit. See Exhibit 5.

15.    Under the terms of the written agreements she made with Mr. Pena (Exhibit 3) and Zeichner, Ellman & Krause LLP (Exhibit 4), Cokus thus agreed with them she would receive 50% of the proceeds from the qui tam lawsuit, Mr. Pena would receive 12½% of the proceeds and the law firm would receive 37½% of the proceeds.

3

16.    On or about September 20, 2007, the United States Government formally notified Zeichner, Ellman & Krause LLP that Cokus would receive $4 million as her share of the settlement the Government reached with Bristol Myers-Squibb, and a check covering her portion of the settlement would be transmitted to Zeichner, Ellman & Krause LLP, in or about, ten days to two weeks.

17.    When Cokus received word from Zeichner, Ellman & Krause LLP of this, she became immediately overwhelmed by greed and disavowed she had made any agreement with Mr. Pena to share with him the proceeds she would receive from the Government.

18.    And shortly thereafter, she challenged the right of Zeichner, Ellman & Krause LLP for it to receive its full share of the proceeds to which she had agreed it would receive in writing.  See Exhibit 6.

19.    On Friday, September 28, 2007, the United States Department of Justice formally announced it had reached a settlement with Bristol Myers-Squibb in which the company would pay the Government more than $515 million to resolve allegations by the Government of fraudulent business practices by the company. See Exhibit 7.

20.    The Government identified six qui tam plaintiffs, including Cokus, to share approximately $50 million in settlement proceeds.

21.    Mr. Pena thereupon commenced an action by Writ of Summon against Cokus for her having broken her word to him and breached their contract, wherein she had promised he would receive from her 12½% of the proceeds – the equivalent

4

of $500,000.

## IV.  Operative Facts

**A.    Cokus seeks the assistance of Mr. Pena to resolve civil and criminal actions in which she is involved.**

22.    In or about mid-May 2001, Cokus reached-out to Mr. Pena to discuss with him civil and criminal proceedings in which she was involved and to explore with him his availability to resolve them for her.

23.    Mr. Pena explained to Cokus though he was by profession an experienced private investigator, he was not then actively practicing his profession, but would, nonetheless, attempt to assist her.

24.    Cokus then told Mr. Pena she was a widow – her husband was diagnosed having Aids, but he had died from wounds he suffered in an attempt to commit suicide, he shot himself in the stomach.  Mr. Pena asked Cokus why did her husband shoot himself in the stomach, because he understood normally when a person wants to kill himself or herself, and avoid the agony of a wound, he or she shoots oneself in the head.  Cokus responded by telling him, her husband had a pain in the liver and shooting himself in this area would cure him of his pain.

25.    Cokus said she was living on disability benefits and everything she had was riding on the outcome of a lawsuit she had brought against Bristol Myers-Squibb, her employer of more than 20 years.

26.    And then Cokus told Mr. Pena she had been charged with violations of the Pennsylvania criminal laws and had been found guilty of two of those charges,

5

and had also been briefly suspected by the police to have murdered her husband, but his death was later determined to be suicide, based on the admission he had made on his deathbed that he had attempted to commit suicide.

27.     Cokus blamed her community's chief of police for the reason she had been prosecuted because he had it-out-for her, telling Mr. Pena she had sued the police chief in order to reclaim from the police the semi-automatic handgun her husband had used to attempt suicide and her lawsuit had caused the chief of police to be removed temporarily from office.  See Exhibit 8.

28.     Cokus told Mr. Pena she had wanted the police chief to return to her the gun because it had "sentimental value" for her, since it was one of the last things her husband had touched, but the police chief had said no.

## 1.     Cokus explains her criminal conviction.

29.     Cokus specifically told Mr. Pena she had been falsely charged by her community's police, on January 19, 1999, with assault, reckless endangerment and making terroristic threats.  See Exhibit 9.

30.     Cokus said to him the criminal charges arose-out of a confrontation she had with four teenage boys outside her apartment complex, during which the teenagers claimed she pointed a semi-automatic handgun at them (indeed, this was the handgun her husband had used in his attempt to commit suicide), threatened to shoot them and yelled-out-loud at them "I am a psycho."

31.     Cokus then told Pena she was later convicted by the Bucks County Court of Common Pleas for assault and reckless endangerment, and though she

6

could have been sentenced to as much as two years in jail, she received a sentence of four years probation and was required to turn-over the semi-automatic handgun she had pointed at the teenagers.

32.     Mr. Pena asked Cokus to show him newspaper accounts of the incident and she later did.

33.     The newspaper coverage of the incident ran headlines (Exhibit 10):

a.      "Psycho Lady? Skateboard Kids: Woman Waved Hubby's Suicide Gun, Said, 'I'm a Psycho'/ Gunning for Kids? Kids: Woman threatened to shoot/ Kathy Cokus is accused of terroristic threats and reckless endangerment for waving a gun" (Trentonian, Friday, March 5, 1999);

b.      "Gun-waving woman gets probation/Kathy Cokus was convicted of pointing a gun at four skateboarders after they insulted her for wearing spandex pants" (Bucks County Courier Times, Friday, June 19, 1999); and

c.      "After verdict, woman ordered to turn in guns/ The judge found a Lower Makefield woman guilty of some charges and not others/ But he said he believed the kids who said Kathy Cokus pointed a gun at them" (Bucks County Courier Times, Sunday, June 20, 1999).

34.     In Trentonian account of the incident for which she was criminally prosecuted, the paper attributes to the thirteen year-old complainant the statement: "Then she pulled a gun out of her waist and said, 'I'm psycho. I'll kill you, and I don't care about going to jail." "She said she was crazy and she would (shoot) because she doesn't care if she gets in trouble."

7

**2.    Cokus next explains to Mr. Pena the civil litigation in which she is involved with Bristol Myers-Squibb's U.S. Pharmaceutical Group and its President.**

35.    Cokus then explained to Mr. Pena she was on disability leave from Bristol Myers-Squibb's U.S. Pharmaceutical Group.

36.    And Cokus told Mr. Pena she had brought a lawsuit against Bristol Myers-Squibb's U.S. Pharmaceutical Group and its president, in New Jersey state court, alleging violations of New Jersey's Conscientious Employee Protection Act, N.J.S.A. 34.19-1 to -8.

37.    Cokus told Mr. Pena that the actions taken by Bristol Myers-Squibb's U.S. Pharmaceutical Group  and its president caused her to have psychiatric problems which ended her career with the company.

38.    Cokus blamed her problem here because she had reported to the company's president unethical conduct by company's executives.

39.    Cokus then said after her co-workers learned of what she had done, they retaliated by ostracizing her and then her superiors started to give her unfavorable performance evaluations, and immediately thereafter she started to have psychiatric problems.

40.    She next told Mr. Pena there had been a number of set-backs in her lawsuit against Bristol Myers-Squibb's U.S. Pharmaceutical Group, and she was not satisfied at all with the performance of her lawyer in the case.

**3.    Cokus explains other matters to Mr. Pena affecting her.**

41.    Cokus explained the chauffeur of the president of Bristol Myers-Squibb's U.S. Pharmaceutical Group, who she said was a drug dealer, had tried to set-her-up with a cocaine deal.

**B.    Mr. Pena focuses on Cokus' allegations of fraudulent business practices by Bristol Myers-Squibb.**

42.    Mr. Pena offered to explore the issues for which Cokus asked his assistance.

43.    Mr. Pena immediately asked Cokus to permit him to have full and complete access to all the documents Cokus and her lawyer had in their possession relating to her claims against Bristol Myers-Squibb's U.S. Pharmaceutical Group.

44.    Cokus granted Mr. Pena's request and he was given access thousands of pages of records generated by the lawsuit Cokus had brought against Bristol Myers-Squibb's U.S. Pharmaceutical Group in New Jersey state court.

45.    These records included pleadings, documents received in discovery and transcripts of deposition testimony of Bristol Myers-Squibb's U.S. Pharmaceutical Group executives.

46.    Mr. Pena examined and studied these records extensively for over two weeks, and communicated several times a day with Cokus to draw from her facts relevant to his investigation.

47.    Afterwards, Mr. Pena explained to Cokus his investigation showed there to be a basis for a <u>qui tam</u> lawsuit against Bristol Myers-Squibb over its

fraudulent business practices which he had uncovered in the course of his initial

two week intensive investigation.

48.    Mr. Pena told Cokus he could work with her to bring a <u>qui</u> <u>tam</u> lawsuit

against Bristol Myers Squibb, and then afterwards look into whether there was a

basis for the criminal charges to have been brought against her.

49.    Cokus agreed to work with Mr. Pena toward this end.

50.    Cokus told Mr. Pena she did not have any money at all with which to

compensate him for the time he expended and costs he incurred thus far, because

she had spent all her money on lawyers (a) to defend her against the criminal

charges for which she was convicted and (b) to prosecute her New Jersey lawsuit

against Bristol Myers-Squibb's U.S. Pharmaceutical Group.

51.    Cokus then agreed with Mr. Pena that he would be compensated for

the time he expended and costs he incurred thus far, and would in the future, based

on a percentage of whatever recovery she would receive that was derived from

Bristol Myers-Squibb.

52.    Cokus and Mr. Pena did not agree then on the specific percentage of

the recovery that she would pay him, but afterwards Cokus did reach an agreement

with Mr. Pena that he would receive 12½%.

**C.    Cokus requests that Mr. Pena arrange to have the law firm of
Zeichner, Ellman & Krause LLP work with him in the
prosecution of the <u>qui</u> <u>tam</u> claim against Bristol Myers-Squibb.**

53.    In June 2001, Mr. Pena arranged with Cokus for her to meet with

representatives of the law firm of Zeichner, Ellman & Krause LLP, with whom he

had discussed undertaking the prosecution of the <u>qui</u> <u>tam</u> claim against Bristol Myers-Squibb.

54.    In extensive meetings with Cokus, throughout the first three weeks of June 2001, Mr. Pena obtained pertinent information from Cokus to support the <u>qui</u> <u>tam</u> claims and correlated this information with documents he had inspected and examined, and thereafter selected to support the <u>qui</u> <u>tam</u> claims.

55.    Mr. Pena's meetings with Cokus were only interrupted once, during this period, and only because of an appointment Cokus had to meet with her probation officer.

56.    Mr. Pena assembled his work-product and afterwards transmitted a banker box of documents and supporting data to Zeichner, Ellman & Krause LLP.

57.    Mr. Pena, thereafter, arranged meetings between representatives of Zeichner, Ellman & Krause LLP and Cokus to discuss the merits of the <u>qui</u> <u>tam</u> claims and he participated with the law firm and Cokus throughout this process.

58.    Being convinced by Mr. Pena of the merits of the <u>qui</u> <u>tam</u> claim, Zeichner, Ellman & Krause LLP agreed to prosecute the case.

59.    Thereupon, Mr. Pena and Cokus formalized, in writing, the arrangement they made by which Cokus would share with Mr. Pena the proceeds of the recovery she would receive from the United States Government arising out of the <u>qui</u> <u>tam</u> claim.

60.    In an agreement that Zeichner, Ellman & Krause LLP had prepared for both Mr. Pena and Cokus to sign, Cokus agreed that Mr. Pena would receive

12½% of the proceeds Cokus received from the United States Government. <u>See</u> Exhibit 3.

61.    Cokus signed this agreement she made with Mr. Pena, on July 13, 2001. <u>See</u> Exhibit 3.

62.    Cokus, afterwards, on July 17, 2001, reaffirmed this agreement with Mr. Pena, at the time at which she signed the retainer agreement, dated July 16, 2001, that Zeichner, Ellman & Krause LLP had prepared for her to sign with it.

63.    Under the arrangement Cokus reached with Zeichner, Ellman & Krause LLP, she agreed for the law firm to receive 37½% of the proceeds she received from the United States Government. <u>See</u> Exhibit 4.

64.    Cokus signed the agreement embodying the arrangement she made with Zeichner, Ellman & Krause LLP, on July 17, 2001. <u>See</u> Exhibit 4.

65.    Once Cokus reached these agreements with Mr. Pena and Zeichner, Ellman & Krause LLP, they diligently worked together, over the next two and one-half months, to prepare the <u>qui tam</u> complaint they would file on behalf of the United States against Bristol Myers-Squibb over its fraudulent business practices.

66.    Zeichner, Ellman & Krause LLP filed the complaint representing the work of Mr. Pena and his investigation, on September 24, 2001. <u>See</u> Exhibit 11.

67.    Thereafter, Mr. Pena continued to gather evidence to support the <u>qui tam</u> claim against Bristol Myers-Squibb.

68.    Mr. Pena worked with Cokus in preparing her to testify before the grand jury investigating Bristol Myers-Squibb's fraudulent business practices, and

selected documents for her to review to support her grand jury testimony.

69.    And afterwards, in response to requests made of Zeichner, Ellman & Krause LLP by federal prosecutors, who were responsible for the Government's grand jury investigation of Bristol Myers-Squibb, Mr. Pena gathered information and documents for the law firm to use to satisfy the federal prosecutors' requests.

**D.    Cokus reaffirms with Mr. Pena he is to receive 12½% of the proceeds which she receives from the Government, but then schemes to disavow the promise she had made to him.**

70.    For many months before December 20, 2006, Cokus anticipated she would receive a substantial portion of the recovery the United States Government intended to obtain from Bristol Myers-Squibb in settlement of the qui tam lawsuits.

71.    Cokus believed she would receive as much as 90% of the recovery the Government intended to pay-out to the qui tam plaintiffs; thus she anticipated she would share with Mr. Pena and Zeichner, Ellman & Krause LLP as much as $45 million.

72.    Cokus often told Mr. Pena she would use 50% share of the proceeds of to purchase a $7 million home on the shore of the Delaware River for her and her three dogs.

73.    However, on December 20, 2006, Cokus' daydream vaporized – she was told then by Zeichner, Ellman & Krause LLP she would receive the short-end of the settlement the Government arranged to receive from Bristol Myers-Squibb, and thus she would not be sharing $45 million with Mr. Pena and Zeichner, Ellman & Krause LLP, but between $3 million to $4.5 million with them.

74.     Cokus became immediately despondent, and anticipated, for no apparent reason, the Government could possibly reduce her recovery to $1.5 million and for which – because of her arrangements with Mr. Pena and Zeichner, Ellman & Krause LLP – she then would receive only $750,000; and this amount was entirely insufficient for her to purchase the home she had dreamed of owning on the shores of the Delaware River.  See Exhibit 12.

75.     Within a minute after Cokus informed Mr. Pena of her despondency which she had over this, she became overwhelmed with greed and contrived to deny Mr. Pena his share of the recovery and thereby increase her share – Cokus then informed Mr. Pena she had lost all her records relating to the qui tam case, including the agreements in which she undertook to share the recovery with Mr. Pena and Zeichner, Ellman & Krause LLP, and could not recall what their shares of the recovery were (Exhibit 13): "I had everything stolen from my car so I don't have one piece of paperwork.  In fact, I don't even know how much Nathan's firm takes from this .... that was in the box, too."

76.     This was damningly suspicious, since a minute before, she had determined her share of the proceeds from a $1.5 million recovery – that is 50% – would be $750,000, after taking into account the arrangements she had made with Mr. Pena and Zeichner, Ellman & Krause LLP.  See Exhibit 12.

77.     And because of her despondency, she became even more daring – on January 11, 2007, after Cokus reaffirmed in e-mail correspondence with Mr. Pena that he is to receive 12½% of the proceeds she receives from the Government – "I

14

<u>completely forgot that you get 12.5%</u>" – she predicted, in her next breath, she could possibly forget she had made such an agreement with Mr. Pena – "<u>I don't even remember that at all.......isn't that weird?????</u>"– (Exhibit 5): "Remember I told you I had all my paperwork stolen from my car regarding all my cases?  Well, I guess I purposely put almost everything out of my mind because it's just too much.  But, I had absolutely zero recollection of how much Nathan's law firm was getting (what percentage) and <u>I completely forgot that you get 12.5%</u>?????? I don't even remember that at all.......isn't that weird?????"

78.    Cokus had become by then entirely overwhelmed by her greed.

**E.    Overwhelmed by her greed, Cokus disavows the agreement she made with Mr. Pena, immediately after Zeichner, Ellman & Krause LLP informs her that she is to receive $4 million as her portion of the proceeds which the United States Government is to receive from settlement of its claims over fraudulent business practices by Bristol Myers-Squibb.**

79.    On or about September 20, 2007, Zeichner, Ellman & Krause LLP informed Cokus that the United States Government intended to distribute $4 million to her as her allocation of the Government's settlement with Bristol-Myers Squibb, and that Ms. Cokus' proceeds could be in-hand in as soon as ten days.

80.    Zeichner, Ellman & Krause LLP then asked her for permission for the law firm to distribute to itself, from the check it anticipated receiving from the Government, its share of proceeds she had undertaken to allocate to it under their July 16, 2001 agreement.

81.    Cokus consented.

82.    At the same time, Zeichner, Ellman & Krause LLP asked her for authority to distribute to Mr. Pena, his share of the proceeds to which she had agreed with him, on July 13, 2001, he would receive.

83.    Cokus, however, refused to give Zeichner, Ellman & Krause LLP such authorization, and disavowed she had ever made such an arrangement with Mr. Pena.

84.    After Mr. Pena was informed by Zeichner, Ellman & Krause LLP that Cokus disavowed the agreement she made with him on July 13, 2001, Mr. Pena transmitted to her the agreement she made with him and she had signed.  See Exhibits 3 and 14.

85.    Because Cokus continued to disavow the agreement she had made with Mr. Pena, Zeichner, Ellman & Krause LLP informed her she should seek-out other counsel to advise her.

86.    On July 25, 2007, Joel M. Friedman, Esquire, notified Zeichner, Ellman & Krause LLP that Cokus had selected him to represent her in her dispute with Mr. Pena.

87.    The next day, September 27, 2007, Mr. Friedman informed Mr. Pena's attorney that Cokus claimed she had not signed any agreement in which she arranged to have Mr. Pena receive 12½% of the recovery which she would receive from the United States Government.

88.    Then, immediately afterwards, Mr. Friedman telephoned Mr. Pena's attorney and told him that Cokus had selected another lawyer to represent her in

the matter and that he no longer would.

89.    In the afternoon of September 27, 2007, a new lawyer for Cokus materialized, George Bochetto, Esquire.

90.    Bochetto told Mr. Pena's attorney that Cokus had not signed the July 13, 2001 agreement, but if she had signed such an agreement, because of the circumstances under which she signed the agreement, the agreement was not enforceable.

91.    Bochetto demanded Mr. Pena relinquish entirely that to which he was entitled by his July 13, 2001 agreement with Cokus. See Exhibit 6.

92.    Bochetto also challenged the arrangement Cokus made with Zeichner, Ellman & Krause LLP. See Exhibit 6.

93.    And Bochetto demanded Zeichner, Ellman & Krause LLP relinquish 12½% of that to which it was entitled under the agreement it made with Cokus. See Exhibit 6.

94.    Bochetto thus demanded that Mr. Pena and Zeichner, Ellman & Krause LLP relinquish 25% of that to which Cokus had originally agreed they receive so that she would receive 75% of the proceeds, rather than 50% to which she originally agreed.

## V. Claim for Relief

### Count I
(For Breach of Contract)

95.    Mr. Pena repeats and incorporates by reference the allegations

17

contained in paragraphs 1 through 94 above as though the same were fully and completely set forth herein.

96.   Cokus agreed, in a writing she signed, that Mr. Pena would receive 12½% of the proceeds she received from the United States Government.

97.   Cokus breached the agreement she made with Mr. Pena by failing to pay him 12½% of the proceeds she received from the Government, the equivalent of $500,000.

98.   As a direct result of Cokus' breach, Mr. Pena has been denied the benefits of his contract with Cokus and has suffered damages in excess of $500,000.

WHEREFORE, plaintiff demands a determination that Cokus breached her agreement with him and demands judgment against Cokus for compensatory and punitive damages, litigation costs, reasonable attorneys' fees, pre-and post-judgment interest and such other relief as the Court deems appropriate.

**ARNOLD I. KALMAN**
Attorney Identification No.  17593
245 South Hutchinson Street
Philadelphia, Pennsylvania 19107
(215) 829-9613

**Attorney for Plaintiff,**
**Octavio Pena**

**Dated: October 1, 2007**

18

## VERIFICATION

I, Octavio Pena, hereby state:

    1.     I am the plaintiff named in the Complaint;

    2.     I verify that the statements made in the foregoing Complaint in Civil Action are true and correct to the best of my knowledge, information and belief; and

    3.     I understand that the statements in the Complaint are made subject to the penalties of 18 Pa. C. S. §4904 relating to unsworn falsification to authorities.

10/1/07

_____

**Octavio Pena**

## CERTIFICATE OF SERVICE

I, Arnold I. Kalman, certify that, on October 1, 2007, I caused to be served, by hand delivery, Plaintiff's Complaint In Civil Action, on Gregory Bochetto, Esquire, at Bochetto & Lentz, 1524 Locust Street, Philadelphia, PA 19102, counsel for defendant, Kathy Cokus.

**ARNOLD I. KALMAN**
Attorney Identification No. 17593
245 South Hutchinson Street
Philadelphia, Pennsylvania 19107
(215) 829-9613

Attorney for Plaintiff,
Octavio Pena

**Dated: October 1, 2007**

EXHIBIT "C"

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA

### CIVIL DIVISION

Plaintiff(s) & Address(es):                              :

Octavio Pena                                            :
5835 Upper Mountain Road                                :    File No. _____
New Hope PA 18938                                       :
             vs.                        :
                                                        :
                                                        :
                                                        :    Civil Action - No. 07-08068-29-1
Defendant(s) & Address(es):                             :

Kathy Cokus                                             :
1816 Polo Run Drive                                     :
Morisville, PA 19067                                    :

### PRAECIPE FOR SUMMONS

TO THE PROTHONOTARY/CLERK OF SAID COURT:

      Issue summons to join additional defendants
in the above case.

    __x__ Writ of Summons shall be issued and forwarded to Attorney/Sheriff.

Date: ___October 11, 2007___

                                      Signature of Attorney

                          Print Name: __George Bochetto__
                          Address: __1524 Locust Street__
                                    __Philadelphia, PA 19102__
                          Telephone: __(215) 735-3900__
                          Supreme Court ID No.: __27783__

                        * * * * *

### SUMMONS IN CIVIL ACTION

TO:    Nathan Schwed, Esquire and Zeichner Ellman & Krause LLP
       575 Lexington Avenue, New York, NY 10022
YOU ARE NOTIFIED THAT THE ABOVE-NAMED PLAINTIFF(S) HAS/HAVE COMMENCED AN ACTION
AGAINST YOU.

    **PATRICIA L. BACHTLE,**
      **PROTHONOTARY**

Date: _10/11/07_                           by: _____
                                                  Deputy

        **SEAL**
       **OF THE**
       **COURT**

                            E-4F-1                         (Rev. 9/00)

# EXHIBIT "D"

# BOCHETTO & LENTZ

A PROFESSIONAL CORPORATION

<div style="float:left">

GEORGE BOCHETTO*
GAVIN P. LENTZ*
JEFFREY W. OGREN*
STEPHEN E. SKOVRON*
DAVID P. HEIM*
VINCENT van LAAR*
SCOTT P. SIGMAN*
TODD S. McGARVEY*
TRICIA DESMARAIS

———

DAVID J. PERLMAN*
*OF COUNSEL*

———

CORA I. O'DONNELL, J.D.
LYNNE T. NUCCI, C.E.B.S.
MARIA TROUT
JANINE REID
*PARALEGALS*

</div>

ATTORNEYS AT LAW
1524 LOCUST STREET
PHILADELPHIA, PA 19102
————
TELEPHONE: (215) 735-3900
TELECOPIER: (215) 735-2455
————
E-MAIL ADDRESS:
gbochetto@bochettoandlentz.com

WEB SITE:
www.bochettoandlentz.com

NEW JERSEY OFFICE
——
1230 BRACE ROAD
CHERRY HILL, NEW JERSEY 08034
TELEPHONE NUMBERS:
(856) 722-9595
(856) 427-0631
TELECOPIER: (856) 722-5511
——

\* ALSO ADMITTED TO NEW JERSEY BAR
† ALSO ADMITTED TO NEW YORK BAR
˙ ALSO ADMITTED TO D.C. BAR

PRACTICE DEDICATED TO LITIGATION MATTERS

October 12, 2007

**VIA E-MAIL AND**
**FIRST-CLASS MAIL**
John B. Harris, Esquire
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.
425 Park Avenue
New York, NY 10022

**Re:**  **_Octavio Pena v. Kathy Cokus v. Nathan Schwed, et al._**
**Civil Action No.: 07-08068-29-1**

Dear Mr. Harris:

I enclose with this letter a time-stamped copy of the Praecipe for Summons issued in the above-captioned matter, naming Nathan Schwed and the law firm of _Zeichner, Ellman & Krause, LLP_ as Additional Defendants in the action initiated by Octavio Pena in the Court of Common Pleas of Bucks County, Pennsylvania, Civil Action No. 07-08068-29-1.

Within a short period of time, we will prepare, file, and forward to you a substantive Complaint, but I wanted you to be on notice of the naming of your clients as Additional Defendants as soon as possible.

Finally, will you accept service on behalf of your clients or will you require me to have them personally served? I would appreciate hearing from you at your earliest opportunity.

Sincerely,

**BOCHETTO & LENTZ, P.C.**

By: _____
George Bochetto

GB:dc

cc:    Arnold I. Kalman, Esquire (via e-mail and first-class mail)

# EXHIBIT "E"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ZEICHNER ELLMAN & KRAUSE LLP,       :
Plaintiff and Interpleader Plaintiff,       :

      :       No. 07 Civ.

 – against –       :

      :       **COMPLAINT FOR**
      :       **DECLARATORY**
KATHY COKUS, Defendant and Interpleader   :       **JUDGMENT AND**
Defendant, and OCTAVIO PENA, Interpleader  :       **INTERPLEADER**
Defendant.       :

      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff and Interpleader Plaintiff Zeichner Ellman & Krause LLP ("Plaintiff" or

"Zeichner"), by its counsel, Stillman, Friedman & Shechtman, P.C., for its Complaint against

Defendant and Interpleader Defendant Kathy Cokus ("Cokus") and Interpleader Defendant

Octavio Pena ("Pena"), alleges as follows:

### PARTIES

1.      Plaintiff and Interpleader Plaintiff Zeichner Ellman & Krause LLP is a New York

limited liability partnership with its principal place of business in New York, New York. None of

its partners is a citizen or domiciliary of Pennsylvania.

2.      Defendant and Interpleader Defendant Kathy Cokus is a Pennsylvania citizen who

resides in Morrisville, Pennsylvania.

3.      Interpleader Defendant Octavio Pena is a Pennsylvania citizen who resides in New

Hope, Pennsylvania.

### JURISDICTION AND VENUE

4.      This is an action by Zeichner against Cokus for breach of contract and a declaratory

judgment pursuant to 28 U.S.C. § 2201 relating to a written contract entered into between these

parties on or about July 16, 2001, with respect to which there is an actual controversy; and, for interpleader pursuant to Rule 22 of the Federal Rules of Civil Procedure to resolve the claims of Cokus and/or Pena, which affect the rights and duties of Zeichner.

5.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to plaintiff's claims occurred in this district, and because the property at issue in this action is located in this district.

<center>**FACTS**</center>

<center>**Breach of Contract and Declaratory Judgment**</center>

7.     On or about July 16, 2001, Zeichner and Cokus entered into a written contingent fee agreement for legal services (the "Fee Agreement"), pursuant to which Zeichner agreed to provide legal representation to Cokus in connection with a potential federal False Claims Act *qui tam* action that Cokus contemplated against her former employer, Bristol-Myers Squibb Company ("BMS"). In exchange for Zeichner's agreement to represent her, Cokus agreed that the firm would be entitled to 37.5 percent of any recovery in the matter after recouping its disbursements, and to take its fee and disbursements directly from the proceeds of any settlement. A copy of the Fee Agreement is annexed as Exhibit A hereto.

8.     For the next several years, Zeichner advocated on behalf of Cokus, including but not limited to, representing her interests in the resulting case entitled *United States ex rel. Cokus v. Bristol Myers Squibb*, Civil Action No. 01-11627-RGS, pending in the United States District Court for the District of Massachusetts.

<center>- 2 -</center>

9.      Prior to September 28, 2007, the United States Department of Justice ("DOJ") informed Zeichner, as Cokus' counsel, that DOJ and various states had reached a settlement with BMS of numerous claims against the company, including the claims asserted by Cokus and other relators. Zeichner was also informed that Cokus would receive $4,005,229.67 (inclusive of interest) as her relator's share with respect to the federal portion of the settlement and $85,003.07 (exclusive of interest) as her relator's share with respect to the state portion of the settlement.

10.     When Zeichner informed Cokus of the impending recovery, for the first time she disputed Zeichner's right to its fee under the Fee Agreement and demanded that the firm hold its entire earned fee in escrow pending resolution of the purported dispute. Zeichner advised Cokus that it disagreed with her and considered her position without merit.

11.     On October 23, 2007, Zeichner received a wire transfer of $4,005,229.67 into its interest bearing attorney trust account at Citibank, N.A. located in New York, New York (the "Trust Account").

12.     At the time of this filing, Zeichner has initiated a wire transfer in the sum of $1,999,067.73 to Cokus.

13.     In addition, at the time of this filing, Zeichner is holding the sum of $1,999,067.73 in Zeichner's Trust Account, which amount includes the sum of $1,506,395.01 owed to Zeichner, consisting of Zeichner's recoupment of its disbursements in the amount of $7,094.21 and its fee in the amount of $1,499,300.80, that is, 37.5 percent of the net recovery in the *qui tam* action. To the full extent permitted by law, Zeichner asserts a lien upon these funds in the amount of $1,506,395.01 for its fees and disbursements.

14.    Pursuant to DR 9-102 of the New York Code of Professional Responsibility, Zeichner arguably may not withdraw the fee to which it is entitled pursuant to the Fee Agreement signed by Cokus, unless and until Cokus' alleged "dispute" is "finally resolved."

15.    Accordingly, Zeichner brings suit to recover damages for Cokus' breach of contract and for a declaration from the Court that Zeichner is legally entitled to $1,506,395.01 in the Trust Account in satisfaction of the fees and disbursements it is entitled to recover under the Fee Agreement, plus applicable interest.

### Interpleader

16.    Zeichner is informed that a non-party to the Fee Agreement, Octavio Pena (an investigator and consultant), asserts that he had a valid, written agreement with Cokus to pay him 12.5 percent of the recovery Cokus receives in the *qui tam* action. Cokus has advised Zeichner that she disputes this claim and believes that Pena is not entitled to that amount. Counsel for Cokus and Pena have each advised Zeichner that it should not pay out this 12.5 percent of the recovery to which Pena claims entitlement, so long as a dispute exists among them.

17.    Thus, Zeichner also brings an action in interpleader against Pena and Cokus, and requests that it be permitted to deposit into the Registry of the Court the sum of $499,766.93— which represents the 12.5 percent of the recovery to which Pena claims he is contractually entitled but which Cokus disputes—and agrees to abide by the judgment of the Court with respect to the treatment of these funds.

### COUNT I—Breach of Contract

18.    Zeichner realleges and incorporates by reference paragraphs 1 through 15 of the Complaint as though fully set forth herein.

19.    Zeichner has fully performed under the terms of the Fee Agreement.

20.     Cokus has breached the Fee Agreement.

21.     By reason of the foregoing, Zeichner has been damaged.

## COUNT II—Declaratory Judgment

22.     Zeichner realleges and incorporates by reference paragraphs 1 through 21 of the Complaint as though fully set forth herein.

23.     An actual controversy exists between Zeichner and Cokus.

24.     Pursuant to the fully executed and binding Fee Agreement between the parties, Zeichner is entitled to 37.5 percent of any sums recovered on behalf of Cokus in the *qui tam* suit after recouping disbursements.

25.     Zeichner has recovered $4,005,229.67 on behalf of Cokus, and accordingly, is entitled to receive immediately its legal fee of $1,499,300.80, plus reimbursement for its disbursements in the amount of $ 7,094.21, for a total of $ 1,506,395.01.

26.     Accordingly, Zeichner seeks a declaration that it is the absolute, unencumbered owner of $1,506,395.01 currently on deposit in Zeichner's trust account, plus the interest accruing thereon.

## COUNT III—Interpleader

27.     Zeichner realleges and incorporates by reference paragraphs 1 through 6, 11-13 and 16-17 of the Complaint as though fully set forth herein.

28.     A dispute exists between Cokus and Pena regarding the ownership of the 12.5 percent of the recovery that Pena claims Cokus agreed to pay him, an amount equal to the sum of $499,766.93.

29.    At the time of this filing, Zeichner is holding the sum of $499,766.93 in the Zeichner Trust Account, which represents the amount of the funds that are the subject of the dispute between Cokus and Pena. These funds do not belong to Zeichner.

30.    If Zeichner transmits these funds to either one of Cokus or Pena, Zeichner faces the prospect of a complaint from the other party.

31.    Accordingly, Zeichner requests that it be permitted to deposit into the Registry of the Court the sum of $499,766.93, representing the 12.5 percent of the recovery disputed between Cokus and Pena, and agrees to abide by the judgment of the Court with respect to the treatment of these funds.

**WHEREFORE,** Zeichner prays that the Court enter a Judgment:

a)  adjudging Cokus liable to Zeichner in the amount of $1,506,395.01, plus interest from October 23, 2007;

b)  adjudging Zeichner the absolute, unencumbered owner pursuant to the Fee Agreement of the $1,506,393.01 on deposit in Zeichner's trust account, plus the interest accruing thereon;

c)  resolving all issues as between Cokus and Pena with respect to the rightful ownership of the $499,766.93 to be deposited with the Court; and

d)  granting such other and further relief as is just and proper.

Dated:  New York, New York
        October 24, 2007

                            STILLMAN, FRIEDMAN & SHECHTMAN, P.C.


                            By: _____
                                John B. Harris (JH 4038)
                                425 Park Avenue
                                New York, New York 10022
                                (212) 223-0200

                            Attorneys for Plaintiff Zeichner Ellman
                                & Krause LLP

# EXHIBIT A

ZEICHNER ELLMAN & KRAUSE LLP

575 LEXINGTON AVENUE
NEW YORK, NEW YORK 10022
(212) 223-0400
FAX: (212) 753-0396

35 MASON STREET
GREENWICH, CT 06830
(203) 622-0900
FAX: (203) 862-9889

Nathan Schwed
(212) 826-5317
nschwed@zeklaw.com

ONE GATEWAY CENTER
NEWARK, NJ 07102
(973) 624-8600
FAX: (973) 624-8585

July 16, 2001

Ms. Kathy Cokus
1704 Kathy Drive
Yardley, PA 19067

Dear Ms. Cokus:

        We are pleased to confirm the retention of our firm (the "Firm") in connection with the potential prosecution of a Qui Tam action (the "Action") under the False Claims Act against Bristol-Myers Squibb Company ("BMS").

        In consideration of the services rendered and to be rendered by us, you agree to pay a fee to us (and we are authorized to endorse for you any checks that may be paid in resolution or settlement of the Action, and to retain out of any monies that may come into our hand by reason of the above claim) in an amount equal to 37.5% of the sum you recover (including attorneys fees and disbursements you recover) as a result of or in connection with the Action against BMS or any settlement thereof. Such percentage is to be computed on the total sum recovered less the amount of all necessary disbursements.

        Although attorneys may advance disbursements on behalf of a client, it is understood the client is responsible for such disbursements regardless of the outcome of the case. The client may be required at any time to pay all disbursements. To the extent we advance disbursements, any such disbursements will be reimbursed to the Firm first out of any monies received on account of the Action and/or claim.

ZEICHNER ELLMAN & KRAUSE LLP

Ms. Kathy Cokus
July 16, 2001
Page 2

You understand that in a Qui Tam action, the government has a limited amount of time to decide whether or not to intervene in the action. If the government chooses to intervene, the government will become the principal party in the Action. However, you will still remain a party in the Action and our firm will continue to represent your interests in the Action.

In the event the government declines to intervene in the Action, you will then have to decide whether or not to pursue the Action. That decision will involve numerous considerations, including (i) a possibility that the Statute of Limitations may bar a substantial portion of your potential claims, (ii) the government's decision to decline intervention may indicate a serious weakness in the claims, (iii) the risk that if you are unsuccessful in the Action, you may be compelled to pay the attorneys fees and expenses of the defendant, and (iv) the costs and expense of proceeding with the Action may be quite substantial.

You understand and agree that if the government declines to intervene in the Action, the Firm may choose to proceed with the Action in conjunction with one or more other law firms. In such event, you agree to cooperate with our firm and assist us in connection with the retention of such other attorneys. Alternatively, the Firm may choose not to proceed with the Action. In such event, you will be given the opportunity to obtain another attorney to proceed with the Action, if you so wish.

You acknowledge that the Firm has made no representations to you of the amount of money that you could be awarded if the case is successful or that the case in fact will be won.

If the foregoing correctly reflects our understanding, please execute this agreement under the words "Accepted and Agreed To," and return one copy of the letter to us.

ZEICHNER ELLMAN & KRAUSE LLP

Ms. Kathy Cokus
July 16, 2001
Page 3

We look forward to working with you on this matter.

Sincerely,

ZEICHNER ELLMAN & KRAUSE LLP

By: _____
     Nathan Schwed

NS/pa

**ACCEPTED AND AGREED TO:**

_____
KATHY COKUS

368962.01/2969-001/NS