# EXHIBIT "G"

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY
## CIVIL DIVISION

Octavio Pena,

**Plaintiff**

No.  07-08069-29-1

**vs.**

Kathy Cokus,

Breach of Contract
Form of Action

**Defendant**

**vs.**

Nathan Schwed, Esquire
and
Zeichner, Ellman, & Krause, LLP

**Additional Defendants**

## NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages you must take action within twenty (20) days after this complaint and notice are served by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE GO TO OR TELEPHONE THE OFFICES SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

Bucks County Bar Association
135 East State Street
Doylestown, PA 18901
Phone (215) 348-9413, 1-800-479-8585
www.bucksbar.org

PA Bar Association: www.pabar.org

George Bochetto, Esquire
Jeffrey W. Ogren, Esquire

Attorney for: Defendant
Attorney I.D. # 27783, 59090
Please type or print name and address:
1524 Locust Street
Philadelphia PA, 19102

**BOCHETTO & LENTZ, P.C.**
By:    George Bochetto, Esquire
        Jeffrey W. Ogren, Esquire
Attorney I.D. Nos.: 27783, 59090
1524 Locust Street
Philadelphia, PA 19102                **Attorneys for Defendant Kathy Cokus**
(215) 735-3900

| | | |
|---|---|---|
| OCTAVIO PENA | : | COURT OF COMMON PLEAS |
| | : | BUCKS COUNTY |
| Plaintiff, | : | TRIAL DIVISION |
| | : | |
| v. | : | NO. 07-08068-29-1 |
| | : | |
| KATHY COKUS | : | |
| | : | |
| Defendant, | : | |
| v. | : | |
| | : | |
| NATHAN SCHWED, ESQUIRE | : | |
| | : | |
| and | : | |
| | : | |
| ZEICHNER, ELLMAN & KRAUSE, LLP | : | |
| | : | |
| Additional Defendants. | : | |

### DEFENDANT KATHY COKUS' COMPLAINT AGAINST ADDITIONAL DEFENDANTS NATHAN SCHWED, ESQUIRE AND ZEICHNER, ELLMAN AND KRAUSE, LLP

AND NOW comes Defendant Kathy Cokus ("Cokus"), by her attorneys, Bochetto & Lentz, P.C., to file this Complaint against Additional Defendants Nathan Schwed, Esquire ("Schwed") and Zeichner, Ellman & Krause, LLP ("ZEK"), and in support thereof alleges as follows:

### PARTIES

1.      Defendant Cokus is a Pennsylvania citizen who resides in Bucks County at

1816 Polo Run Drive, Yardley, PA 19067. Cokus files this Complaint against additional Defendants Schwed and ZEK.

2.    Additional Defendant Schwed is a resident of New York and, upon information and belief, resides at 149 Harborview, Lawrence, NY 11559. Schwed is an attorney licensed to practice law in New York, Registration Number: 1822550. At all times relevant to this law suit, Schwed was a partner with the law firm of ZEK, focusing on bankruptcy litigation.

3.    Additional Defendant, ZEK, is a New York Limited Liability Partnership, with a principal place of business at 575 Lexington Avenue, New York, NY 10022. ZEK boasts it has a national practice.

## JURISDICTION AND VENUE

4.    This action arises under the laws of the Commonwealth of Pennsylvania and is within the subject matter jurisdiction of this Court.

5.    Venue is proper in this Court pursuant to Rule 2179 of the Pennsylvania Rules of Civil Procedure.

6.    Many of the acts of Defendants -- particularly with respect to the acts of co-conspirator Octavio Pena ("Plaintiff" or "Pena"), the Plaintiff and counterclaim Defendant in this action -- took place in Bucks County, and the harm visited upon by Cokus by Defendants' conduct mostly occurred in Bucks County.

7.    Schwed and ZEK have in at least two different cases represented Pennsylvania residents and businesses.

2

## OPERATIVE FACTS

## The Runner and His Lawyer

8.    For more than twenty years, Cokus was employed by the pharmaceutical company Bristol-Myers Squibb ("B-MS") first beginning in 1976. During her employment, Cokus observed B-MS carry out a series of schemes and marketing plans in violation of various federal and state statutes, rules, and regulations.

9.    Cokus decided to report to law enforcement authorities the various B-MS schemes, and in that regard contacted the FBI on March 5, 2001 by e-mail. (Such e-mail is attached hereto as Exhibit "A.") Such e-mail specifically made reference to developing or joining a *qui tam* type prosecution of B-MS.

10.    By doing so, Cokus made the decision to pursue a *qui tam* action well before she ever met Pena, Schwed or ZEK.

11.    Thereafter, in or about May 2001, Pena introduced himself to Cokus under the alias "Paul 699.6," via the *AdultFriendFinder* website, soliciting Cokus for sex. (See website listings attached hereto as Exhibit "B.") At the time, he knew nothing of or about Cokus.

12.    Cokus, then single, had a listing on *AdultFriendFinder*, in response to which Pena beseeched and urged Cokus to meet with him, love him, and bed him.

13.    Thereafter, Pena, though a married man, relentlessly persisted in his attempts to meet with Cokus, still using the alias "Paul," and finally did convince Cokus, who was then experiencing bereavement over the death of her husband and the loss of her job, to meet with Pena under such false pretenses.

14.    At such meeting, Pena falsely described himself as an investigator of

3

international proportions, having assisted many governmental agencies, including the FBI, the CIA, and others, with profound and important investigations affecting society as a whole.

15.     Pena described that he no longer engaged in such activities for profit, that he had already made a fortune, lived in a mansion, and that he only undertook projects on a charitable ("nonprofit") basis for those he desired to help.

16.     Pena asked Cokus to tell him all about the problems she was having with B-MS.

17.     Pena then orchestrated a series of meetings with his personal attorney, Schwed and the law firm of ZEK, and convinced Cokus that such law firm could help Cokus in her difficulties with B-MS and that they were capable in handling *qui tam* type actions.

18.     In fact, neither Schwed nor, upon information and belief, ZEK had ever prosecuted a *qui tam* action before.

19.     In reality, Pena was essentially a "runner" for Schwed and ZEK, attempting to generate cases and litigation matters for them, with the offer of sharing a percentage of whatever recovery was obtained.

20.     Toward this end, Pena convinced Cokus to attend certain meetings concerning the retention of Schwed and ZEK to pursue a *qui tam* action on Cokus' behalf against Bristol-Myers Squibb, and over a several week period, Schwed and ZEK began consulting Cokus.

### Betrayal – The Secret Agreement

21.     During the time period Cokus was consulting with Schwed and ZEK, Schwed secretly prepared a document ("Secret Agreement") (attached to Plaintiff's Complaint as

4

Exhibit 3), purporting to have Cokus hire Pena's company, Lynch International, Inc. (a corporation not licensed to do business in Pennsylvania) for investigative and public relations work.

22.    During such process, Pena put numerous papers in front of Cokus to sign, which Cokus was led to believe dealt with the retention of Schwed and ZEK for the *qui tam* action. In this process, Pena may have, unbeknownst to Cokus, slipped to Cokus the signature page of the Secret Agreement, which she may have unwittingly signed.

23.    At no time in the year 2001 or for years thereafter did Pena, Schwed, or ZEK disclose to Cokus that Schwed had prepared the Secret Agreement, or that he was supplying it to Pena, or that Cokus would purportedly give up significant rights in such document.

24.    At no time did Cokus understand or agree to engage either Pena or Lynch International, Inc. to render investigative or legal services on her behalf for a contingency fee.

25.    At no time did Cokus have an opportunity to negotiate the terms of the Secret Agreement with Pena, nor was there ever a meeting of the minds on its terms.

26.    Cokus never would have agreed to pay either Pena or Lynch International, Inc. a contingency fee in connection with the *qui tam* action for any purported investigative or legal services they purported to render.

27.    Further still, at no time did Cokus agree to convey *all* rights to interviews, publications, or movies about Cokus' life experiences to Pena, and such "rights" were fraudulently and without notice included in the Secret Agreement drafted by Schwed and manipulated by Pena. Rather, Pena only ever advised Cokus that if she needed to give interviews, he could help buffer the media so that Cokus would not get "sued" for anything she

might say in an interview, and could help her if anyone wanted to make a movie of her experiences with B-MS.

28.    Cokus was at the time, and still is, untrained in the law, unfamiliar with *qui tam* type litigation, and was at the time suffering not only bereavement, but financial and emotional distress.

29.    At no time was Cokus advised by Pena or Schwed to consult with an independent lawyer concerning any purported contract, including the Secret Agreement.

30.    Pena, together with Schwed and ZEK, perceived that Cokus was in a particularly vulnerable position, both legally and emotionally, and preyed upon her to sign whatever documents they put in front of her, to her great disadvantage, and in an effort to enrich Pena, Schwed and the ZEK.

### The Law Firm's Retainer Agreement

31.    In addition to drafting the Secret Agreement for Pena, Schwed drafted a retainer agreement ("Retainer Agreement") by which Cokus would hire Schwed and ZEK to represent her in the *qui tam* action.  (A copy of the Retainer Agreement is attached hereto as Exhibit "C.")

32.    Pursuant to the Retainer Agreement between Cokus, Schwed and ZEK, upon a recovery, Schwed and ZEK would be paid 37.5% of the gross amount of relator's fees to be awarded to Cokus.

33.    At the time of engaging Schwed and ZEK, the United States Government, Department of Justice, had already conducted extensive investigations into B-MS affairs, and was actively pursuing B-MS in a variety of fora. *Qui tam* actions were already pending against

6

B-MS on behalf of other relators.

34.    At the time of engaging Schwed and ZEK, it was obvious that, beyond preparing a Complaint, little actual litigation work would be required of them in furthering the *qui tam* litigation, and indeed in the Retainer Letter they reserved the right to discontinue such representation if the government declined to intervene in the *qui tam* action.

35.    At no time did Schwed or ZEK -- or, for that matter, Pena -- disclose to Cokus that their fee of 37.5% was negotiable or that Cokus would benefit from consulting with independent counsel concerning the size of Schwed's and ZEK's fee.

36.    Under the circumstances then existing, the 37.5% fee recited in the retainer letter is unreasonable, excessive, and adhesionary, particularly when combined with the 12.5% Pena fee, and was extracted from Cokus under misleading and fraudulent circumstances.

37.    Such fee arrangement was violative of New York's Code of Professional Responsibility, DR 2-106(A) which plainly provides that a "lawyer shall not enter into an agreement for, charge or collect an illegal or excessive fee."

38.    The *qui tam* action was brought in the Commonwealth of Massachusetts, a jurisdiction to which Schwed is not admitted to practice law.  Further, Schwed was never admitted to the Federal District Court in Massachusetts.

39.    These facts were never disclosed to Cokus by Schwed, ZEK, or Pena.

40.    Further, Schwed and ZEK appear to also have engaged a lawyer by the name of Howard M. Brown, who signed the *qui tam* Complaint as an attorney for Cokus.

41.    Cokus never met, spoke to, knew of, or heard about Howard Brown, and certainly never authorized him to act as counsel in the *qui tam* action.

7

42.    Further still, at the time of engaging Schwed and ZEK, neither ever told Cokus that Schwed had never before prosecuted a *qui tam* action.

## Schwed and ZEK File the Action Against B-MS on Behalf of Cokus

43.    On or about September 24, 2001, on behalf of Cokus, Schwed and ZEK filed a *qui tam* complaint in the matter *United States ex rel. Cokus v. Bristol-Myers Squibb*, Civil Action No. 01-11627-RGS (the "Action"). (A true and correct copy of the *qui tam* complaint is attached to Plaintiff's Complaint as Exhibit 11.)

44.    Thereafter, Schwed and ZEK performed little if any actual litigation work in order to prosecute the *qui tam* action, particularly as the government promptly intervened in the action and assumed responsibility for all such litigation.

45.    In or around January of 2007, it was learned by Schwed that the B-MS *qui tam* action would settle, and that Cokus' relator's fee would be approximately $4,000,000.

## The Conspiracy to Defraud Cokus Continues

46.    At or about this time in January of 2007, Cokus received a telephone call from Pena on her private home telephone number (which Cokus never supplied to him) congratulating her on the settlement and reminding her of his 12.5% contingency fee.

47.    Cokus learned from speaking to Schwed that Schwed had given her confidential home telephone number to Pena so Pena could call Cokus about the settlement agreement, and also learned that Schwed had told Pena not only of the settlement, but the size of Cokus' relator fee.

48.    It was only then that Cokus learned that Pena claimed she signed an agreement (the Secret Agreement) with him and that he was purportedly entitled to 12.5% of her

recovery pursuant to the terms of this Secret Agreement.

49.    Indeed, Cokus told Pena she completely forgot ever having agreed to a 12.5% fee.

50.    Cokus also learned in January of 2007 for the first time that the Secret Agreement was in all respects drafted by her own attorney, Schwed.

## Breach of Rules of Professional Conduct

51.    By breaching their confidential duty with Cokus, Pena learned or was led to believe the following from Schwed and ZEK, as alleged in Pena's Complaint:

A.    "On or about September 20, 2007, the United States Government formally notified Zeichner, Ellman & Krause LLP that Cokus would receive $4 million as her share of the settlement the Government reached with Bristol Myers-Squibb, and a check covering her portion of the settlement would be transmitted to Zeichner, Ellman & Krause LLP, in or about ten days to two weeks." (See Plaintiff's Complaint, ¶16.)

B.    "When Cokus received word from Zeichner, Ellman & Krause LLP of this, she . . . disavowed she had made any agreement with Mr. Pena to share with him the proceeds she would receive from the Government." (See Plaintiff's Complaint, ¶17.)

C.    "Zeichner, Ellman & Krause LLP then asked her for permission for the law firm to distribute to itself, from the check it anticipated receiving from the Government, its share of proceeds she had

9

undertaken to allocate to it under their July 16, 2001 agreement."
(See Plaintiff's Complaint, ¶80.)

D.    "Cokus consented." (See Plaintiff's Complaint, ¶81.)

E.    "At the same time, Zeichner, Ellman & Krause LLP asked her for authority to distribute to Mr. Pena, his share of the proceeds to which she had agreed with him, on July 13, 2001, he would receive." (See Plaintiff's Complaint, ¶82.)

F.    "Cokus, however, refused to give Zeichner, Ellman & Krause LLP such authorization, and disavowed she had ever made such an arrangement with Mr. Pena." (See Plaintiff's Complaint, ¶83.)

G.    "After Mr. Pena was informed by Zeichner, Ellman & Krause LLP that Cokus disavowed the agreement she made with him on July 13, 2001, Mr. Pena transmitted to her the agreement she made with him and she had signed." (See Plaintiff's Complaint, ¶84.)

H.    "Because Cokus continued to disavow the agreement she had made with Mr. Pena, Zeichner, Ellman & Krause LLP informed her she should seek-out other counsel to advise her." (See Plaintiff's Complaint, ¶85.)

52.    As a direct and proximate result of Schwed breaching attorney/client communications, Pena filed the instant lawsuit against Cokus.

53.    Cokus never authorized Schwed or other representatives at ZEK to communicate to Pena her confidential attorney/client communications.

10

54.    Schwed and ZEK's conduct in breaching the attorney/client privilege by divulging confidential communications to Plaintiff Pena violated various provisions of New York's Code of Professional Responsibility, including:

A.    **DR 4-101 Preservation of Confidences and Secrets of a Client**
"[a] lawyer shall not knowingly:

1. Reveal a confidence or secret of a client.

2. Use a confidence or secret of a client to the disadvantage of the client.

3. Use a confidence or secret of a client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure.

55.    In addition to breaching the attorney/client privilege, Schwed and ZEK also engaged in a non-waivable conflicts of interest by drafting the Secret Agreement for Pena to slip to Cokus at the very same time Schwed and ZEK were consulting with Cokus on the B-MS *qui tam* case, in violation of New York's Code of Professional Responsibility including:

A.    **DR 5-105 Conflict of Interest; Simultaneous Representation**

"A lawyer shall decline proffered employment if the exercise of professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve the lawyer in representing differing interests, . . ."

## The Inherent Illegality of the Secret Agreement

56.    It is illegal under both Pennsylvania and New York law -- as it is in most if not all other jurisdictions -- to compensate an unlicensed individual or company for private investigative services.

57.    Further, it is illegal under both Pennsylvania and New York law -- as it is

11

in most if not all other jurisdictions -- to compensate a private investigator on a contingency fee basis.

58.     Further, it is illegal under both Pennsylvania and New York law -- as it is in most if not all other jurisdictions -- to compensate an unlicensed individual or company to perform legal services.

59.     The purported investigative services to be rendered by Pena pursuant to the Secret Agreement drafted by Schwed would, by client dint of necessity, be rendered in great part in Pennsylvania.

60.     There is no record of Pena or Lynch International, Inc. being licensed as private investigators in Pennsylvania.

61.     Further, in New York, Pena's license as a private investigator expired June 30, 2005, at which time it was not renewed, and for portions of time, therefore, when presumably Pena was still obligated to perform services pursuant to the Secret Agreement.

62.     The unholy Secret Agreement concocted by Pena and Schwed was little more than their attempt to pay Pena out of Cokus' share of relator's fees for being a runner.

63.     Schwed and ZEK are aware (or should have been aware) that such arrangements are strictly prohibited by New York's Code of Professional Responsibility, which clearly states that "A lawyer or law firm shall not share legal fees with a non-lawyer . . ." DR-3-102(A).

### Schwed and Pena Conceal the Existence of the Secret Agreement at Pena's Deposition in *Pena v. Guzman.*

64.     Unbeknownst to Cokus, while Schwed and ZEK were representing her,

Schwed and ZEK were also representing Pena in a case known as *Octavio Pena v. Emmanuel Gutierrez Guzman, et al.*, in the United States District Court for the Southern District of New York, No. 1:03-cv-05130-SHS (hereafter, "*Guzman* Case").

65.    Upon information and belief, this case involved a dispute over whether Pena was contracted to collect/negotiate the payment of a judgment. The Defendant therein alleged Pena was not hired to collect the judgment, yet Pena produced a signed copy of an agreement which was disputed by the Defendant.

66.    On August 17, 2004, Pena was deposed under oath in the *Guzman* Case and was represented by Schwed. (A true and correct copy of August 17, 2004 Deposition of Octavio Pena is attached hereto as Exhibit "D.")

67.    In his deposition and under oath, Pena was asked the following questions and gave the following responses in the presence of Schwed:

> *Q:*     *Is Lynch International still engaged in the business of private investigations?*
>
> *A:*     *It is licensed to do private investigations. Most of the work I have been doing is pro bono work, I have not solicited any business for ten, 15 years.*
>
> *Q:*     *Leaving aside the matter that is the subject of this litigation, have you accepted any paying business either for yourself or Lynch International in the last ten years?*
>
> *MR. SCHWED:*     *Objection. You can answer.*
>
> *A:*     **In the last ten years, any paying business, I don't think so.**

13

MR. SCHWED:  Are you asking whether he has been paid for any work?

MR. STECHER:  No.  My question before was whether Lynch was still involved -- I asked the witness if Lynch International is still engaged in the business of private investigations and he told me that he has not solicited any business for ten or 15 years, so I am wondering and wanted to know whether he had accepted any business.

MR. SCHWED:  Because you used the word "paying."  Whether he got paid or not, I want to clarify what you are searching for.

MR. STECHER:  Okay.  **I am not interested in this question in whether or not he got paid; I am interested in whether or not at the beginning of the engagement, the understanding was that he was going to get paid, and I picked ten years because that's the figure that the witness gave me.**

A.     Can you repeat the question.

Q.     **In the last ten years, have you performed any services for any clients, other than with respect to this litigation, so other than the matter of the Mexican judgment, in which at the beginning of the engagement your understanding was that the client was going to pay you?**

A.     **Ten years, I don't remember.**

Q.     Who was the last paying client you had, again leaving aside the dispute between yourself and the defendants in this case?

MR. SCHWED:  Objection.

14

*Do you want to know when was the last time he got paid, I don't have a problem with that; I don't think you are entitled to know who his clients are.*

*MR. STECHER:  Well, I don't agree with you, but I'll change the question.*

Q.    **When was the last time you accepted the business of a client who you expected to pay you?**

A.    **Probably it was about ten years ago, it might have been a U.S. court.**

Q.    *It may have been that you were engaged by a U.S. court, is that what you're saying?*

A.    *Could I talk to my attorney, I just want to clarify something.*

*MR. SCHWED:  But there is a question pending.  Again, Mr. Stecher is not so interested in who you were retained by, he is more interested in when you were retained.*

*And let me just see if I can clarify one thing, because I know what he is having trouble with.  **What Mr. Stecher is interested in is not whether you expected to get paid on an hour basis or you expected to get paid on a contingent basis; as long as you had some reasonable expectation that you might get paid, that would be considered the kind of retention he is talking about, as well.***

*I believe that may have been giving you some trouble.  **So he is talking about any time you have been retained, the last time you were retained***

15

*where you had a reasonable expectation that you might get paid,*

*whether it was result-based or not.*

A.      *It was a bankruptcy court –*

MR. SCHWED:  *The question was not by whom, the question was when.*

A.      **It might have been in the mid-Nineties, somewhere around there.**

Q.      *This was in a bankruptcy proceeding?*

A.      *Yes.*

Q.      *Were you retained by the trustee?*

A.      *Yes.*

Q.      *What was the bankrupt entity?*

A.      *I don't remember.*

MR. SCHWED:  *What was the name of the person or entity that was*

*bankrupt?*

A.      *Mr. Papas.*

Q.      *What is Mr. Papas' first name?*

A.      *I don't remember.*

Q.      *What was the nature of the engagement?*

A.      *Apparently he had -- I was looking for assets.*

Q.      *And you were engaged to try to find assets?*

A.      *That's correct.*

Q.      *You were engaged by the trustee?*

A.      *Yes.*

16

Q.     *What was the basis of your compensation on that matter?*

A.     *I don't remember.*

Q.     *Did you find any assets?*

A.     *No.*

Q.     *As a result of that, you did not get paid, correct?*

A.     *That's correct.*

Q.     *Prior to the engagement in the Papas bankruptcy, what was the previous engagement in which you expected to get paid?*

A.     *In the past ten years?*

Q.     *I think what you have told us is that the Papas bankruptcy was the last engagement you took on in which you had a reasonable expectation of getting paid.*

A.     *That's correct.*

Q.     *But you did not get paid in that matter.*

A.     *That's correct.*

Q.     ***So what I am trying to find out is the next previous engagement that you had in which you had a reasonable expectation of getting paid.***

A.     ***It was Jordache Enterprises.***

Q.     ***When was that?***

A.     ***That was in the late Eighties.***

(See Exhibit "D," pp. 6-12)(emphasis added.)

17

68.    Thus, as late as August of 2004, Pena denied there was any agreement between him and Cokus (the "Secret Agreement") (dated July 13, 2001) by which Cokus was to pay either Pena or Lynch International, Inc. 12.5% for services as a private investigator.

69.    Thus, either the Secret Agreement is a fabrication or Pena lied under oath in the *Guzman* case.

70.    Further, Schwed took no steps to bring to the Court's (or anyone's) attention in the *Guzman* litigation that Pena had given false testimony (as he was bound to do under the Rules of Professional Conduct), or to bring to anyone's attention in the instant case that the Secret Agreement with Cokus a fabrication.

71.    That the B-MS *qui tam* action was in Pena's consciousness at the time of his testimony in the *Guzman* case is best illustrated by emails exchanged by and between Cokus, Schwed and Pena only two weeks earlier, on August 3 and 4, 2004. (True and correct copies of the e-mails are attached hereto as Exhibit"E.")

72.    In one such email, Pena (email address: lii2001@hotmail.com) informed Cokus and Schwed that Schering-Plough was settling a case with the government for the sum of $345 million.

73.    In another such email, dated August 4, 2004, Pena (email address: lii2001@hotmail.com) informed Cokus and Schwed that Bristol-Myers was likely to pay $75 million to settle charges levied by the government that it manipulated drug inventories to inflate reported sales.

## COUNT I

## FRAUD - INTENTIONAL NON-DISCLOSURE

### COKUS v. SCHWED and ZEK

74.    Cokus hereby incorporates all other paragraphs of this pleading as though fully set forth herein at length.

75.    At the time of its drafting and for several years thereafter (until January of 2007), Schwed and ZEK intentionally failed to disclose the Secret Agreement to Cokus.

76.    The non-disclosure of the Secret Agreement was material to the attorney/client relationship between Cokus, Schwed, and ZEK.

77.    The non-disclosure of the Secret Agreement was both willful and intentional.

78.    The non-disclosure of the Secret Agreement was perpetrated to mislead and defraud Cokus.

79.    Because neither the existence nor the authorship of the Secret Agreement was disclosed to Cokus (until January of 2007), Cokus justifiably relied on the representations of Schwed and ZEK throughout the course of their representation of Cokus that they, not Pena, would perform whatever legal and investigative services need to be performed in connection with the *qui tam* action.

80.    Cokus has sustained substantial damages directly and as a proximate cause of the foregoing conduct of Schwed and ZEK, including being subjected to the instant lawsuit for a contingency fee by Pena (and incurring legal fees in its defense), being subjected to paying an unreasonably large fee to Schwed and the ZEK for services they should have rendered in

19

connection with the *qui tam* litigation at a much lower percentage, being subjected to conflicts of interest of Pena, Schwed, and the ZEK, being subjected to disloyalty, and a breach of confidentiality, by Pena, Schwed, and the ZEK, as well as other financial and emotional damages.

81.    Cokus' damages and injuries are ongoing.

82.    The conduct of Pena, both individually and in tandem with Schwed and ZEK, was outrageous, wanton, and willful, designed purely to enrich themselves without regard to the rights or interests of Cokus.

WHEREFORE, Cokus hereby demands judgment against Schwed and ZEK jointly, severally, and individually for an amount in excess of Seventy -Five Thousand ($75,000) Dollars, together with such other costs, interest, attorneys' fees and relief as the court deems just.  Cokus also requests that punitive damages be assessed against both Schwed and ZEK, jointly, severally, and individually based upon their outrageous and malicious conduct.

## COUNT II

## UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

## 73 P.S. §201-1 ET SEQ.

## (COKUS v. SCHWED and ZEK)

83.    Cokus hereby incorporates all other paragraphs of this pleading as though fully set forth herein at length.

84.    Cokus purchased services from Schwed and ZEK primarily for personal, family, or household purposes.

85.    Schwed and ZEK, by and through their unfair and deceptive practices set

20

forth herein, violated the Unfair Trade Practices and Consumer Protection Law (the "Act") in at least one or more of the following ways by:

> (iii)    Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another (i.e., Pena);
>
> (xi)    Promising or offering prior to time of sale to pay, credit or allow to any buyer (i.e., Pena or Cokus), any compensation or reward for the procurement of a contract for purchase of goods or services with another or others (i.e., Pena or Cokus), or for the referral of the name or names of another or others (i.e., Cokus) for the purpose of attempting to procure or procuring such a contract of purchase with such other person or persons when such payment, credit, compensation or reward is contingent upon the occurrence of an event subsequent to the time of the signing of a contract to purchase (i.e., the settlement of the *qui tam* action);
>
> (xv)    Knowingly misrepresenting that services (i.e, those of Pena's), replacements or repairs are needed if they are not needed; and
>
> (xxi)    Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding;

pursuant to 73 P.S. §201-2(4)(ii), (xi), (xv), and (xxi).

86.    Pursuant to the Act, Cokus' ascertainable loss of money are approximately the $500,000 purportedly payable to Pena (based upon his asserted 12.5%) and approximately the

21

$1,500,000 purportedly payable to Schwed and ZEK (based upon their asserted 37.5%), for total statutory damages of approximately $2,000,000.

87.    Pursuant to §201-9.2 of the Act, such ascertainable losses may be ***trebled*** by the Court in the form of a damage award to Cokus.

88.    In addition to trebling of damages, §201-9.2 of the Act authorizes the imposition of attorneys fees incurred in prosecuting a private action.

WHEREFORE, Cokus hereby demands judgment against Schwed and ZEK jointly, severally, and individually for the amount of $2,000,000 dollars, trebled to $6,000,000 dollars, as authorized by 73 P.S. §201-9.2, plus costs and attorneys' fees and relief as authorized by 73 P.S. §201-9.2.

## COUNT III

## CIVIL CONSPIRACY

## COKUS v. SCHWED and ZEK

89.    Cokus hereby incorporates all other paragraphs of this pleading as though fully set forth herein at length.

90.    Schwed, ZEK, and Pena entered into an unlawful and wrongful civil conspiracy to mislead and defraud Cokus.

91.    Schwed, ZEK, and Pena, acting in concert, conspired with one another to damage and injure Cokus through their unlawful and wrongful conduct described herein, and took numerous overt acts affecting interstate commerce to advance such conspiracy.

92.    In pursuing their common plan, scheme, and design to injure Cokus, Schwed, ZEK, and Pena have caused substantial financial and emotional damage to Cokus.

22

93.    Schwed, ZEK, and Pena's actions were without justification or privilege.

94.    Schwed, ZEK, and Pena's conduct was willful, wanton, and outrageous such as to warrant the imposition of punitive damages.

WHEREFORE, Cokus hereby demands judgement against Schwed and ZEK jointly, severally, and individually for an amount in excess of Seventy-Five Thousand ($75,000) Dollars, together with such other costs, interest, fees and relief as the court deems just.

## COUNT IV

## BREACH OF FIDUCIARY DUTY

## COKUS v. SCHWED and ZEK

95.    Cokus hereby incorporates all other paragraphs of this pleading as though fully set forth herein at length.

96.    Cokus and Schwed and ZEK had an attorney/client relationship which started when Cokus first consulted with Schwed and ZEK about the prospects of the *qui tam* action against B-MS.

97.    Schwed and ZEK, as counsel for Cokus, owed Cokus various fiduciary duties, including a duty of undivided loyalty.

98.    Schwed and ZEK also owed Cokus the fiduciary duty of avoiding engaging in conflicts of interest.

99.    "There are few of the business relations in life involving a higher trust and confidence than those of attorney and client or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit,

23

and to be watchful and industrious, to see that confidence thus shall not be used to the detriment or prejudice of the rights of the party bestowing it." *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277, 1283 (Pa. 1992) *quoting Stockton v. Ford*, 52 U.S. 232, 247 (1850).

100.    Schwed and ZEK beached their fiduciary duties owed to Cokus in at least the following ways:

i.    Communicating confidential attorney/client communications (writings, telephone number, and conversations) to Pena (and perhaps others) without the consent of Cokus;

ii.    Intentionally failing to disclose to Cokus the Secret Agreement and failing to advise her to seek independent counsel as to it;

iii.    Intentionally failing to disclose to Cokus they drafted the Secret Agreement.

iv.    Failing to advise Cokus that, upon information and belief, Pena was not licensed as a private investigator in Pennsylvania or New York and, to the extent he was investigating in Pennsylvania or New York, as alleged in Pena's Complaint, he was doing so against the law;

v.    Charging excessive amounts (37.5% to ZEK and allegedly 12.5% to Lynch International, Inc.) to represent Cokus in the Action;

vi.    Failing to advise Cokus that Schwed was representing Pena in a litigation matter at the same time he was representing Cokus;

vii.    Failing to explain to Cokus the doctrine of conflict of interest and how this doctrine could interfere with Schwed and ZEK's ability to represent Cokus

24

with undivided loyalty;

viii.    Failing to explain to Cokus that neither Schwed nor ZEK had ever, upon information and belief, prosecuted a *qui tam* action prior to working on the Action;

ix.    Engaging in a scheme whereby Schwed and ZEK, in concert with Pena, attempted to compensate a non-lawyer (Pena) as a "runner," contrary to the laws of Pennsylvania and New York.

x.    Failing to perform all legal and investigative services required of them, by hiring Howard Brown to purportedly represent Cokus without her permission or authority, and by purporting to have Cokus hire Pena.

101.    As a direct and proximate cause of the aforementioned breaches of fiduciary duties, Cokus has sustained substantial financial and emotional damages warranting the disgorgement of all fees paid to or to be paid to Schwed and ZEK pursuant to *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277, 1283 (Pa. 1992); *Zeiden v. Oliphant*, 54, N.Y.S.2d 27 (Sup.Ct. 1945).

WHEREFORE, Cokus hereby demands judgement against Schwed and ZEK jointly, severally, and individually for an amount in excess of Seventy-Five Thousand ($75,000) Dollars, together with such other costs, interest, attorneys' fees and relief as the court deems just, including the disgorgement and payment to Cokus of the 37.5% contingent fee claimed by Schwed and ZEK. Cokus also requests that punitive damages be assessed against both Schwed and ZEK jointly, severally, and individually based upon their outrageous, wanton, and malicious conduct.

25

## COUNT V

## BREACH OF CONTRACT

## COKUS v. SCHWED and ZEK

102.    Cokus hereby incorporates all other paragraphs of this pleading as though fully set forth herein at length.

103.    Cokus, Schwed and ZEK entered into a Retainer Agreement whereby Schwed and ZEK agreed to act as Cokus' attorneys in the Action against B-MS in consideration of receiving a contingency fee.

104.    As Cokus' attorneys, Schwed and ZEK were bound by the duty to strictly adhere to the New York Lawyer's Code of Professional Responsibility, as to which Schwed and ZEK were in violation by:

    i.    Communicating confidential attorney/client communications (writings, telephone number, and conversations) to Pena (and perhaps others) without the consent of Cokus;

    ii.    Intentionally failing to disclose to Cokus the Secret Agreement and failing to advise her to seek independent counsel to advise her on the document;

    iii.    Failing to advise Cokus that, upon information and belief, Pena was not licensed as a private investigator in Pennsylvania or New York and, to the extent he was investigating in Pennsylvania or New York, as alleged in Pena's Complaint, he was doing so against the law;

    iv.    Charging excessive amounts (37.5% to ZEK and allegedly 12.5% to Lynch International, Inc.) to represent Cokus in the Action;

26

v.    Failing to advise Cokus that Schwed was representing Pena in a litigation

matter at the same time he was representing Cokus;

vi.    Failing to explain to Cokus the doctrine of conflict of interest and how this

doctrine could interfere with Schwed and ZEK's ability to represent Cokus

with undivided loyalty;

vii.    Failing to explain to Cokus that neither Schwed nor ZEK had ever

prosecuted a *qui tam* action prior to working on the Action;

viii.    Engaging in a scheme whereby Schwed and ZEK, in concert with Pena,

attempted to compensate a non-lawyer (Pena) as a "runner," contrary to

the laws of New York.

105.    Further, Schwed and ZEK were to perform all legal and investigative

services, not Pena, and not Howard Brown.

106.    Schwed and ZEK's breaches of contract were the direct and proximate

cause of substantial financial and emotional damages to Cokus.

WHEREFORE, Cokus hereby demands judgement against Schwed and ZEK jointly,

severally, and individually for an amount to be determined by the evidence addressed at trial and

in excess of Seventy-Five Thousand ($75,000) Dollars, together with such other costs, interest,

fees and relief as the court deems just, including the disgorgement and payment to Cokus of the

37.5% contingent fee claimed by Schwed and ZEK.

## COUNT VI

## LEGAL MALPRACTICE - NEGLIGENCE

## (COKUS v. SCHWED and ZEK)

107.    Cokus hereby incorporates all other paragraphs of this pleading as though fully set forth herein at length.

108.    Schwed and ZEK were engaged by Cokus as her attorneys to protect Cokus' interests and to prosecute Cokus' claims against B-MS.

109.    As a result of such engagement, Schwed and ZEK had a duty to protect Cokus' interests at all times relating to their representation of Cokus.

110.    Schwed and ZEK committed negligence in that they failed to exercise the ordinary skill, care, and knowledge in performing their duties on behalf of Cokus that are exercised by attorneys practicing law of the type and in the locale as Defendants.

111.    As a direct and proximate result of Schwed and ZEK's failure to exercise such ordinary skill, care, and knowledge, Cokus incurred substantial financial and emotional damages.

112.    Schwed, ZEK and Pena's conduct was reckless, wanton, and outrageous such as to warrant the imposition of punitive damages.

WHEREFORE, Cokus hereby demands judgement against Schwed and ZEK jointly, severally, and individually for an amount in excess of Seventy-Five Thousand ($75,000) Dollars, together with such other costs, interest, fees and relief as the court deems just.  Cokus hereby also requests disgorgement of any and all fees claimed by Schwed and ZEK pursuant to the Retainer Agreement and the payment of the same to Cokus.

## COUNT VII

## LEGAL MALPRACTICE - RESPONDEAT SUPERIOR

## (COKUS v. ZEK)

113.    Cokus hereby incorporates all other paragraphs of this pleading as though fully set forth herein at length.

114.    At all times relevant to the allegations contained in this complaint, Schwed was an officer, shareholder, employee or agent of ZEK working within the scope of his employment and with the knowledge and consent of ZEK.

115.    ZEK is liable to Cokus for the conduct of Schwed as set forth herein pursuant to the doctrine of respondeat superior.

WHEREFORE, Cokus hereby demands judgement against ZEK for an amount in excess of Seventy-Five Thousand ($75,000) Dollars, together with such other costs, interest, fees and relief as the court deems just.  Cokus hereby also requests disgorgement of any and all fees claimed by ZEK pursuant to the Retainer Agreement and the payment of the same to Cokus.

## COUNT VIII

## DECLARATORY JUDGEMENT

## COKUS v. SCHWED and ZEK

116.    Cokus hereby incorporates all other paragraphs of this pleading as though fully set forth herein at length.

117.    The purported contract attached to Plaintiff's Complaint as Exhibit 3, dated July 13, 2001, was prepared and presented to Cokus under false, fraudulent, and misleading circumstances.

29

118. Further, the purported contract was prepared, produced, and borne of conflicts of interest between Pena, Cokus, and Schwed.

119. Cokus never knowingly or voluntarily entered into or agreed to any such purported contract.

WHEREFORE, Cokus respectfully requests that this Court declare the purported contract dated July 13, 2001, null and void, to order Schwed and ZEK to reimburse Cokus all damages sustained by way of the creation of the Secret Agreement, and to enter such other relief, including for costs and attorneys fees, as the Court deems just.

## COUNT IX

## DECLARATORY JUDGMENT

## (COKUS v. SCHWED and ZEK)

120. Cokus hereby incorporates all other paragraphs of this pleading as though fully set forth herein at length.

121. The Retainer Agreement dated July 16, 2001, is void as against public policy.

122. Further, the Retainer Agreement dated July 16, 2001, has been materially breached in numerous respects, and has therefore been repudiated by Defendants.

WHEREFORE, Cokus respectfully requests that this Count declare the Retainer Agreement dated July 16, 2001, null and void, to order that the 37.5% contingent fee claims by Schwed and ZEK be paid to Cokus, and to enter such other relief, including for costs and attorneys fees, as the Court deems just.

## COUNT X

## PRELIMINARY INJUNCTION

## (COKUS v. SCHWED and ZEK)

123.    Cokus hereby incorporates all other paragraphs of this pleading as though fully set forth herein at length.

124.    Cokus has been informed through counsel for Schwed and ZEK that upon her request, ZEK has escrowed the 37.5% fee to which Schwed and ZEK claim they are entitled pursuant to the Retainer Agreement, and that ZEK also escrowed the 12.5% fee to which Pena claims he is entitled pursuant to the Secret Agreement.

125.    Cokus has also put Schwed and ZEK on notice to preserve all documents relating in any way to the B-MS Action and to refrain from destroying same.

126.    If Schwed and ZEK fail to maintain these funds in an interest bearing client trust account, said dissipation of funds will cause Cokus irreparable harm and injury.

127.    If Schwed and ZEK fail to maintain and preserve all documents relating in any way to the B-MS Action, said destruction of documents will cause Cokus irreparable harm and injury.

128.    Unless Schwed and ZEK are preliminarily enjoined from disbursing the aforementioned funds from Schwed and ZEK's trust account until the resolution of this action, and preserving all documents relating in any way to the B-MS Action, Schwed and ZEK will reap the reward of their wrongful, unlawful, and illegal conduct.

129.    Cokus is entitled to an injunction enjoining Schwed and Cokus from (i) dissipating or disbursing any portion of the 37.5% fee to which Schwed and ZEK claim they are

31

entitled pursuant to the Retainer Agreement; (ii) dissipating or distributing the 12.5% fee to which Pena believes he is entitled pursuant to the Secret Agreement; (iii) removing the 37.5% and 12.5% disputed fees from Schwed and ZEK's client trust account until the conclusion of this action; and (iv) to desist from destroying any and all documents relating to the B-MS Action.

130.    An injunction would maintain the status quo and prevent Schwed and ZEK from further harming Cokus.

131.    The equities favor the grant of the injunction.

132.    Public policy favors the grant of the injunction to keep persons/entities such as Schwed and ZEK from conspiring to take unlawful actions and from abusing their fiduciary relationships for their personal gain.

WHEREFORE, Cokus respectfully requests the entry of an order of this Court enjoining Schwed and ZEK and any other person, entity, business or company with which they are associated, to immediately desist from removing dissipating or the 37.5% and 12.5% disputed fees from Schwed and ZEK's client trust account until the conclusion of this action, and from destroying any and all documents relating to the B-MS Action. Cokus further requests an award of costs and attorneys fees and for such other and further relief as this court shall deem just and appropriate.

## COUNT XI

## INDEMNIFICATION

## (COKUS v. SCHWED AND ZEK)

133.    Cokus hereby incorporates all other paragraphs of this pleading as though fully set forth herein at length.

134.    Schwed and ZEK have placed Cokus in a position of being at risk to Pena for 12.5% of the relator's fee she is otherwise entitled to as a result of the settlement of the B-MS *qui tam* action.

135.    Further, Schwed and ZEK have placed Cokus in a position of being a Defendant in this litigation originated by Pena based upon the Secret Agreement, thus forcing Cokus to incur substantial legal fees.

136.    In addition, Schwed and ZEK have placed Cokus in a position to be without the 12.5% of the relator's fees she would otherwise be entitled to as a result of the settlement of the B-MS *qui tam* action, and thus having to forego the interest on such funds.

WHEREFORE, Cokus respectfully requests indemnification from Schwed and ZEK as to all principal, interest, and attorneys fees incurred or forsaken as a result of Pena's claims against Cokus, as set forth in Plaintiff's Complaint, and for the imposition of such other relief as the Court deems just.

## COUNT XII

## ACCOUNTING

## COKUS v. SCHWED and ZEK

137.    Cokus hereby incorporates all other paragraphs of this pleading as though fully set forth herein at length.

138.    Cokus is entitled to an accounting from Schwed and ZEK for (i) all payments received by Schwed and ZEK relating in any way to the Retainer Agreement; (ii) all billings and hourly work performed by Schwed and ZEK relating in any way to the Retainer Agreement or the prosecution of the Cokus *qui tam* action; (iii) all payments made by Schwed

33

and ZEK relating in any way to the Retainer Agreement; (iv) for all payments made by Schwed and ZEK to Octavio Pena for the last ten years; and (vii) for all revenues and profits obtained by Schwed and ZEK relating in any way to the Action.

139.    Cokus is also entitled to an accounting of all transactions, representations, and financial arrangements between Schwed, ZEK, and Pena as to any other case or client where (1) Schwed or ZEK represented Pena or Lynch International, Inc., or (2) where Schwed or ZEK represented a client to which Pena originated, or for which Pena was retained or in any way compensated.

140.    Defendants Schwed and ZEK (together with co-conspirator Pena) are in sole possession of all such information.

141.    As fiduciaries, Schwed and ZEK are bound to fully account to Cokus as to all such matters.

WHEREFORE, Cokus hereby demands judgement against Schwed and ZEK for an accounting of all amounts and transactions as set forth herein.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

By:_____
George Bochetto, Esquire
Jeffrey W. Ogren, Esquire
Attorneys for Kathy Cokus

Date:

34

## VERIFICATION

I, Kathy Cokus, Third Party Plaintiff in the instant action, verify that the statements made in the foregoing Complaint Against Additional Defendants are, to the best of my knowledge, true and correct. I understand that false statements made herein are subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities. I further state that certain legal positions and the description of the significance and effect of certain facts have been drafted within the Complaint against additional Defendants Schwed and ZEK by my attorneys.

Date: 9/30/07

Kathy Cokus

# EXHIBIT "H"

# BOCHETTO & LENTZ

A PROFESSIONAL CORPORATION

GEORGE BOCHETTO†
GAVIN P. LENTZ*
JEFFREY W. OGREN*
STEPHEN E. SKOVRON*
DAVID P. HEIM*
VINCENT van LAAR *
SCOTT P. SIGMAN*
TODD S. McGARVEY*
TRICIA DESMARIAS

DAVID J. PERLMAN*
OF COUNSEL

CORA O'DONNELL, J.D.
LYNNE T. NUCCI, C.E.B.S.
MARIA TROUT
JANINE BAKER
PARALEGALS

PRACTICE DEDICATED TO LITIGATION MATTERS

ATTORNEYS AT LAW
1524 LOCUST STREET
PHILADELPHIA, PA  19102
—
TELEPHONE: (215) 735-3900
TELECOPIER: (215) 735-2455
—
E-MAIL ADDRESS:
gbochetto@bochettoandlentz.com
WEBSITE: bochettoandlentz.com

NEW JERSEY OFFICE
—
1230 BRACE ROAD
CHERRY HILL, NEW JERSEY  08034
TELEPHONE NUMBERS:
(856) 722-9595
(856) 427-0631
TELECOPIER: (856) 722-5511
—

†ALSO ADMITTED TO NEW YORK BAR
*ALSO ADMITTED TO NEW JERSEY BAR

October 30, 2007

## <u>VIA OVERNIGHT MAIL - SIGNATURES REQUIRED</u>

Nathan Schwed, Esquire
575 Lexington Avenue
New York, NY 10022

Zeichner, Ellman & Krause, LLP
575 Lexington Avenue
New York, NY 10022

RE:  **Octavio Pena v. Kathy Cokus v. Schwed and Zeichner, et al.**
**Bucks County CCP; No.  07-08068-29-1**

Dear Gentleman:

Enclosed please find a copy of the Defendant's Complaint against you, the original of which is being filed of record in the above-referenced matter. This letter and enclosure, coming to you by overnight mail, constitutes Service of Process pursuant to the Pennsylvania Rules of Civil Procedure.

Thank you for your time and attention to this matter.

Sincerely,

**BOCHETTO & LENTZ, P.C.**

By: _____
George Bochetto

GB/jr
Encl.
cc: John B. Harris, Esquire (via overnight mail)
Arnold I. Kalman, Esquire (via overnight mail)