# EXHIBIT B

ARNOLD I. KALMAN, ESQUIRE
Identification No.   17593
245 South Hutchinson Street
Philadelphia, PA 19107
(215) 829-9613

**ATTORNEY FOR PLAINTIFF**

| | | |
|---|---|---|
| Octavio Pena | : | BUCKS COUNTY |
| 5835 Upper Mountain Road | : | COURT OF COMMON PLEAS |
| New Hope PA. 18938 | : | TRIAL DIVISION |
| | : | |
| Plaintiff. | : | |
| | : | |
| VS. | : | |
| | : | Civil Action No. 07-08068-29-1 |
| Kathy Cokus | : | |
| 1816 Polo Run Drive | : | |
| Morrisville, PA 19067 | : | |
| Defendant. | : | |

## Complaint In Civil Action

## Plaintiffs' Complaint In Civil Action

Plaintiff, Octavio Pena, by his attorney, files this complaint against defendant, Kathy Cokus, and alleges:

### I. The Parties

#### A. Plaintiff

1.    Plaintiff, Octavio Pena ("Mr. Pena"), is a Pennsylvania citizen and resides, in Bucks County, at 5835 Upper Mountain Road, New Hope, PA 18938.

2.    Mr. Pena is a professional investigator with almost 40 years of experience in this field.

3.    Mr. Pena offers his investigative services and capabilities to the public, including individuals, corporations and the United States Government.

4.    The United States District Court for the Eastern District of New York, the Federal Bureau of Investigation, the Organized Crime Strike Forces of the Unites States Department of Justice and the United States Attorneys' Offices for the Southern District of New York, Eastern District of New York and Southern District of California, have used Mr. Pena's investigative capabilities to serve the United States. See Exhibit 1.

5.    And representatives of the United States Customs Service, United States Drug Enforcement Agency and Criminal Investigation Division of the Internal Revenue Service have collaborated with Mr. Pena and drawn on his expertise to serve the United States. See Exhibit 2.

1

6.      Mr. Pena's career, in private investigation, through 1996, is the subject of extensive coverage in the book he co-authored, entitled <u>The Pena Files: One Man's War Against Federal Corruption and the Abuse of Power</u>, published, August 1996, by Harpercollins.

### B. Defendant

7.      Defendant, Kathy Cokus ("Cokus"), is a Pennsylvania citizen and resides, in Bucks County, at 1816 Polo Run Drive, Morrisville, Pa 19067.

### II. Jurisdiction and Venue

8.      Jurisdiction in Pennsylvania and venue in Bucks County are proper in because the Cokus is found, resides, lives and regularly conducts business there, and the facts, circumstances and events giving rise to Mr. Pena's claims occurred in Bucks County, Pennsylvania.

### III. Summary of Complaint

9.      A <u>qui tam</u> or "whistleblower" suit, under the False Claims Act, 31 U.S.C. §3729-3733, permits a private person to sue on behalf of the United States, and if the Government is successful in resolving or litigating the claim, the <u>qui tam</u> plaintiff or "whistleblower" may receive a share of the proceeds the Government recovers.

10.     Cokus retained Mr. Pena to investigate the basis for a <u>qui tam</u> claim, on behalf of the United States Government, against her former employer, Bristol Myers-Squibb Company, and thereafter retained the Manhattan, New York-law of firm of Zeichner, Ellman & Krause LLP to prosecute such a claim against the

2

company, along with Mr. Pena, on the basis of the fraudulent business practices of the company which Mr. Pena uncovered during the course of his investigation.

11.    On July 13, 2001, Cokus contracted, in writing, with Mr. Pena to share with him the proceeds she would receive from the United States Government arising out of the <u>qui tam</u> lawsuit.  <u>See</u> Exhibit 3.

12.    Cokus agreed with Mr. Pena to have him receive 12½% of the proceeds she would receive from the Government stemming from the <u>qui tam</u> lawsuit.  <u>See</u> Exhibit 3.

13.    Cokus reaffirmed her agreement with Mr. Pena, on July 17, 2001, when she signed a similar contract with the law firm of Zeichner, Ellman & Krause LLP, promising the law firm that it would receive 37½% of the proceeds she would receive from the United States Government as a result of the <u>qui tam</u> lawsuit.  <u>See</u> Exhibit 4.

14.    And again, on January 11, 2007, Cokus reaffirmed the agreement she made with Mr. Pena for him to receive 12½% of the proceeds she would receive from the Government stemming from the <u>qui tam</u> lawsuit.  <u>See</u> Exhibit 5.

15.    Under the terms of the written agreements she made with Mr. Pena (Exhibit 3) and Zeichner, Ellman & Krause LLP (Exhibit 4), Cokus thus agreed with them she would receive 50% of the proceeds from the <u>qui tam</u> lawsuit, Mr. Pena would receive 12½% of the proceeds and the law firm would receive 37½% of the proceeds.

3

16.    On or about September 20, 2007, the United States Government formally notified Zeichner, Ellman & Krause LLP that Cokus would receive $4 million as her share of the settlement the Government reached with Bristol Myers-Squibb, and a check covering her portion of the settlement would be transmitted to Zeichner, Ellman & Krause LLP, in or about, ten days to two weeks.

17.    When Cokus received word from Zeichner, Ellman & Krause LLP of this, she became immediately overwhelmed by greed and disavowed she had made any agreement with Mr. Pena to share with him the proceeds she would receive from the Government.

18.    And shortly thereafter, she challenged the right of Zeichner, Ellman & Krause LLP for it to receive its full share of the proceeds to which she had agreed it would receive in writing. See Exhibit 6.

19.    On Friday, September 28, 2007, the United States Department of Justice formally announced it had reached a settlement with Bristol Myers-Squibb in which the company would pay the Government more than $515 million to resolve allegations by the Government of fraudulent business practices by the company. See Exhibit 7.

20.    The Government identified six qui tam plaintiffs, including Cokus, to share approximately $50 million in settlement proceeds.

21.    Mr. Pena thereupon commenced an action by Writ of Summon against Cokus for her having broken her word to him and breached their contract, wherein she had promised he would receive from her 12½% of the proceeds – the equivalent

4

of $500,000.

## IV. Operative Facts

**A.    Cokus seeks the assistance of Mr. Pena to resolve civil and criminal actions in which she is involved.**

22.    In or about mid-May 2001, Cokus reached-out to Mr. Pena to discuss with him civil and criminal proceedings in which she was involved and to explore with him his availability to resolve them for her.

23.    Mr. Pena explained to Cokus though he was by profession an experienced private investigator, he was not then actively practicing his profession, but would, nonetheless, attempt to assist her.

24.    Cokus then told Mr. Pena she was a widow – her husband was diagnosed having Aids, but he had died from wounds he suffered in an attempt to commit suicide, he shot himself in the stomach. Mr. Pena asked Cokus why did her husband shoot himself in the stomach, because he understood normally when a person wants to kill himself or herself, and avoid the agony of a wound, he or she shoots oneself in the head. Cokus responded by telling him, her husband had a pain in the liver and shooting himself in this area would cure him of his pain.

25.    Cokus said she was living on disability benefits and everything she had was riding on the outcome of a lawsuit she had brought against Bristol Myers-Squibb, her employer of more than 20 years.

26.    And then Cokus told Mr. Pena she had been charged with violations of the Pennsylvania criminal laws and had been found guilty of two of those charges,

and had also been briefly suspected by the police to have murdered her husband, but his death was later determined to be suicide, based on the admission he had made on his deathbed that he had attempted to commit suicide.

27.    Cokus blamed her community's chief of police for the reason she had been prosecuted because he had it-out-for her, telling Mr. Pena she had sued the police chief in order to reclaim from the police the semi-automatic handgun her husband had used to attempt suicide and her lawsuit had caused the chief of police to be removed temporarily from office. See Exhibit 8.

28.    Cokus told Mr. Pena she had wanted the police chief to return to her the gun because it had "sentimental value" for her, since it was one of the last things her husband had touched, but the police chief had said no.

1.    **Cokus explains her criminal conviction.**

29.    Cokus specifically told Mr. Pena she had been falsely charged by her community's police, on January 19, 1999, with assault, reckless endangerment and making terroristic threats. See Exhibit 9.

30.    Cokus said to him the criminal charges arose-out of a confrontation she had with four teenage boys outside her apartment complex, during which the teenagers claimed she pointed a semi-automatic handgun at them (indeed, this was the handgun her husband had used in his attempt to commit suicide), threatened to shoot them and yelled-out-loud at them "I am a psycho."

31.    Cokus then told Pena she was later convicted by the Bucks County Court of Common Pleas for assault and reckless endangerment, and though she

6

could have been sentenced to as much as two years in jail, she received a sentence of four years probation and was required to turn-over the semi-automatic handgun she had pointed at the teenagers.

32.    Mr. Pena asked Cokus to show him newspaper accounts of the incident and she later did.

33.    The newspaper coverage of the incident ran headlines (Exhibit 10):

a.    "Psycho Lady? Skateboard Kids: Woman Waved Hubby's Suicide Gun, Said, 'I'm a Psycho'/ Gunning for Kids? Kids: Woman threatened to shoot/ Kathy Cokus is accused of terroristic threats and reckless endangerment for waving a gun" (Trentonian, Friday, March 5, 1999);

b.    "Gun-waving woman gets probation/Kathy Cokus was convicted of pointing a gun at four skateboarders after they insulted her for wearing spandex pants" (Bucks County Courier Times, Friday, June 19, 1999); and

c.    "After verdict, woman ordered to turn in guns/ The judge found a Lower Makefield woman guilty of some charges and not others/ But he said he believed the kids who said Kathy Cokus pointed a gun at them" (Bucks County Courier Times, Sunday, June 20, 1999).

34.    In Trentonian account of the incident for which she was criminally prosecuted, the paper attributes to the thirteen year-old complainant the statement: "Then she pulled a gun out of her waist and said, 'I'm psycho. I'll kill you, and I don't care about going to jail." "She said she was crazy and she would (shoot) because she doesn't care if she gets in trouble."

7

2.  **Cokus next explains to Mr. Pena the civil litigation in which she is involved with Bristol Myers-Squibb's U.S. Pharmaceutical Group and its President.**

35.   Cokus then explained to Mr. Pena she was on disability leave from Bristol Myers-Squibb's U.S. Pharmaceutical Group.

36.   And Cokus told Mr. Pena she had brought a lawsuit against Bristol Myers-Squibb's U.S. Pharmaceutical Group and its president, in New Jersey state court, alleging violations of New Jersey's Conscientious Employee Protection Act, N.J.S.A. 34.19-1 to -8.

37.   Cokus told Mr. Pena that the actions taken by Bristol Myers-Squibb's U.S. Pharmaceutical Group and its president caused her to have psychiatric problems which ended her career with the company.

38.   Cokus blamed her problem here because she had reported to the company's president unethical conduct by company's executives.

39.   Cokus then said after her co-workers learned of what she had done, they retaliated by ostracizing her and then her superiors started to give her unfavorable performance evaluations, and immediately thereafter she started to have psychiatric problems.

40.   She next told Mr. Pena there had been a number of set-backs in her lawsuit against Bristol Myers-Squibb's U.S. Pharmaceutical Group, and she was not satisfied at all with the performance of her lawyer in the case.

### 3.   Cokus explains other matters to Mr. Pena affecting her.

41.   Cokus explained the chauffeur of the president of Bristol Myers-Squibb's U.S. Pharmaceutical Group, who she said was a drug dealer, had tried to set-her-up with a cocaine deal.

### B.   Mr. Pena focuses on Cokus' allegations of fraudulent business practices by Bristol Myers-Squibb.

42.   Mr. Pena offered to explore the issues for which Cokus asked his assistance.

43.   Mr. Pena immediately asked Cokus to permit him to have full and complete access to all the documents Cokus and her lawyer had in their possession relating to her claims against Bristol Myers-Squibb's U.S. Pharmaceutical Group.

44.   Cokus granted Mr. Pena's request and he was given access thousands of pages of records generated by the lawsuit Cokus had brought against Bristol Myers-Squibb's U.S. Pharmaceutical Group in New Jersey state court.

45.   These records included pleadings, documents received in discovery and transcripts of deposition testimony of Bristol Myers-Squibb's U.S. Pharmaceutical Group executives.

46.   Mr. Pena examined and studied these records extensively for over two weeks, and communicated several times a day with Cokus to draw from her facts relevant to his investigation.

47.   Afterwards, Mr. Pena explained to Cokus his investigation showed there to be a basis for a qui tam lawsuit against Bristol Myers-Squibb over its

fraudulent business practices which he had uncovered in the course of his initial

two week intensive investigation.

48.     Mr. Pena told Cokus he could work with her to bring a <u>qui tam</u> lawsuit

against Bristol Myers Squibb, and then afterwards look into whether there was a

basis for the criminal charges to have been brought against her.

49.     Cokus agreed to work with Mr. Pena toward this end.

50.     Cokus told Mr. Pena she did not have any money at all with which to

compensate him for the time he expended and costs he incurred thus far, because

she had spent all her money on lawyers (a) to defend her against the criminal

charges for which she was convicted and (b) to prosecute her New Jersey lawsuit

against Bristol Myers-Squibb's U.S. Pharmaceutical Group.

51.     Cokus then agreed with Mr. Pena that he would be compensated for

the time he expended and costs he incurred thus far, and would in the future, based

on a percentage of whatever recovery she would receive that was derived from

Bristol Myers-Squibb.

52.     Cokus and Mr. Pena did not agree then on the specific percentage of

the recovery that she would pay him, but afterwards Cokus did reach an agreement

with Mr. Pena that he would receive 12½%.

> **C.     Cokus requests that Mr. Pena arrange to have the law firm of
> Zeichner, Ellman & Krause LLP work with him in the
> prosecution of the <u>qui tam</u> claim against Bristol Myers-Squibb.**

53.     In June 2001, Mr. Pena arranged with Cokus for her to meet with

representatives of the law firm of Zeichner, Ellman & Krause LLP, with whom he

had discussed undertaking the prosecution of the qui tam claim against Bristol
Myers-Squibb.

54.    In extensive meetings with Cokus, throughout the first three weeks of
June 2001, Mr. Pena obtained pertinent information from Cokus to support the qui
tam claims and correlated this information with documents he had inspected and
examined, and thereafter selected to support the qui tam claims.

55.    Mr. Pena's meetings with Cokus were only interrupted once, during
this period, and only because of an appointment Cokus had to meet with her
probation officer.

56.    Mr. Pena assembled his work-product and afterwards transmitted a
banker box of documents and supporting data to Zeichner, Ellman & Krause LLP.

57.    Mr. Pena, thereafter, arranged meetings between representatives of
Zeichner, Ellman & Krause LLP and Cokus to discuss the merits of the qui tam
claims and he participated with the law firm and Cokus throughout this process.

58.    Being convinced by Mr. Pena of the merits of the qui tam claim,
Zeichner, Ellman & Krause LLP agreed to prosecute the case.

59.    Thereupon, Mr. Pena and Cokus formalized, in writing, the
arrangement they made by which Cokus would share with Mr. Pena the proceeds of
the recovery she would receive from the United States Government arising out of
the qui tam claim.

60.    In an agreement that Zeichner, Ellman & Krause LLP had prepared
for both Mr. Pena and Cokus to sign, Cokus agreed that Mr. Pena would receive

12½% of the proceeds Cokus received from the United States Government.  See
Exhibit 3.

61.    Cokus signed this agreement she made with Mr. Pena, on July 13,
2001.  See Exhibit 3.

62.    Cokus, afterwards, on July 17, 2001, reaffirmed this agreement with
Mr. Pena, at the time at which she signed the retainer agreement, dated July 16,
2001, that Zeichner, Ellman & Krause LLP had prepared for her to sign with it.

63.    Under the arrangement Cokus reached with Zeichner, Ellman &
Krause LLP, she agreed for the law firm to receive 37½% of the proceeds she
received from the United States Government.  See Exhibit 4.

64.    Cokus signed the agreement embodying the arrangement she made
with Zeichner, Ellman & Krause LLP, on July 17, 2001.  See Exhibit 4.

65.    Once Cokus reached these agreements with Mr. Pena and Zeichner,
Ellman & Krause LLP, they diligently worked together, over the next two and one-
half months, to prepare the qui tam complaint they would file on behalf of the
United States against Bristol Myers-Squibb over its fraudulent business practices.

66.    Zeichner, Ellman & Krause LLP filed the complaint representing the
work of Mr. Pena and his investigation, on September 24, 2001.  See Exhibit 11.

67.    Thereafter, Mr. Pena continued to gather evidence to support the qui
tam claim against Bristol Myers-Squibb.

68.    Mr. Pena worked with Cokus in preparing her to testify before the
grand jury investigating Bristol Myers-Squibb's fraudulent business practices, and

12

selected documents for her to review to support her grand jury testimony.

69.    And afterwards, in response to requests made of Zeichner, Ellman & Krause LLP by federal prosecutors, who were responsible for the Government's grand jury investigation of Bristol Myers-Squibb, Mr. Pena gathered information and documents for the law firm to use to satisfy the federal prosecutors' requests.

**D.    Cokus reaffirms with Mr. Pena he is to receive 12½% of the proceeds which she receives from the Government, but then schemes to disavow the promise she had made to him.**

70.    For many months before December 20, 2006, Cokus anticipated she would receive a substantial portion of the recovery the United States Government intended to obtain from Bristol Myers-Squibb in settlement of the qui tam lawsuits.

71.    Cokus believed she would receive as much as 90% of the recovery the Government intended to pay-out to the qui tam plaintiffs; thus she anticipated she would share with Mr. Pena and Zeichner, Ellman & Krause LLP as much as $45 million.

72.    Cokus often told Mr. Pena she would use 50% share of the proceeds of to purchase a $7 million home on the shore of the Delaware River for her and her three dogs.

73.    However, on December 20, 2006, Cokus' daydream vaporized – she was told then by Zeichner, Ellman & Krause LLP she would receive the short-end of the settlement the Government arranged to receive from Bristol Myers-Squibb, and thus she would not be sharing $45 million with Mr. Pena and Zeichner, Ellman & Krause LLP, but between $3 million to $4.5 million with them.

74.    Cokus became immediately despondent, and anticipated, for no apparent reason,  the Government could possibly reduce her recovery to $1.5 million and for which – because of her arrangements with Mr. Pena and Zeichner, Ellman & Krause LLP – she then would receive only $750,000; and this amount was entirely insufficient for her to purchase the home she had dreamed of owning on the shores of the Delaware River. See Exhibit 12.

75.    Within a minute after Cokus informed Mr. Pena of her despondency which she had over this, she became overwhelmed with greed and contrived to deny Mr. Pena his share of the recovery and thereby increase her share – Cokus then informed Mr. Pena she had lost all her records relating to the qui tam case, including the agreements in which she undertook to share the recovery with Mr. Pena and Zeichner, Ellman & Krause LLP, and could not recall what their shares of the recovery were (Exhibit 13): "I had everything stolen from my car so I don't have one piece of paperwork.  In fact, I don't even know how much Nathan's firm takes from this .... that was in the box, too."

76.    This was damningly suspicious, since a minute before, she had determined her share of the proceeds from a $1.5 million recovery – that is 50% – would be $750,000, after taking into account the arrangements she had made with Mr. Pena and Zeichner, Ellman & Krause LLP.  See Exhibit 12.

77.    And because of her despondency, she became even more daring – on January 11, 2007, after Cokus reaffirmed in e-mail correspondence with Mr. Pena that he is to receive 12½% of the proceeds she receives from the Government – "I

14

completely forgot that you get 12.5%" – she predicted, in her next breath, she could

possibly forget she had made such an agreement with Mr. Pena – "I don't even

remember that at all.......isn't that weird?????"– (Exhibit 5): "Remember I told you I

had all my paperwork stolen from my car regarding all my cases? Well, I guess I

purposely put almost everything out of my mind because it's just too much. But, I

had absolutely zero recollection of how much Nathan's law firm was getting (what

percentage) and I completely forgot that you get 12.5%?????? I don't even remember

that at all.......isn't that weird?????"

78.    Cokus had become by then entirely overwhelmed by her greed.

E.    **Overwhelmed by her greed, Cokus disavows the agreement she
made with Mr. Pena, immediately after Zeichner, Ellman &
Krause LLP informs her that she is to receive $4 million as her
portion of the proceeds which the United States Government is
to receive from settlement of its claims over fraudulent
business practices by Bristol Myers-Squibb.**

79.    On or about September 20, 2007, Zeichner, Ellman & Krause LLP

informed Cokus that the United States Government intended to distribute $4

million to her as her allocation of the Government's settlement with Bristol-Myers

Squibb, and that Ms. Cokus' proceeds could be in-hand in as soon as ten days.

80.    Zeichner, Ellman & Krause LLP then asked her for permission for the

law firm to distribute to itself, from the check it anticipated receiving from the

Government, its share of proceeds she had undertaken to allocate to it under their

July 16, 2001 agreement.

81.    Cokus consented.

15

82.    At the same time, Zeichner, Ellman & Krause LLP asked her for authority to distribute to Mr. Pena, his share of the proceeds to which she had agreed with him, on July 13, 2001, he would receive.

83.    Cokus, however, refused to give Zeichner, Ellman & Krause LLP such authorization, and disavowed she had ever made such an arrangement with Mr. Pena.

84.    After Mr. Pena was informed by Zeichner, Ellman & Krause LLP that Cokus disavowed the agreement she made with him on July 13, 2001, Mr. Pena transmitted to her the agreement she made with him and she had signed. See Exhibits 3 and 14.

85.    Because Cokus continued to disavow the agreement she had made with Mr. Pena, Zeichner, Ellman & Krause LLP informed her she should seek-out other counsel to advise her.

86.    On July 25, 2007, Joel M. Friedman, Esquire, notified Zeichner, Ellman & Krause LLP that Cokus had selected him to represent her in her dispute with Mr. Pena.

87.    The next day, September 27, 2007, Mr. Friedman informed Mr. Pena's attorney that Cokus claimed she had not signed any agreement in which she arranged to have Mr. Pena receive 12½% of the recovery which she would receive from the United States Government.

88.    Then, immediately afterwards, Mr. Friedman telephoned Mr. Pena's attorney and told him that Cokus had selected another lawyer to represent her in

16

the matter and that he no longer would.

89.    In the afternoon of September 27, 2007, a new lawyer for Cokus materialized, George Bochetto, Esquire.

90.    Bochetto told Mr. Pena's attorney that Cokus had not signed the July 13, 2001 agreement, but if she had signed such an agreement, because of the circumstances under which she signed the agreement, the agreement was not enforceable.

91.    Bochetto demanded Mr. Pena relinquish entirely that to which he was entitled by his July 13, 2001 agreement with Cokus.  <u>See</u> Exhibit 6.

92.    Bochetto also challenged the arrangement Cokus made with Zeichner, Ellman & Krause LLP.  <u>See</u> Exhibit 6.

93.    And Bochetto demanded Zeichner, Ellman & Krause LLP relinquish 12½% of that to which it was entitled under the agreement it made with Cokus. <u>See</u> Exhibit 6.

94.    Bochetto thus demanded that Mr. Pena and Zeichner, Ellman & Krause LLP relinquish 25% of that to which Cokus had originally agreed they receive so that she would receive 75% of the proceeds, rather than 50% to which she originally agreed.

### V. Claim for Relief

### Count I
(For Breach of Contract)

95.    Mr. Pena repeats and incorporates by reference the allegations

contained in paragraphs 1 through 94 above as though the same were fully and completely set forth herein.

96.     Cokus agreed, in a writing she signed, that Mr. Pena would receive 12½% of the proceeds she received from the United States Government.

97.     Cokus breached the agreement she made with Mr. Pena by failing to pay him 12½% of the proceeds she received from the Government, the equivalent of $500,000.

98.     As a direct result of Cokus' breach, Mr. Pena has been denied the benefits of his contract with Cokus and has suffered damages in excess of $500,000.

WHEREFORE, plaintiff demands a determination that Cokus breached her agreement with him and demands judgment against Cokus for compensatory and punitive damages, litigation costs, reasonable attorneys' fees, pre-and post-judgment interest and such other relief as the Court deems appropriate.

ARNOLD I. KALMAN
Attorney Identification No. 17593
245 South Hutchinson Street
Philadelphia, Pennsylvania 19107
(215) 829-9613

**Attorney for Plaintiff,
Octavio Pena**

**Dated: October 1, 2007**

18

# VERIFICATION

I, Octavio Pena, hereby state:

1.      I am the plaintiff named in the Complaint;

2.      I verify that the statements made in the foregoing Complaint in Civil Action are true and correct to the best of my knowledge, information and belief; and

3.      I understand that the statements in the Complaint are made subject to the penalties of 18 Pa. C. S. §4904 relating to unsworn falsification to authorities.

10/1/07

_____
**Octavio Pena**

## CERTIFICATE OF SERVICE

I, Arnold I. Kalman, certify that, on October 1, 2007, I caused to be served, by hand delivery, Plaintiff's Complaint In Civil Action, on Gregory Bochetto, Esquire, at Bochetto & Lentz, 1524 Locust Street, Philadelphia, PA 19102, counsel for defendant, Kathy Cokus.

**ARNOLD I. KALMAN**
Attorney Identification No.  17593
245 South Hutchinson Street
Philadelphia, Pennsylvania 19107
(215) 829-9613

Attorney for Plaintiff,
Octavio Pena

**Dated: October 1, 2007**