# EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

ZEICHNER, ELLMAN & KRAUSE LLP,
Plaintiff and Interpleader Plaintiff,

                                  No. 07 CIV 9521 (JGK)(MHD)

         – against –

KATHY COKUS,
Defendant and Interpleader Defendant

and

OCTAVIO PENA,
Interpleader Defendant

------------------------------------------------------------x

OCTAVIO PENA,
Cross-Claim Plaintiff

         – against –

KATHY COKUS,
Cross-Claim Defendant

------------------------------------------------------------x

**Answer of Interpleader Defendant Octavio Pena and Amended Cross-Claim of Interpleader Defendant Octavio Pena against Interpleader Defendant Kathy Cokus**

**<u>JURY TRIAL DEMANDED</u>**

Interpleader defendant, Octavio Pena ("Pena"), by his attorneys, answers the Complaint of Zeichner Ellman & Krause LLP, and cross-claims against interpleader defendant, Kathy Cokus ("Cokus"), as follows:

**Answer to Complaint**

1.     Pena admits the allegations in this paragraph of the Complaint.

2.     Pena admits the allegations in this paragraph of the Complaint.

3.     Pena admits the allegations in this paragraph of the Complaint.

4.     Pena admits the allegation in this paragraph of the Complaint that plaintiff's action for interpleader is being brought, "pursuant to Rule 22 of the Federal Rules of Civil Procedure to resolve the claims of Cokus and/or Pena which affect the rights and duties of it." The remainder of the allegations made by plaintiff in this paragraph do not pertain to Pena, and therefore, to which he

is not required to respond.

    5.     Pena admits the allegations in this paragraph of the Complaint.

    6.     Pena admits the allegation in this paragraph that venue is proper in this Court, because the property subject to plaintiff's interpleader action is located in this district. Plaintiff denies the remainder of the allegations made by plaintiff in this paragraph.

    7.     Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

    8.     Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

    9.     Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

    10.    Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

    11.    Pena admits the allegations in this paragraph of the Complaint.

    12.    Pena admits the allegations in this paragraph of the Complaint.

    13.    Pena admits the allegations in this paragraph of the Complaint.

    14.    Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

    15.    Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

16.     Pena admits the allegations in this paragraph of the Complaint.

17.     Pena admits the allegations in this paragraph of the Complaint.

18.     Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

19.     Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

20.     Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

21.     Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

22.     Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

23.     Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

24.     Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

25.     Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

26.    Pena is not required by plaintiff to respond to the allegations made by it in this paragraph because plaintiff alleges such allegations do not pertain to the interpleader action that it brought against Pena.

27.    Pena re-alleges and incorporates by reference his answers to paragraphs 1 through 6, 11 through 13 and 16 through 17 of his Answer as though fully set forth herein.

28    Pena admits the allegations in this paragraph of the Complaint, and alleges and incorporates herein by reference his allegations against Cokus in paragraphs 1 through 136 of his Cross-Claim.

29.    Pena admits the allegations in this paragraph of the Complaint, and alleges and incorporates herein by reference his allegations against Cokus made in paragraphs 1 through 136 of his Cross-Claim.

30.    Pena admits the allegations in this paragraph of the Complaint.

31.    Pena admits the allegations in this paragraph of the Complaint, and consents to plaintiff's request to have the Court permit it to deposit into the Registry of the Court the sum of $499,766.93, representing 12.5% of the recovery received in the qui tam lawsuit and to which Pena is entitled to receive.

WHEREFORE, Pena prays that the Court enter a judgment permitting plaintiff to deposit into the Registry of the Court the sum of $499,766.93, which represents the 12.5% of the recovery to which Pena is contractually entitled by Cokus to receive.

## Cross-Claim of Octavio Pena against Kathy Cokus

Interpleader defendant, Octavio Pena, in the position of plaintiff, files this Cross-Claim against interpleader defendant, Kathy Cokus, who here is in the position of the cross-claim defendant, and alleges:

### I. The Parties

**A. Cross-Claim Plaintiff**

1.    Cross-Claim plaintiff, Octavio Pena ("Mr. Pena"), is a Pennsylvania citizen and

4

resides, in Bucks County, at 5835 Upper Mountain Road, New Hope, PA., 18938.

2.    Mr. Pena is a professional investigator with almost 40 years of experience in this field.

3.    Mr. Pena provided investigation and consulting services, during the period relevant to this Cross-Claim, through Lynch International, Inc. ("Lynch International"), a company which he owns and operates.

4.    Lynch International was licensed as a private investigator by the States of New York and New Jersey, through June 30, 2005, and February 26, 2003, respectively, and during then, the company designated Mr. Pena its principal representative.

5.    Mr. Pena, through Lynch International, has offered his investigative services and capabilities to the public, including individuals, corporations and the United States Government.

6.    The United States District Court for the Eastern District of New York, the Federal Bureau of Investigation, the Organized Crime Strike Forces of the Unites States Department of Justice and the United States Attorneys' Offices for the Southern District of New York, Eastern District of New York and Southern District of California, have used Mr. Pena's investigative capabilities to serve the United States.

7.    And representatives of the United States Customs Service, United States Drug Enforcement Administration and Criminal Investigation Division of the Internal Revenue Service have collaborated with Mr. Pena and drawn on his expertise to serve the United States.

**B. Cross-Claim Defendant**

8.    Cross-Claim defendant, Kathy Cokus ("Cokus"), is a Pennsylvania citizen and resides, in Bucks County, at 1816 Polo Run Drive, Morrisville, PA., 19067.

**II. Jurisdiction and Venue**

9.    Jurisdiction of the district court, under Rule 22 of the Federal Rules of Civil Procedure, and venue in this district, under 28 U.S.C. §1391(a)(2), are proper because the property subject to an interpleader action and this action are located in this district.  And the district court

5

has jurisdiction of the matter under principles of supplemental jurisdiction, pursuant to 28 U.S.C. §1367.

### III. Summary of Complaint

10.    A <u>qui</u> <u>tam</u> or "whistleblower" suit, under the False Claims Act, 31 U.S.C. §3729-3733, permits a private person to sue on behalf of the United States, and if the Government is successful in resolving or litigating the claim, the <u>qui</u> <u>tam</u> plaintiff or "whistleblower" may receive a share of the proceeds the Government recovers.

11.    Cokus retained Lynch International, and through it retained Mr. Pena, to investigate the basis for, and consult on, what later became a <u>qui</u> <u>tam</u> lawsuit, which she filed, on behalf of the United States Government, against her former employer, Bristol-Myers Squibb Company ("Bristol-Myers Squibb").

12.    Cokus insisted Mr. Pena convince the Manhattan, New York-based law of firm of Zeichner, Ellman & Krause LLP, to represent her to prosecute the <u>qui</u> <u>tam</u> lawsuit on her behalf.

13.    Mr. Pena convinced the law firm to undertake this <u>qui</u> <u>tam</u> lawsuit.

14.    Cokus, thereupon, retained Zeichner, Ellman & Krause LLP to prosecute such a claim against the company, in consultation with Mr. Pena, on the basis of the fraudulent business practices of the company which Mr. Pena uncovered during the course of his investigation.

15.    On July 13, 2001, Cokus contracted, in writing, to pay Lynch International 12½% of the proceeds she would receive from the United States Government relating to, or arising out of, the <u>qui</u> <u>tam</u> lawsuit. A true and correct copy of this contract is attached hereto as Exhibit 1.

16.    Cokus determined this percentage approximated a reasonable level of compensation for the services that Lynch International and Mr. Pena had rendered her and would render her in the future and for which she therefore should pay them.

17.    Cokus reaffirmed her agreement with Lynch International, on July 17, 2001, at the time she signed a contract with the law firm of Zeichner, Ellman & Krause LLP, promising the law firm that it would receive 37½% of the proceeds she would receive from the United States

6

Government relating to, or arising out of, the qui tam lawsuit. A true and correct copy of this contract is attached as Exhibit A to the Complaint of Zeichner Ellman & Krause LLP against Kathy Cokus, Case No. 07 CIV 9521.

18.    In an agreement made as of January 3, 2006, Lynch International assigned to Mr. Pena all rights to receive any and all monies due it or may become due it from Cokus and to sue Cokus for breach of contract, tort or other causes of action arising under, or relating to, the contract that Cokus made with it on July 13, 2001. A true and correct copy of the assignment agreement is attached hereto as Exhibit 2.

19.    Under the terms of the written contracts Cokus made with Lynch International (Exhibit 1) and Zeichner, Ellman & Krause LLP, Cokus thus agreed with them she would receive 50% of the proceeds from the qui tam lawsuit, Lynch International would receive 12½% of such and the law firm would receive 37½% of such.

20.    On or about September 20, 2007, the United States Government formally notified Zeichner, Ellman & Krause LLP that Cokus would receive approximately $4 million as her share of the settlement the Government reached with Bristol-Myers Squibb, and a check covering her portion of the settlement would be transmitted to Zeichner, Ellman & Krause LLP, in or about ten days to two weeks.

21.    When Cokus received word from Zeichner, Ellman & Krause LLP of this, she disavowed her contract with Lynch International and denied she had made any agreement whatsoever with Lynch International to pay it 12½% of that which she recovered from the qui tam lawsuit.

22.    And shortly thereafter, she challenged the right of Zeichner, Ellman & Krause LLP for it to receive its full share of the proceeds.

23.    On Friday, September 28, 2007, the United States Department of Justice formally announced that it had reached a settlement with Bristol Myers-Squibb in which the company would pay the Government more than $515 million to resolve allegations by the Government of fraudulent

business practices by the company.

24.   The Government identified six qui tam plaintiffs, including Cokus, to share approximately $50 million in settlement proceeds.

25.   Mr. Pena has commenced this action against Cokus (a) for her having broken her word to Lynch International and him, and thereby having breached their contract, wherein she had promised to pay Lynch International 12½% of the proceeds she recovered–the equivalent of approximately $500,000, and (b) for making intentionally false statements.

26.   And Mr. Pena has commenced this action against Cokus, on the basis of the legal principles of quantum meruit and unjust enrichment, to receive reasonable compensation from Cokus for Lynch International and him for the services that they performed for Cokus, at her insistence, and from which she has directly benefitted and been enriched thereby.

27.   The reasonable amount of compensation for which Lynch International and Mr. Pena are entitled to receive from Cokus exceeds $500,000.

28.   There is pending, in the Court of Common Pleas of Bucks County, Pennsylvania, an action Mr. Pena brought against Cokus, on September 28, 2007, alleging breach of contract arising out of the same facts being alleged by him in this cross-claim (hereinafter, the "Bucks County Action")..

29.   In the Bucks County Action, Cokus has:

    (a)   asserted counterclaims against Mr. Pena alleging, in part, "she may have unwittingly signed" the contract and, therefore, the contract is null and void; and

    (b)   joined Zeichner, Ellman & Krause LLP and a partner of the law firm, Nathan Schwed, as additional defendants, asserting claims against them, in which, in part, she contests the validity of the contract she made with the law firm.

### IV.  Operative Facts

**A.   Cokus seeks the assistance of Mr. Pena and Lynch International to resolve criminal and civil actions in which she is involved.**

8

30.    On May 11, 2001, Cokus engaged Lynch International, in part, to investigate and consult with her on what later became the basis for a <u>qui tam</u> lawsuit brought by her against Bristol-Myers Squibb, a New Jersey-based company.

31.    Cokus explained to Mr. Pena she was living on disability benefits and everything she had was riding on the outcome of an employment-related lawsuit that she had brought against Bristol-Myers Squibb, her employer of more than 20 years.

**1.    Cokus explains the criminal charges, in the past, for which she was convicted.**

32.    Cokus told Mr. Pena that she had been charged with violations of the Pennsylvania criminal laws and had been found guilty of two of those charges.

33.    Cokus blamed her community's chief of police for the reason she had been prosecuted in the first place, claiming that he had it out for her.

34.    Cokus specifically told Mr. Pena that she had been falsely charged by her community's police, on January 19, 1999, with assault, reckless endangerment and making terroristic threats.

35.    Cokus told Mr. Pena that the criminal charges arose out of a confrontation she had with four teenage boys outside her apartment complex, during which the teenagers claimed she pointed a semi-automatic handgun at them, threatened to shoot them with it, yelled out loud at them "<u>I am a psycho</u>," and physically slapped at least one of them.

36.    Cokus then told Mr. Pena that she was later convicted by the Bucks County Court of Common Pleas for assault and reckless endangerment, and though she could have been sentenced to as much as two years in jail, she received a sentence of four years probation and was required to turn over the handgun she had pointed at the teenagers.

**2.    Cokus explains the employment related lawsuit she brought against Bristol-Myers Squibb.**

37.    Cokus then explained to Mr. Pena she had brought a lawsuit against Bristol-Myers Squibb's U.S. Pharmaceutical Group and its president, in New Jersey state court, alleging violations

of New Jersey's Conscientious Employee Protection Act, N.J.S.A. §§ 34.19-1 to -8. See Cokus v. Bristol-Myers Squibb Co., 362 N.J. Super. 366, 827 A. 2d 1173 (Law Div. 2002), summary judgment affirmed, 362 N.J. Super. 245, 827 A. 2d 1098 (App. Div. 2003).

38.    Cokus told Mr. Pena that Bristol-Myers Squibb had taken actions against her as a consequence of an anonymous letter being sent to the company's president in which the author reported unethical conduct by the company's executives and which later she was accused to have authored.

39.    Cokus said that when her co-workers learned of this, they retaliated by ostracizing her and then her superiors started to give her unfavorable performance evaluations.

40.    She next told Mr. Pena there had been a number of set backs in her lawsuit against Bristol Myers-Squibb's U.S. Pharmaceutical Group, and she was not satisfied at all with the performance of her lawyer in the case.

**B.    Mr. Pena focuses on Cokus' allegations of fraudulent business practices by Bristol-Myers Squibb.**

41.    Mr. Pena offered to explore these matters and others that she discussed with him and for which Cokus asked his assistance.

42.    Mr. Pena immediately asked Cokus to permit him to have access to all the documents Cokus and her lawyer had in their possession relating to her claims against Bristol-Myers Squibb's U.S. Pharmaceutical Group.

43.    Cokus granted Mr. Pena's request and he was then given full access to thousands of pages of records generated by this lawsuit.

44.    These records included pleadings, documents received in discovery, transcripts of deposition testimony and exhibits thereto, affidavits and motions and memoranda.

45.    Mr. Pena examined and studied these records extensively for over several weeks, and communicated several times a day with Cokus to draw from her facts relevant to his investigation.

46.    Afterwards, Mr. Pena explained to Cokus that his own investigation undertaken by

10

him in New Jersey into Bristol-Myers Squibb's fraudulent business practices showed there to be a basis for a qui tam lawsuit against the company.

47.    Mr. Pena told Cokus he could work with her to bring a qui tam lawsuit against Bristol-Myers Squibb, and then afterwards look into whether there was a basis for the criminal charges ever to have been brought against her.

48.    Cokus agreed to work with Mr. Pena toward this end.

49.    Cokus told Mr. Pena she did not have any money at all with which to compensate him for the time he expended and costs he incurred thus far, because she had spent all her money on lawyers, in part, (a) to defend herself against the criminal charges for which she was convicted, and (b) to prosecute her New Jersey lawsuit against Bristol-Myers Squibb's U.S. Pharmaceutical Group.

50.    Cokus  encouraged Mr. Pena to accept an arrangement similar to the one which she made with her New Jersey lawyer in which she would agree to compensate him based on a percentage of whatever recovery she would receive from any action taken against Bristol-Myers Squibb.

51.    Cokus therefore told Mr. Pena that she would agree to compensate him, both for the time he expended and costs he incurred thus far and as well as for future work, based on a percentage of whatever recovery she would receive which was derived from any action taken against Bristol-Myers Squibb.

52.    Cokus and Mr. Pena did not agree then on the specific percentage of the recovery that she would pay him, but afterwards Cokus did reach an agreement with Mr. Pena that Lynch International would receive 12½% of any recovery.

C.    **Cokus requests for Mr. Pena to arrange to have the law firm of Zeichner, Ellman & Krause LLP prosecute the qui tam claim against Bristol-Myers Squibb.**

53.    Cokus expressed to Mr. Pena keen dissatisfaction for the lawyer she had retained to prosecute her employment-related lawsuit against Bristol-Myers Squibb—Cokus wrote that her lawyer was a "jack-ass" and she told Mr. Pena her lawyer was not doing enough or the right things

11

for her and was not strong.

54.   Cokus asked Mr. Pena to make an attempt to find a lawyer to replace this lawyer.

55.   Cokus insisted on Mr. Pena locating a law firm that could aggressively represent her in the qui tam lawsuit, because under no circumstances did she want her current lawyer representing her in this lawsuit.

56.   Cokus told him time was of the essence, because she needed such a law firm to prepare her for her scheduled appearance before a federal grand jury, sitting in Boston, Massachusetts, and investigating fraudulent business practices of Bristol-Myers Squibb.

57.   In June 2001, Mr. Pena arranged with Cokus for her to meet with representatives of the law firm of Zeichner, Ellman & Krause LLP.

58.   In extensive meetings with Cokus throughout the first three weeks of June 2001, Mr. Pena obtained other pertinent information from Cokus to support the qui tam claims and correlated this information with documents he had inspected and examined and, thereafter, selected to support the qui tam claims.

59.   Mr. Pena assembled his work-product and afterwards transmitted a banker box of documents and supporting data, weighing more than 30 pounds, to Zeichner, Ellman & Krause LLP.

60   Mr. Pena, thereafter, arranged meetings and several telephone conferences between representatives of Zeichner, Ellman & Krause LLP and Cokus to discuss the merits of the qui tam claims and other matters.

61.   With Cokus' authorization, Mr. Pena participated with the law firm and her throughout this process and afterwards.

62.   Cokus tape recorded at least one telephone conference with representatives of Zeichner, Ellman & Krause LLP during which she expressed dissatisfaction with her current lawyer and asked the firm to take on the qui tam case.

63.   Being convinced by the evidence with which Mr. Pena had provided it, Zeichner, Ellman & Krause LLP agreed to prosecute the case.

64.     Mr. Pena's meetings with Cokus were only interrupted once during this period, and only because of an appointment that Cokus had to meet with her probation officer.

65.     Cokus told her probation officer of the arrangements she was making to have Zeichner, Ellman & Krause LLP, with Mr. Pena's assistance, prosecute the qui tam lawsuit on her behalf.

66.     And in order for Cokus to travel to Manhattan to meet with the law firm, Cokus needed to obtain the authorization of her probation officer for this and she received such authorization from him.

67.     Cokus later told her probation officer that they agreed to undertake the matter on her behalf, for which they would receive a percentage of the recovery she obtained and for which, they would advance the costs of litigation, since she did not have any money available to her to pay for such costs.

68.     Cokus recorded on tape the conference she had with her probation officer at which she made this admission.

**D.     Cokus formalizes her arrangement with Lynch International to pay it a percentage of the recovery she anticipates receiving from the qui tam lawsuit.**

69.     Mr. Pena and Cokus formalized, in writing, the contract they made by which she had agreed she pay Lynch International for the work he had already performed, and would perform in the future, from the proceeds of the recovery she would receive from the United States Government arising out of the qui tam lawsuit against Bristol-Myers Squibb.

70.     This contract was prepared for Cokus and Mr. Pena by Zeichner, Ellman & Krause LLP, after it had received from them instructions to prepare such a document for them to sign.

71.     In this contract, Cokus agreed, *inter alia*, to pay Lynch International 12½% of the proceeds she received relating to, or arising out of, any recovery from the qui tam lawsuit.

72.     When Mr. Pena received the contract from the law firm:

        (a)     he brought the written agreement to her, at her apartment, in Yardley,

Pennsylvania;

        (b)     Cokus reviewed the contract with Mr. Pena and discussed its subject matter, in detail, with him (additional matter covered copyright and publicity and media rights over which she granted Mr. Pena authority);

        (c)     thereafter, each signed the contract and placed the date on which they signed the contract, July 13, 2001, following their signatures (Exhibit 1);

        (d)     there were no other papers in front of them at the time, other than the aforesaid contract; and

        (e)     Cokus had invited Mr. Pena to come to her apartment specifically so she could review the contract with him and to sign it, and for Mr. Pena to prepare her for her grand jury appearance, then scheduled for July 17, 2001, in Boston, Massachusetts.

73.     Mr. Pena provided Cokus with a copy of the contract they had signed for her to keep.

**E.     Cokus is an experienced business person and very much accustomed to contractual undertakings.**

74.     When Cokus signed the contract with Lynch International, she:

        (a)     was 50 years of age;

        (b)     had a 151 IQ;

        (c)     had an extensive 20-year corporate career which had provided her with substantial business and commercial experience; and

        (d)     was a savvy business person.

75.     Cokus was very much accustomed to court and legal processes – both civil and criminal – because of business and personal experiences.

76.     For example, while employed by Bristol-Myers Squibb, Cokus managed and oversaw all contracts and bidding done by the company covering its generic products division.

77.     This role also involved her in assisting the company's litigation lawyers, and she performed this role so well she was given the responsibility to train employees how to testify in court

14

proceedings.

78.    In a moment of candor, Cokus admitted to Mr. Pena that she had no reservation
about lying under oath.

F.    **Cokus reaffirms to Mr. Pena her contract with Lynch International.**

79.    On July 17, 2001, in Boston, Massachusetts, Cokus reaffirmed with Mr. Pena the
contract she made with Lynch International, when she signed the retainer agreement, dated July 16,
2001, that Zeichner, Ellman & Krause LLP had prepared for it and her.

80.    Under the arrangement Cokus reached with Zeichner, Ellman & Krause LLP, she
agreed to pay the law firm 37½% of the proceeds she received.  See Complaint in this action , Exhibit
A.

81.    But before Cokus signed the retainer agreement she made with  Zeichner, Ellman &
Krause LLP, Nathan Schwed, a partner in the law firm, told Cokus that she would receive 50% of the
proceeds from any recovery from the qui tam lawsuit, as Mr. Pena would receive 12½% and his law
firm would receive 37½%.  Cokus agreed that this was correct.

82.    Mr. Pena and Mr. Schwed were in Boston, Massachusetts, to prepare Cokus for her
appearance to testify before the federal grand jury which was investigating Bristol-Myers Squibb's
fraudulent business practices.

83.    And before then, Mr. Pena had worked with Cokus to prepare her to testify, having
selected documents for her to review to support her grand jury testimony.

84.    After Cokus' appearance before the federal grand jury, Mr. Pena (Lynch
International) and Zeichner, Ellman & Krause LLP diligently worked together, over the next two
and one-half months, to prepare the qui tam complaint that would be filed on behalf of the United
States against Bristol-Myers Squibb over its fraudulent business practices.

85.    Zeichner, Ellman & Krause LLP filed the qui tam complaint representing the work of
Mr. Pena and his investigation, on September 24, 2001.

86.    Mr. Pena, thereafter, continued to gather evidence to support the qui tam lawsuit

15

against Bristol-Myers Squibb.

87.    And, in response to requests made of Zeichner, Ellman & Krause LLP by federal prosecutors, overseeing the grand jury investigation of Bristol-Myers Squibb, Mr. Pena gathered information and documents for the law firm to use to satisfy the federal prosecutors' requests.

**G.    Cokus expresses her gratitude to Mr. Pena and tells him she anticipates receiving tens of millions of dollars from the _qui_ _tam_ lawsuit and of drastically changing her lifestyle.**

88.    Cokus told Mr. Pena, afterwards, that she was elated with the work he performed for her and attributes the recovery she anticipates receiving, perhaps in the tens of millions of dollars, entirely to him.

89.    In an e-mail from Cokus to Mr. Pena, dated September 5, 2001, she tells him: "thanks . . . for working too damn hard for me . . . ."

90.    In another e-mail from Cokus to Mr. Pena, dated October 6, 2001, she tells him: "I'm sure when the time comes that I do see the fruits of YOUR labor and I get paid, I will put the check in the safe and do nothing for probably a few months."

91.    And from the _qui_ _tam_ lawsuit she tells him, on October 6, 2001, she anticipates she could recover tens of millions of dollars and with this money she hopes to make a drastic change in her lifestyle: "You know, I was thinking about that Tap Pharmaceuticals and the 95 million dollars and as much as I guess I know that one day I'll get money from this whole thing, it really doesn't seem fathomable to me . . . it's like surreal."

92.    Cokus often told Mr. Pena she would use her 50% share of the proceeds to purchase a $7 million home on the shore of the Delaware River for her and her three dogs.

93.    In an e-mail from Cokus to Mr. Pena, dated December 20, 2006 , she told him "I had hoped to be able to make a substantial change in my life. Not the way I live, but where." And just before that, on October 27, 2006, in an e-mail Cokus told Mr. Pena "Oh, I hope that I soon will be a very wealthy woman too . . . ."

94.    Until Mr. Pena appeared in Cokus' life, her life had been miserable.

Cokus said she could not thank Mr. Pena enough for what he did for her because

       (a)    he built the <u>qui tam</u> case for her;

       (b)    he convinced Zeichner, Ellman & Krause LLP, <u>at her insistence</u>, to take the case on a 37½% contingency basis and which, what more, agreed to advance the costs of the lawsuit, because she had no money available to pay for such costs; and

       (c)    he gave her a hope she could recover millions of dollars from it.

**H.**    **The United States awards Cokus a recovery significantly and substantially less than she had anticipated and crushes her spirits.**

95.    For over five years, Cokus was overcome with euphoria in anticipation of receiving a huge recovery, perhaps, in the tens of millions of dollars from the United States.

96.    The United States, however, crushed her hopes, on December 19, 2006, and told her she would receive the short-end of the settlement that it reached with Bristol-Myers Squibb – such that she could possibly receive no more than $ 4½ million, and possibly less than $3½ million.

97.    In an e-mail from Cokus to Mr. Pena, immediately after she was informed of this by Zeichner, Ellman & Krause LLP, she told him "I don't think that I'm going to get as much as we expected at the beginning."

98.    After ruminating during the night over this, Cokus admitted to Mr. Pena, the next day, in an e-mail to him, she could possibly receive no more than $1½ million which she recognized she would then have to pay half of which to Lynch International and Zeichner, Ellman & Krause LLP – she calculated she would thus receive no more than $750,000, before taxes.

99.    Cokus told Mr. Pena that with this amount she could not at all make the drastic change in her lifestyle for which she had hoped: "Honestly, after talking to Nathan, I believe that if I get $750,000, before taxes, I'm lucky. Wait and see . . . I bet I'm right. Which is not going to make any drastic lifestyle change for me."

100.    Her e-mail correspondence with Mr. Pena, at this moment, shows her to be despondent and depressed over this:

17

(a)    "And, I don't have my hopes up for a lot of money" (e-mail, dated December 19, 2006, and sent by her at 9:56 P.M.);

(b)    "I don't think that I'm going to get as much as we expected at the beginning. But, it doesn't matter. As long as I can do OK, that's all that matters. I don't have kids that I have to worry about"(e-mail, dated December 19, 2006, and sent by her at 11:48 P.M.);

(c)    "I told you it wouldn't be any thing near what we thought. . . . It's what I was afraid of but expected to happen. . . . . Which is not going to make any lifestyle change for me . . . . Honestly, I don't think I can make many changes at all considering I really don't have a pension to speak of since my wages were frozen ten years ago. But, that's life, right. . . . I'm not trying to seem ungrateful by any means, but it's just a little disappointing. I had hoped to be able to make a substantial change in my lifestyle. Not the way I live, but where. This won't really allow that" (e-mail, dated December 20, 2006, and sent by her at 2:17 P.M.); and

(d)    "Well, I'm not sure of all the details but I expected to get next to nothing and I will (I believe ) get enough to be able to live. Perhaps a million" (e-mail, dated January 11, 2007, and sent by her at 3:44 P.M.)

I.    **Cokus schemes to eliminate all evidence, in her possession, showing she knew she contracted to pay Lynch International 12½% of the recovery she received from the qui tam lawsuit.**

101.    Her disappointment in the size of the award led her to disavow the contract she had made with Lynch International and Mr. Pena to pay them 12½% of her qui tam recovery -- first, by scheming to eliminate all evidence in her possession showing she knowingly and freely contracted to pay them a percentage of the recovery which she received.

102.    Pursuant to this scheme, on December 20, 2006, Cokus told Mr. Pena, in an e-mail that she had lost all her records relating to the qui tam lawsuit and thus she did not have any records whatsoever to show she had agreed to pay anything to Lynch International and Mr. Pena.

103.    Cokus told Mr. Pena: "I had everything stolen from my car so I don't have one piece of paperwork. In fact, I don't even know how much Nathan's firm takes from this.......that was in the

box, too."

104.    In another e-mail on January 11, 2007, Cokus repeated what she said to him then telling him: "Remember I told you I had all my paperwork stolen from my car regarding all my cases? Well, I guess I purposely put almost everything out of my mind because it's just too much. But, I had absolutely zero recollection of how much Nathan's law firm was getting (what percentage) and I completely forgot that you get 12.5%?????? I don't even remember that at all.......isn't that weird?????"

105.    Next, on January 6, 2007, Cokus told Mr. Pena, that on January 1, 2007, "my browser crashed and disappeared and with it all my email since 4/06."

106.    This is significant, because, first, included among the records she purportedly lost is her e-mail correspondence with Mr. Pena, in which she admits to her despondency over receiving the short-end of the settlement that the United States made with Bristol-Myers Squibb.

107.    And, second, among this purportedly lost correspondence is her calculation that she made in which she anticipated receiving a minimal $1½ million recovery and speculated, under the arrangement she made with Lynch International and Mr. Pena and the law firm, she would receive half of that – $750,000 – with the other half being allotted to them.

108.    Her admission, thus, shows her to be definitely aware that, under the contracts she signed with Lynch International and Mr. Pena and the law firm of Zeichner, Ellman & Krause LLP, she would receive 50% of the proceeds recovered from the United States, and Lynch International and Mr. Pena and the law firm would receive the other 50%, the former 12½% and the latter 37½%.

109.    After having told Mr. Pena she had lost all her records showing she had agreed to pay Lynch International and Mr. Pena 12½% of her recovery, she professed to him, in e-mails sent on January 11, 2007, that she had no knowledge whatsoever she had made such an agreement, telling him:

(a)    at 2:27 P.M., "I completely forgot that you get 12.5%?????? I don't even remember that at all . . . isn't that weird?????";

19

(b)    at 4:44 P.M., "Do you remember that you get 12.5%?  Why don't I remember that at all?"; and

(c)    at 8:07 P.M., "It bothers me when I can't remember things."

110.    In other e-mails that same day, however, she remembered that she had signed away to Mr. Pena, in the same contract, all her copyright and publication and media rights.

111.    Cokus was now employing a strategy that she previously told Mr. Pena that she had used when she testified under oath as a deponent on behalf of Bristol-Myers Squibb—to selectively "forget" damaging information.

**J.    Cokus hires a new law firm and falsely states to it she has no knowledge of ever contracting to pay Lynch International 12½% of the recovery she receives from the <u>qui tam</u> lawsuit.**

112.    On or about September 20, 2007, Cokus instructed Zeichner, Ellman & Krause, LLP, that it should not distribute to Lynch International and Mr. Pena any of the proceeds she received from the <u>qui tam</u> lawsuit.

113.    Cokus told Zeichner, Ellman & Krause, LLP that she made no agreement whatsoever to pay Lynch International 12½% of the proceeds she received from the <u>qui tam</u> lawsuit.

114.    Apparently believing she had eliminated all evidence in her possession to show she ever knew she contracted with Lynch International, she initially engaged Joel M. Friedman, Esquire, but then retained the law firm of Bochetto & Lentz, P.C. to aid and assist her to disavow her contract with Lynch International and to prevent the distribution to Lynch International and Mr. Pena of any percentage of the recovery she had received from the United States.

115.    Upon information and belief, Cokus did not disclose to Joel M. Friedman, Esquire, and Bochetto & Lentz, P.C. her already formed scheme, but concealed her scheme from them.

116.    Upon information and belief, Cokus did not disclose to Joel M. Friedman, Esquire, and Bochetto & Lentz, P.C. the July 13, 2001 contract she had signed along with Mr. Pena, but concealed the contract and her act of signing it from them.

117.    Upon information and belief, Cokus did not disclose to Joel M. Friedman, Esquire,

20

and Bochetto & Lentz, P.C. her e-mail correspondence with Mr. Pena, but concealed this correspondence from them.

118.    Upon information and belief, but Cokus falsely stated to Joel M. Friedman, Esquire, and Bochetto & Lentz, P.C.:

      (a)    she never contracted to pay Lynch International 12½% of the proceeds she received from the qui tam lawsuit;

      (b)    her signature on any such contract is a forgery;

      (c)    Mr. Pena "may have, unbeknownst to Cokus, slipped to Cokus the signature page [of the July 13, 2001 contract], which she may have unwittingly signed";

119.    Upon information and belief, Joel M. Friedman, Esquire, and Bochetto & Lentz, P.C. relied on the false statements Cokus made to them.

120.    When the time came for the proceeds from Cokus' recovery to be distributed, Joel M. Friedman, Esquire, and Bochetto & Lentz, P.C., disavowed, on her behalf, the contract in which she agreed to pay Lynch International 12½% of the recovery she received from the qui tam lawsuit.

121.    Joel M. Friedman, Esquire, and Bochetto & Lentz, P.C., thereafter, repeated Cokus' false statements, telling Mr. Pena and Zeichner, Ellman & Krause, LLP that Cokus' signature on the contract is a forgery, and Bochetto & Lentz, P.C. later claimed, at her insistence, in court proceedings that "she may have unwittingly signed" the contract, but under no circumstances did she agree to pay either Lynch International or Mr. Pena a percentage of any recovery she received arising out of, or related, to any claim made against Bristol-Myers Squibb.

122.    Cokus thus engaged Joel M. Friedman, Esquire, and Bochetto & Lentz to aid and assist her, in her already formed scheme to commit fraud.

123.    Cokus' conduct is fundamentally inconsistent with the basic premises of the adversary system.

124.    Cokus' conduct was done with the intent to deprive Lynch International and Mr. Pena of the proceeds to which Cokus was contractually obligated to pay Lynch International.

21

125.    When Zeichner, Ellman & Krause LLP received Cokus' share of the proceeds from the settlement the United States made with Bristol-Myers Squibb, Bochetto & Lentz, P.C. compelled the law firm to place that portion of the proceeds which was allotted to Lynch International, or $499,766.93, in escrow.

126.    Then Cokus renounced the contract she made with Mr. Pena, after she had insisted, in the first place, that Mr, Pena be compensated on a percentage basis of her recovery.

127.    Cokus thus required Mr. Pena to undertake litigation, and incur unnecessary litigation costs and attorneys' fees, first in the Pennsylvania state court action, and then in this Court, to secure for Lynch International and himself the proceeds of the recovery that Cokus received and to which he is contractually entitled.

### V. Claim for Relief

#### Count I
(For Breach of Contract)

128.    Mr. Pena repeats and incorporates by reference the allegations contained in paragraphs 1 through 127 above as though the same were fully and completely set forth herein.

129.    Cokus agreed, in a writing she signed, that she would pay Lynch International, and therefore, its assignee, Mr. Pena, 12½% of the proceeds she received relating to, or arising out of, the qui tam lawsuit.

130.    Cokus breached the agreement she made with Lynch International, and therefore, with Mr. Pena, by failing to pay him 12½% of the proceeds she received – the equivalent of now more than $499,766.93.

131.    As a direct result of Cokus' breach, Lynch International, and therefore, Mr. Pena, has been denied the benefits of his contract with Cokus and has suffered damages in excess of $499,766.93

#### Count II

(For Quantum Meruit and Unjust Enrichment)

22

132.    Mr. Pena repeats and incorporates by reference the allegations contained in paragraphs 1 through 127 above as though the same were fully and completely set forth herein.

133.    Cokus agreed to pay Lynch International and Mr. Pena for the investigative and consulting services they performed for her and which, at her insistence, they provided her.

134.    Cokus accepted the investigative and consulting services that Lynch International and Mr. Pena performed for her.

135.    Cokus has benefitted from their services and has been enriched thereby.

136.    Lynch International and Mr. Pena expected and are entitled to reasonable compensation for the investigative and consulting services they performed for.

137.    Cokus has refused to pay Lynch International and Mr. Pena the reasonable remuneration for their services to which she agreed.

138.    It is unjust under the circumstances to allow Cokus to retain the benefit of the investigative and consulting services she insisted Lynch International and Mr. Pena perform for her and to be enriched thereby, without them receiving a reasonable remuneration.

### Count III
(For Publication of Injurious Falsehood)

139.    Mr. Pena repeats and incorporates by reference the allegations contained in paragraphs 1 through 127 above as though the same were fully and completely set forth herein.

140.    Cokus made false statements, in writing and orally, to Joel M. Friedman, Esquire, Bochetto & Lentz, P.C. and Zeichner, Ellman & Krause LLP that are harmful to the interests of Lynch International and Mr. Pena and she is subject to liability for all pecuniary losses resulting to them because of her false statements.

141.    Cokus intended for publication of her false statements to result in harm to the interests of Lynch International and Mr. Pena.

142.    Cokus knew the statements she made to Joel M. Friedman, Esquire, Bochetto & Lentz, P.C. and Zeichner, Ellman & Krause LLP to be false, or she acted in reckless disregard of the

23

truth or falsity of such statements.

143.    Cokus intended to have her false statements to Joel M. Friedman, Esquire, Bochetto & Lentz, P.C. and Zeichner, Ellman & Krause LLP prevent distribution of the agreed-upon percentage of the proceeds from her recovery to Lynch International and Mr. Pena for which she was contractually obligated to pay to them.

## Count IV
### (For Prima Facie Tort)

144.    Mr. Pena repeats and incorporates by reference the allegations contained in paragraphs 1 through 127 above as though the same were fully and completely set forth herein.

145.    Cokus knew the false statements she made to Joel M. Friedman, Esquire, Bochetto & Lentz, P.C. and Zeichner, Ellman & Krause LLP would injure Lynch International and Mr. Pena.

146.    Cokus made such false statements intentionally.

147.    Cokus' conduct is culpable and not in accord with community standards of right conduct, and it is without justification or serves no legitimate purpose.

148.    Cokus intended to cause and did cause Lynch International and Mr. Pena injury by denying them recovery of the percentage of the proceeds to which Cokus was contractually obligated to pay Lynch International.

149.    Lynch International and Mr. Pena suffered injury being denied such recovery.

## VI. Requests for Relief

WHEREFORE, Mr. Pena prays that the Court enter a judgment:

1.    finding, in Count I, Cokus to have breached her contract with Lynch International and, therefore, Mr. Pena;

2.    finding, in Count II, Cokus to have benefitted from and been unjustly enriched by the investigative and consulting services Lynch International and Mr, Pena performed for her at her insistence and, therefore, Cokus be required to pay Mr. Pena reasonable remuneration that is in excess of $500,000;

24

3.    finding, in Count III, Cokus to have made false statements harmful to the interests of Lynch International and Mr. Pena;

4.    finding, in Count IV, Cokus to have intentionally caused injury to Lynch International and Mr. Pena;

5.    awarding Mr. Pena, on Count I of his Cross-Claim for breach of contract, the amount of $499,766.93;

6.    awarding Mr. Pena, on each count of his Cross-Claim, direct and consequential damages, including loss of business and investment opportunities;

7.    awarding Mr. Pena, on Counts III and IV of his Cross-Claim for publication of injurious falsehoods and prima facie tort, respectively, all his attorney's fees and costs associated with his recovery of the proceeds for which he was entitled to receive and for which Cokus was contractually obligated to pay Lynch International and him, including those associated with any state and/or federal court actions;

8.    awarding Mr. Pena punitive damages on Counts III and IV of the Cross-Claim for publication of injurious falsehoods and prima facie tort;

9.    awarding Mr. Pena pre- and post- judgment interest;

10.    awarding Mr. Pena costs of suit, including litigation costs and reasonable attorneys' fees; and

11.    awarding Mr. Pena such other relief as is just and proper, including (a) awarding Mr. Pena ownership of the sum of $499,766.93, which has been deposited with the Registry of the Court and (b) the immediate transfer of such funds to him.

Dated:  New York, New York
        November 20, 2007

25

By: _____

JAMES C. SHERWOOD
ANDREW S. HARRIS
Schlam Stone & Dolan LLP
19th Floor
26 Broadway
New York, NY 10004
Phone: 212-344-5400
Fax: 212-344-7677

Dated:   Philadelphia, Pennsylvania
         November 20, 2007

_____

ARNOLD I. KALMAN
Law Offices of Arnold I. Kalman
245 South Hutchinson Street
Philadelphia, Pennsylvania 19107
Phone: 215-829-9613
Fax: 215-829-9619
E-mail: arnold.i.kalman@verizon.net

**Attorneys for Interpleader Defendant and
Cross-Claim Plaintiff, Octavio Pena**

# EXHIBIT 1

**LYNCH INTERNATIONAL, INC.**
**90 Washington Valley Road**
**Bedminster, New Jersey 07921**

July 13, 2001

Ms. Kathy Cokus
1704 Kathy Drive
Yardley, PA 19067

Dear Kathy:

       I am writing to memorialize our agreement in connection with the services that Lynch International, Inc. ("Lynch") has rendered and will continue rendering on your behalf.

       As you know, for the past few months, we have expended an enormous amount of time and effort in connection with your various claims against Bristol-Myers Squib Company ("BMS"), including reviewing, analyzing and digesting an enormous amount of documents, meeting and consulting with you, Nathan Schwed and various other individuals, and performing various other services in connection therewith.  You have requested our continued assistance as an investigator and consultant in these matters.  In consideration therefore, and in order to induce Lynch to continue acting on your behalf, you have agreed and, by signing below, confirm your agreement that:

1.    Lynch will be entitled to receive 12 ½% of any payments or recoveries that you receive from or in connection with any and all claims, actions, law suits or settlements against or involving BMS.

2.    You hereby give, license and grant forever Lynch, its successors, licensees and assigns, the exclusive irrevocable right and license to use, depict, simulate,

portray and otherwise exploit to such extent and in such manner as Lynch in its sole discretion may determine, by any or all systems, means or materials and in any and all media throughout the universe, your likeness, name, personality, activities, history, biography and career, factually or otherwise under your name or under any other name selected by Lynch (collectively, the "Rights").  It is understood and agreed that you will grant no interviews or engage in discussions on a background basis, or provide any materials or documents in any journalist, news organization, motion picture production, television production company or any other publishing or media organizations or their representatives without obtaining prior written permission from Lynch.

3.   All copyrights relating to the Rights will be in Lynch's name.  Lynch will have full editorial control over all material relating to the Rights.

4.   Octavio Pena is hereby irrevocably authorized and empowered by you to act on your behalf as your attorney-in-fact, in Mr. Pena's discretion, to do the following (the "Power"): (a) approve and permit any and all publicity and advertising; (b) approve and permit the use of your name, photograph, likeness, voice, sound effects, characatures, and literary and other media materials for purposes of advertising, publicity and for any other exploitation of the Rights; (c) execute documents and contracts relating to exploitation of the Rights; (d) collect and receive any and all compensation or other income or payments, as well as endorse your name upon and cash any and all checks payable to you relating to the Rights (the "Rights Proceeds") and disburse all or any portion of the Rights Proceeds in accordance with this agreement; and (e) engage as well as discharge and/or direct for you, and in your name, accountants, public relations firms and lawyers, as

well as other persons, firms and corporations who may be retained in connection with the Rights.

If the foregoing meets with your approval, please indicate your acceptance and agreement by signing in the space herein below provided.

Sincerely,

LYNCH INTERNATIONAL, INC.

By: Octavio Pena

AGREED AND ACCEPTED:

Kathy Cokus

369502.01/2969-001/NS

# EXHIBIT 2

ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AGREEMENT (this "Agreement") is made as of January 3, 2006, by and between Lynch International, Inc. ("Lynch International") and Octavio Pena ("Pena").

W I T N E S S E T H:

WHEREAS, on July 2, 1997, Lynch International entered into that certain letter agreement with Mr. Edwin P. Wilson ("Wilson"), a copy of which is attached hereto as Exhibit 1, pursuant to which, among other things, Wilson assigned to Lynch International the Rights and the Claims (as those terms are defined in the July 2, 1997 letter agreement) (the "Wilson Agreement");

WHEREAS, on July 13, 2001, Lynch International entered into that certain letter agreement with Ms. Kathy Cokus ("Cokus"), a copy of which is attached hereto as Exhibit 2, pursuant to which, among other things, Cokus agreed to pay Lynch International twelve and one-half percent (12½ %) of any payments or recoveries that Cokus receives from or in connection with any and all claims, actions, law suits or settlements against or involving Bristol-Myers Squib Company (the "Cokus Agreement") (the Wilson Agreement and the Cokus Agreement are referred to herein as the "Letter Agreements");

WHEREAS, Pena is the sole shareholder of Lynch International; and

WHEREAS, Pena and Lynch International are entering into this Agreement, pursuant to which Lynch International will assign all of its rights under the Letter Agreements to Pena, and Pena will accept such assignment of rights.

NOW, THEREFORE, in consideration of the payment of one dollar ($1.00) from Pena to Lynch International, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1. <u>Assignment and Transfer</u>. Lynch International hereby assigns, conveys and transfers to Pena all of Lynch International's rights, titles, and interests under and/or relating to the Letter Agreements, and Pena hereby accepts such assignment of rights. Such rights include, but are not limited to, the right to receive any and all monies due or that may become due from Cokus and/or from Wilson under the respective Letter Agreements, and the right to sue Cokus and/or Wilson, and/or their respective representatives, agents, and all of their respective, heirs, successors and assigns for past, present or future breach of contract, tort or other causes of action arising under or relating to either or both of the Letter Agreements.

2. <u>No Assumption</u>. The parties acknowledge and agree that Lynch International is not delegating to Pena any of Lynch International's obligations under or relating to the Letter Agreements, and Pena does not assume any obligations that Lynch International has, may have,



or may have had under or relating to the Letter Agreements. The parties further acknowledge and agree that Lynch International shall remain liable for any obligations that Lynch International has, may have, or may have had under or relating to the Letter Agreements.

3. <u>Indemnification</u>. Lynch International hereby agrees to indemnify, defend and hold harmless Pena with respect to any and all liability that Pena may incur under or relating to either of the Letter Agreements.

4. <u>Further Assurances</u>. Pena and Lynch International each agree to execute and deliver such further instruments of assignment and take such other actions reasonably requested by the other party in order to more effectively evidence and implement the assignment of rights as contemplated by this Agreement.

5. <u>Joinder as a Party</u>. If it becomes necessary or desirable for Pena to join Lynch International as a party in any action against Cokus and/or Wilson, and/or their respective heirs, successors or assigns, arising under or relating to either one of Letter Agreements, Lynch International hereby agrees to be so joined, and Lynch International hereby agrees that Pena shall have complete control over any such action, any settlement related thereto, and Pena shall be entitled to any and all recoveries, whether by judgment, by settlement or otherwise, in connection with any such action.

6. <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, heirs and assigns.

IN WITNESS WHEREOF, the undersigned has executed this Assignment and Assumption Agreement as of the date first above written.

LYNCH INTERNATIONAL, INC.

By: _____
       Octavio Pena, President
       Title:

_____
Octavio Pena, in his individual capacity

2