## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY
### CIVIL DIVISION

0709681

Octavic Pena

**Plaintiff**
    **vs.**

:
:
:
:
:
:
:

No._____

Civil Action-Trespass

**Form of Action**

Kathy Cokus

**Defendant**

**Complaint**

## NOTICE

    You have been sued in court.  If you wish to defend against the claims set forth in the following pages you must take action within twenty (20) days after this complaint and notice are served by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

    **YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE GO TO OR TELEPHONE THE OFFICES SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

Bucks County Bar Association
135 East State Street
Doylestown, PA 18901
Phone (215) 348-9413, 1-800-479-8585
www.bucksbar.org

PA Bar Association: www.pabar.org

Attorney for Octavio Pena

Attorney I.D. # 17593
Please type or print name and address

Arnold I. Kalman, Esquire
245 South Hutchinson Street
Philadelphia, PA 19107-5722

ARNOLD I. KALMAN, ESQUIRE
Identification No. 17593
Law Offices of Arnold I. Kalman
245 South Hutchinson Street
Philadelphia, PA 19107
Telephone: (215) 829-9613
Fax: (215) 829-9619

**ATTORNEY FOR PLAINTIFF**

| | |
|---|---|
| Octavio Pena<br>5835 Upper Mountain Road<br>New Hope PA. 18938 | BUCKS COUNTY<br>COURT OF COMMON PLEAS<br>TRIAL DIVISION |
| Plaintiff. | |
| VS. | |
| Kathy Cokus<br>1816 Polo Run Drive<br>Morrisville, PA 19067 | Civil Action No. |
| Defendant. | |

# Complaint In Civil Action – Trespass

### Complaint in Civil Action-Trespass of Octavio Pena against Kathy Cokus

Plaintiff, Octavio Pena, by his attorney, files this Complaint in Trespass against defendant, Kathy Cokus, and alleges:

### I. The Parties

#### A. Plaintiff

1.     Plaintiff, Octavio Pena ("Mr. Pena"), is a Pennsylvania citizen and resides, in Bucks County, at 5835 Upper Mountain Road, New Hope, PA 18938.

2.     Mr. Pena is a professional investigator with almost 40 years of experience in this field.

3.     Mr. Pena provided investigation and consulting services, during a period relevant to this Complaint, through Lynch International, Inc. ("Lynch International"), a company which he owns and operates.

4.     Lynch International was licensed as a private investigator by the States of New York and New Jersey, through June 30, 2005, and February 26, 2003, respectively, and during then, the company designated Mr. Pena its principal representative.

5.     Mr. Pena, through Lynch International, has offered his investigative and consulting services and capabilities to the public, including individuals, corporations and the United States Government.

6.     The United States District Court for the Eastern District of New York, the Federal Bureau of Investigation, the Organized Crime Strike Forces of the Unites States Department of Justice and the United States Attorneys' Offices for the Southern District of New York, Eastern District of New York and Southern

District of California, have used Mr. Pena's investigative capabilities to serve the United States.

7.    And representatives of the United States Customs Service, United States Drug Enforcement Administration and Criminal Investigation Division of the Internal Revenue Service have consulted and collaborated with Mr. Pena and drawn on his expertise to serve the United States.

8.    Mr. Pena's career, in private investigation, through 1996, is the subject of extensive coverage in the book he co-authored, entitled <u>The Pena Files: One Man's War Against Federal Corruption and the Abuse of Power</u>, published, August 1996, by Harpercollins.

## B. Defendant

9.    Defendant, Kathy Cokus ("Cokus"), is a Pennsylvania citizen and resides, in Bucks County, at 1816 Polo Run Drive, ~~Morrisville~~, Pa 19067.

## II.  Jurisdiction and Venue

10.    Jurisdiction in Pennsylvania and venue in Bucks County are proper because Cokus is found, resides, lives and regularly conducts business there, and the facts, circumstances and events giving rise to Mr. Pena's claims occurred in Bucks County, Pennsylvania.

## III.  Summary of Complaint

11.    A <u>qui tam</u> or "whistleblower" suit, under the False Claims Act, 31 U.S.C. §3729-3733, permits a private person to sue on behalf of the United States, and if the Government is successful in resolving or litigating the claim, the

2

qui tam plaintiff or "whistleblower" may receive a share of the proceeds the Government recovers.

12.     Cokus retained Lynch International, and through it retained Mr. Pena, to investigate the basis for, and consult on, what later became a qui tam lawsuit, which she filed, on behalf of the United States Government, against her former employer, Bristol-Myers Squibb Company ("Bristol-Myers Squibb").

13.     Cokus insisted Mr. Pena convince the Manhattan, New York-based law of firm of Zeichner, Ellman & Krause LLP, to represent her to prosecute the qui tam lawsuit on her behalf.

14.     Mr. Pena convinced the law firm to undertake this qui tam lawsuit.

15.     Cokus, thereupon, retained Zeichner, Ellman & Krause LLP to prosecute such a claim against the company, in consultation with Mr. Pena, on the basis of the fraudulent business practices of the company which Mr. Peña uncovered during the course of his investigation.

16.     On July 13, 2001, Cokus contracted, in writing, to pay Lynch International 12½ % of the proceeds she would receive from the United States Government relating to, or arising out of, the qui tam lawsuit.  A true and correct copy of this contract is attached hereto as Exhibit 1.

17.     Cokus determined this percentage approximated a reasonable level of compensation for the services that Lynch International and Mr. Pena had rendered her and would render her in the future and for which she therefore should pay them.

3

18.    Cokus reaffirmed her agreement with Lynch International, on July 17, 2001, at the time she signed a contract with the law firm of Zeichner, Ellman & Krause LLP, promising the law firm that it would receive 37½% of the proceeds she would receive from the United States Government relating to, or arising out of, the qui tam lawsuit.

19    In an agreement made as of January 3, 2006, Lynch International assigned to Mr. Pena all rights to receive any and all monies due it or may become due it from Cokus and to sue Cokus for breach of contract, tort or other causes of action arising under, or relating to, the contract that Cokus made with it on July 13, 2001. A true and correct copy of the assignment agreement is attached hereto as Exhibit 2.

20.    Under the terms of the written contracts Cokus made with Lynch International (Exhibit 1) and Zeichner, Ellman & Krause LLP, Cokus thus agreed with them she would receive 50% of the proceeds from the qui tam lawsuit, Lynch International would receive 12½% of such and the law firm would receive 37½% of such.

21.    On or about September 20, 2007, the United States Government formally notified Zeichner, Ellman & Krause LLP that Cokus would receive approximately $4 million as her share of the settlement the Government reached with Bristol-Myers Squibb, and a check covering her portion of the settlement would be transmitted to Zeichner, Ellman & Krause LLP, in or about, ten days to two weeks.

4

22.    When Cokus received word from Zeichner, Ellman & Krause LLP of this, she became immediately overwhelmed by greed and disavowed her contract with Lynch International and denied she had made any agreement whatsoever with Lynch International to pay it 12½% of that which she recovered from the <u>qui</u> <u>tam</u> lawsuit.

23.    Cokus then directed Zeichner, Ellman & Krause LLP to not make any distribution of the proceeds from the recovery to either Lynch International or Mr. Pena.

24.    To prevent any such distribution being made to Lynch International or Mr. Pena, then or thereafter, Cokus falsely stated, orally and/or in writing, to Zeichner, Ellman & Krause LLP and, thereafter, to her lawyers:

(a)    she never contracted to pay Lynch International 12½% of the proceeds she received from the <u>qui</u> <u>tam</u> lawsuit;

(b)    her signature on any such contract is a forgery;

(c)    Mr. Pena "may have, unbeknownst to Cokus, slipped to Cokus the signature page [of the July 13, 2001 contract], which she may have unwittingly signed";

(d)    neither Lynch International nor Mr. Pena had performed any investigative services on her behalf for which she agreed to pay either one a percentage of any recovery she received arising out of, or related, to any claim made against Bristol-Myers Squibb;

(e)    neither Lynch International nor Mr. Pena had performed any

5

consulting services on her behalf for which she agreed to pay either one a percentage of any recovery she received arising out of, or related, to any claim made against Bristol-Myers Squibb;

      (f)    Zeichner, Ellman & Krause, LLP "secretly" prepared the July 13, 2001 contract for Mr. Pena and for him then to have her to sign;

      (g)    Cokus did not know she had agreed that Mr. Pena would receive 12½% of the recovery from the <u>quit</u> <u>tam</u> lawsuit and that Zeichner, Ellman & Krause, LLP would receive 37½% of the recovery from the <u>quit</u> <u>tam</u> lawsuit; and

      (h)    Pena was a "runner" for Zeichner, Ellman & Krause, LLP "attempting to generate cases and litigation matters for them with the offer of sharing a percentage of whatever recovery was obtained."

25.    Cokus then renounced her July 13, 2001 contract with Lynch International asserting the contract – in which she had insisted Mr. Pena be compensated on the basis of a specific percentage of the recovery she received – to be illegal and, therefore, unenforceable, and has refused whatsoever to compensate Lynch International and Mr. Pena for the services they performed for her and for which she benefitted therefrom and was enriched thereby.

26.    Cokus has also challenged the right of Zeichner, Ellman & Krause LLP to receive its share of the proceeds from the <u>qui</u> <u>tam</u> lawsuit recovery to compensate it for the work it performed.

27.    On October 23, 2007, Zeichner, Ellman & Krause LLP received $4,005,229.67, representing Cokus' portion of the recovery which the United States

6

received from Bristol-Myers Squibb.

28.    Zeichner, Ellman & Krause LLP, on or about October 24, 2007, transmitted to Cokus $1,999,067.73.

29.    Zeichner, Ellman & Krause LLP next deposited $499,766.93 into an escrow account, which is the percentage of the recovery allotted to Lynch International and Mr. Pena, under the July 13, 2001 contract, pending the outcome of Cokus' dispute with Lynch International and Mr. Pena.

30.    Zeichner, Ellman & Krause LLP then placed in escrow $1,506,395.01, representing its entitlement, pending the outcome of Cokus' dispute with it.

31.    Mr. Pena has commenced this action against Cokus for making, and continuing to make, intentionally false statements, and to recover damages which are directly attributable to Cokus' false statements.

32.    Cokus has compelled Mr. Pena to incur substantial expenses, including litigation costs and attorney's fees, to recover for Lynch International just and reasonable compensation for the services they performed for Cokus and from which she has directly benefitted and been enriched thereby.

33.    And Mr. Pena has commenced this action against Cokus, on the basis of the legal principles of quantum meruit and unjust enrichment, to receive reasonable compensation from Cokus for Lynch International and him for the services that they performed for Cokus, at her insistence, and from which she has directly benefitted and been enriched thereby.

34.    The reasonable amount of compensation for which Lynch International

7

and Mr. Pena are entitled to receive from Cokus exceeds $500,000.

## IV. Operative Facts

### A. Cokus seeks the assistance of Mr. Pena and Lynch International to resolve criminal and civil actions in which she is involved.

35.     On May 11, 2001, Cokus engaged Lynch International, in part, to investigate and consult with her on what later became the basis for a qui tam lawsuit brought by her against Bristol-Myers Squibb, a New Jersey-based corporation.

36.     Cokus explained to Mr. Pena she was living on disability benefits and everything she had was riding on the outcome of an employment-related lawsuit that she had brought against Bristol-Myers Squibb, her employer of more than 20 years.

### 1. Cokus explains the criminal charges, in the past, for which she was convicted.

37.     Cokus told Mr. Pena she had been charged with violations of the Pennsylvania criminal laws and had been found guilty of two of those charges.

38.     Cokus blamed her community's chief of police for the reason she had been prosecuted, in the first place, claiming he had it out for her.

39.     Cokus specifically told Mr. Pena she had been falsely charged by her community's police, on January 19, 1999, with assault, reckless endangerment and making terroristic threats.

40.     Cokus said to him the criminal charges arose-out of a confrontation she

8

had with four teenage boys outside her apartment complex, during which the
teenagers claimed she pointed a semi-automatic handgun at them, threatened to
shoot them with it, yelled out loud at them "I am a psycho," and physically slapped,
at least, one of them.

41.    Cokus then told Mr. Pena she was later convicted by the Bucks County
Court of Common Pleas for assault and reckless endangerment, and though she
could have been sentenced to as much as two years in jail, she received a sentence
of four years probation and was required to turn over the handgun she had pointed
at the teenagers.

### 2.    Cokus explains the employment related lawsuit she brought against Bristol-Myers Squibb.

42.    Cokus then explained to Mr. Pena she had brought a lawsuit against
Bristol Myers-Squibb's U.S. Pharmaceutical Group and its president, in New Jersey
state court, alleging violations of New Jersey's Conscientious Employee Protection
Act, N.J.S.A. 34.19-1 to -8. Cokus v. Bristol-Myers Squibb Co., 362 N.J. Super. 366,
827 A. 2d 1173 (Law Div. 2002), summary judgment affirmed, 362 N.J. Super. 245,
827 A. 2d 1098 (App. Div. 2003).

43.    Cokus told Mr. Pena that Bristol-Myers Squibb had taken actions
against her as a consequence of an anonymous letter being sent to the company's
president in which the author reported unethical conduct by the company's
executives and of which later she was accused to have authored.

44.    Cokus said that when her co-workers learned of this, they retaliated by

9

ostracizing her and then her superiors started to give her unfavorable performance evaluations.

45.    She next told Mr. Pena there had been a number of setbacks in her lawsuit against Bristol Myers-Squibb's U.S. Pharmaceutical Group, and she was not satisfied at all with the performance of her New Jersey lawyer in the case.

**B.    Mr. Pena focuses on Cokus' allegations of fraudulent business practices by Bristol-Myers Squibb.**

46.    Mr. Pena offered to explore these matters, and others, that she discussed with him, and for which Cokus asked his assistance.

47.    Mr. Pena immediately asked Cokus to permit him to speak with her New Jersey lawyer and to have access to all the documents Cokus and her lawyer had in their possession relating to her claims against Bristol-Myers-Squibb's U.S. Pharmaceutical Group.

48.    Cokus granted Mr. Pena's request and he was then given full access thousands of pages of records generated by this lawsuit.

49.    These records included pleadings, documents received in discovery, transcripts of deposition testimony and exhibits thereto, affidavits and motions and memoranda.

50.    Mr. Pena examined and studied these records extensively for over several weeks, and communicated several times a day with Cokus to draw from her all facts possibly relevant to his investigation.

51.    Mr. Pena spoke with Cokus' New Jersey lawyer and provided her with

assistance.

52.    Afterwards, Mr. Pena explained to Cokus that his own investigation, which he had undertaken, in New Jersey, into Bristol-Myers Squibb's fraudulent business practices, showed, together with Cokus' personal knowledge, there might be a basis for a qui tam lawsuit against the company.

53.    Mr. Pena told Cokus he could work with her to bring a qui tam lawsuit against Bristol-Myers Squibb, and then afterwards look into whether there was a basis for the criminal charges ever to have been brought against her.

54.    Cokus agreed to work with Mr. Pena toward this end.

55.    Cokus told Mr. Pena she did not have any money at all with which to compensate him for the time he expended and costs he incurred thus far, because she had spent all her money on lawyers, in part, (a) to defend herself against the criminal charges for which she was convicted, and (b) to prosecute her New Jersey lawsuit against Bristol-Myers Squibb's U.S. Pharmaceutical Group.

56.    Cokus was in dire financial strait:

(a)    GE Capital Consumers Card Company obtained a judgment against her for $11,301.37; and

(b)    Saks Fifth Avenue obtained a judgement against her for $27,239.86.

57.    Cokus' dire financial condition compelled her to seek federal bankruptcy protection.

58.    Cokus thus encouraged Mr. Pena to accept an arrangement similar to

11

the one which she made with her New Jersey lawyer in which she would agree to compensate him based on a percentage of whatever recovery she would receive from any action taken against Bristol-Myers Squibb.

59.    Cokus therefore told Mr. Pena that she would agree to compensate him, both for the time he expended and costs he incurred thus far and as well as for future work, based on a percentage of whatever recovery she would receive which was derived from any action taken against Bristol-Myers Squibb.

60.    Cokus and Mr. Pena did not agree then on the specific percentage of the recovery that she would pay him, but afterwards Cokus did reach an agreement with Mr. Pena that Lynch International would receive 12½% of any recovery.

**C.    Cokus requests for Mr. Pena to arrange to have the law firm of Zeichner, Ellman & Krause LLP prosecute the qui tam claim against Bristol-Myers Squibb.**

61.    Cokus expressed to Mr. Pena her keen dissatisfaction for the lawyer she had retained to prosecute her employment-related lawsuit against Bristol-Myers Squibb.

62.    Cokus wrote that her lawyer was a "jack-ass" and she told Mr. Pena her lawyer was not doing enough or the right things for her and was not strong.

63.    Cokus asked Mr. Pena to make an attempt to find a lawyer to replace this lawyer.

64.    And Cokus insisted on Mr. Pena locating a law firm that could aggressively represent her in the qui tam lawsuit, because under no circumstances did she want her current lawyer representing her in this lawsuit.

12

65.    Cokus told him time was of the essence, because she needed such a law firm to prepare her for her scheduled appearance before a federal grand jury, sitting in Boston, Massachusetts, and investigating fraudulent business practices of Bristol-Myers Squibb.

66.    In June 2001, Mr. Pena arranged with Cokus for her to meet with representatives of the law firm of Zeichner, Ellman & Krause LLP.

67.    In extensive meetings with Cokus, throughout the first three weeks of June 2001, Mr. Pena obtained other pertinent information from Cokus to support the qui tam claims and correlated this information with documents he had inspected and examined and, thereafter, selected to support the qui tam claims.

68.    Mr. Pena assembled his work-product and afterwards transmitted a banker's box of documents and supporting data, weighing more than 30 pounds, to Zeichner, Ellman & Krause LLP for it to examine.

69.    Mr. Pena, thereafter, arranged meetings and several telephone conferences between representatives of Zeichner, Ellman & Krause LLP and Cokus to discuss the merits of the qui tam claims and other matters.

70.    With Cokus' authorization, Mr. Pena participated with the law firm and her throughout this process and afterwards.

71.    Cokus expressed to Zeichner, Ellman & Krause LLP the dissatisfaction she had with the performance of her current lawyer and asked the firm to take on the qui tam case.

72.    Being convinced by the evidence with which Mr. Pena had provided it,

13

Zeichner, Ellman & Krause LLP agreed to prosecute the case.

73.    Mr. Pena's meetings with Cokus were only interrupted once, during this period, and only because of an appointment that Cokus had to meet with her probation officer.

74.    Cokus told her probation officer of the arrangements she was making to have Zeichner, Ellman & Krause LLP to prosecute the qui tam lawsuit, on her behalf.

75.    And in order for Cokus to travel to Manhattan to meet with the law firm, Cokus needed to obtain the authorization of her probation officer for this and she received such authorization from him.

76.    Cokus later told her probation officer they agreed to undertake the matter, on her behalf, for which they would receive a percentage of the recovery she obtained and for which they would advance the costs of litigation, since she did not have any money available to her to pay for such costs.

**D.    Cokus formalizes her arrangement with Lynch International to pay it a percentage of the recovery she anticipates receiving from the qui tam lawsuit.**

77.    Mr. Pena and Cokus formalized, in writing, the contract they made by which she had agreed she pay Lynch International for the work he had already performed, and would perform in the future, from the proceeds of the recovery she would receive from the United States Government arising out of the qui tam lawsuit against Bristol-Myers Squibb.

78.    This contract was prepared for Cokus and Mr. Pena by Zeichner,

14

Ellman & Krause LLP, after it had received from them instructions to prepare such a document for them to sign.

79.    In this contract, Cokus agreed, inter alia, to pay Lynch International 12½% of the proceeds she received relating to, or arising out of, any recovery from the qui tam lawsuit.

80.    When Mr. Pena received the contract from the law firm:

(a)    he brought the written agreement to her, at her apartment, in Yardley, Pennsylvania;

(b)    Cokus reviewed the contract with Mr. Pena – it was 3 pages in length – and discussed its subject matter, in detail, with him (additional matter covered copyright and publicity and media rights over which she granted Mr. Pena authority);

(c)    thereafter, each signed the contract and placed the date on which they signed the contract, July 13, 2001, following their signatures (Exhibit 1);

(d)    there were no other papers in front of them at the time, other than the aforesaid contract; and

(e)    Cokus had invited Mr. Pena to come to her apartment specifically so she could review the contract with him and to sign it, and for Mr. Pena to prepare her for her grand jury appearance, then scheduled for July 17, 2001, in Boston, Massachusetts.

81.    Mr. Pena provided Cokus with a copy of the contract they had signed for her to keep.

### E.   Cokus is an experienced business person and very much accustomed to contractual undertakings.

82.   When Cokus signed the contract with Lynch International, she was no ingénue – she

(a)   was 50 years of age;

(b)   had a 151 IQ;

(c)   had an extensive 20-year corporate career which had provided her with significant and substantial business and commercial experience; and

(d)   was a savvy business person.

83.   Cokus admitted she could be very tough and she once said: "I want you to understand I've probably got more brass than anyone who you ever met in a female body, you know.  I have a license to carry a gun, . . . . "

84.   And Cokus told Mr. Pena she was gutsy and because of this she could always get what she wanted.

85.   For example, she explained to Mr. Pena that when the police refused to return to her the gun which her husband had apparently used to commit suicide, she sued the police chief to have him return the gun to her, telling the court the gun had enormous "sentimental value" for her since it was one of the last things her husband had touched, however, immediately after the police chief was compelled by the court to return the gun to her, she sold it – telling Mr. Pena, "I got rid of it."

86.   Cokus was very much accustomed to court and legal processes – both civil and criminal – because of her business and personal experiences.

16

87.    For example, while employed by Bristol Myers-Squibb, Cokus managed and oversaw all contracts and bidding done by the company covering its generic products division.

88.    This role also involved her in assisting the company's litigation lawyers, and she performed this role so well she was given the responsibility to train employees how to testify in court proceedings.

89.    In a moment of candor, Cokus admitted to Mr. Pena she had no reservation about lying under oath.

90.    Cokus admitted this to Mr. Pena, in a response she made to a memorandum which Mr. Pena had submitted to her and in which he summarized the facts he had, thus far, elicited from her for purposes of his investigation – "I [Cokus] feel very comfortable with everything stated here . . . . . 8. When she has testified at depositions on behalf of the company she has been trained by outside law firms to FORGET (lie) under oath.  She was so proficient in her testimony (forgot many times) that the outside legal firm representing the corporation asked her to train others on giving depositions."

**F.    Cokus reaffirms to Mr. Pena her contract with Lynch International.**

91.    On July 17, 2001, in Boston, Massachusetts, Cokus reaffirmed with Mr. Pena the contract she made with Lynch International, when she signed the retainer agreement, dated July 16, 2001, that Zeichner, Ellman & Krause LLP had prepared for her.

17

92.    Under the arrangement Cokus reached with Zeichner, Ellman & Krause LLP, she agreed to pay the law firm 37½% of the proceeds she received.

93.    But before Cokus signed the retainer agreement she made with Zeichner, Ellman & Krause LLP, Nathan Schwed, Esquire, a partner in the law firm, told Cokus she would be receiving 50% of the proceeds from any recovery from the qui tam lawsuit, Mr. Pena would receive 12½% and his law firm would receive 37½%, and to which Cokus agreed.

94.    Mr. Pena and Mr. Schwed were in Boston, Massachusetts, to prepare Cokus for her appearance to testify before the federal grand jury which was investigating Bristol-Myers Squibb's fraudulent business practices.

95.    And before then, Mr. Pena had worked with Cokus to prepare her to testify, having selected documents for her to review to support her grand jury testimony.

96.    After Cokus' appearance before the federal grand jury, Mr. Pena (Lynch International) and Zeichner, Ellman & Krause LLP diligently worked together, over the next two and one-half months, to prepare the qui tam complaint that would be filed on behalf of the United States against Bristol Myers-Squibb over its fraudulent business practices.

97.    During this time, Mr. Pena spoke daily with Cokus toward preparing the qui tam complaint and served as an intermediary between the law firm and Cokus for purposes of exchanging information.

98.    Zeichner, Ellman & Krause LLP filed the qui tam complaint

18

representing the work of Mr. Pena and his investigation, on September 24, 2001.

99.    Mr. Pena, thereafter, continued to gather evidence to support the qui tam lawsuit against Bristol-Myers Squibb.

100.    And, in response to requests made of Zeichner, Ellman & Krause LLP by federal prosecutors, overseeing the grand jury investigation of Bristol-Myers Squibb, Mr. Pena gathered information and documents for the law firm to use to satisfy the federal prosecutors' requests.

101.    Mr. Pena kept Cokus informed of all of this.

G.    **Cokus expresses her gratitude to Mr. Pena and tells him she anticipates receiving tens of millions of dollars from the qui tam lawsuit and of drastically changing her lifestyle.**

102.    Cokus told Mr. Pena, afterwards, that she was elated with the work he performed for her and attributed the recovery she anticipated receiving, perhaps in the tens of millions of dollars, entirely to him.

103.    In an e-mail from Cokus to Mr. Pena, dated September 5, 2001, she tells him: "thanks . . . for working too damn hard for me . . . ."

104.    In another e-mail from Cokus to Mr. Pena, dated October 6, 2001, she tells him: "I'm sure when the time comes that I do see the fruits of YOUR labor and I get paid, I will put the check in the safe and do nothing for probably a few months."

105.    And from the qui tam lawsuit she tells him, on October 6, 2001, she anticipates she could recover tens of millions of dollars and with this money she hopes to make a drastic change in her lifestyle: "You know, I was thinking about

19

that Tap Pharmaceuticals and the 95 million dollars and as much as I guess I know that one day I'll get money from this whole thing, it really doesn't seem fathomable to me . . . it's like surreal."

106.   Cokus often told Mr. Pena she would use her 50% share of the proceeds to purchase a $7 million home on the shore of the Delaware River for her and her three dogs.

107.   In an e-mail from Cokus to Mr. Pena, dated December 20, 2006 , she told him "I had hoped to be able to make a substantial change in my life.  Not the way I live, but <u>where</u>."

108.   Until Mr. Pena appeared in Cokus' life, her life had been miserable:

(a)    her brief marriage to her second husband, who had contracted HIV/AIDS, ended with his apparent suicide, which up until then, his medical treatment had placed enormous financial strains on her;

(b)    she had been convicted on charges brought against her by the Commonwealth of Pennsylvania of assault and reckless endangerment and was sentenced to four years probation;

(c)    she was on social security disability, having voluntarily ended her employment at Bristol-Myers Squibb;

(d)    she was pestered by creditors, was then sued by them and had filed for and sought bankruptcy protection from them; and

(e)    she was involved in a lawsuit with Bristol Meyers-Squibb Company over her employment, and

20

        (i)     she was completely dissatisfied with the performance of her lawyer – she wrote her lawyer was a "jack-ass";

        (ii)    she told Mr. Pena her lawyer had accomplished absolutely nothing for her;

        (iii)   it was too late in time to replace her lawyer and she was indebted to this lawyer for the costs the lawyer had advanced; and

        (iv)   she was on the verge of losing the lawsuit, which she later did. Cokus v. Bristol-Myers Squibb Co., 362 N.J. Super. 366, 827 A. 2d 1173 (Law Div. 2002), summary judgment affirmed, 362 N.J. Super. 245, 827 A. 2d 1098 (App. Div. 2003).

109.   Cokus said she could not thank Mr. Pena enough for what he did for her because

        (a)    he built the qui tam case for her;

        (b)    he convinced Zeichner, Ellman & Krause LLP, at her insistence, to take the case on a 37½% contingency basis and which, what more, agreed to advance the costs of the lawsuit, because she had no money available to pay for such costs; and

        (c)    he gave her a hope she could recover millions of dollars from it.

110.   And Cokus repeatedly told Mr. Pena she would take her life and that of her three dogs, if he did not work to build a qui tam case for her.

111.   Cokus' mental health records contain expressions she made of her suicidal tendencies.

21

**H.    The United States awards Cokus a recovery significantly and substantially less than she had anticipated and crushes her spirits.**

112.    For over five years, Cokus was overcome with euphoria in anticipation of receiving a huge recovery, perhaps, in the tens of millions of dollars from the United States.

113.    The United States, however, crushed her hopes, on December 19, 2006, and told her she would receive the short-end of the settlement that it reached with Bristol-Myers Squibb – such that she could possibly receive no more than $ 4½ million, and possibly as less than $3½ million.

114.    In an e-mail from Cokus to Mr. Pena, immediately after she was informed of this by Zeichner, Ellman & Krause LLP, she told him "I don't think that I'm going to get as much as we expected at the beginning."

115.    After ruminating during the night over this, Cokus admitted to Mr. Pena, the next day, in an e-mail to him, she could possibly receive no more than $1½ million which she recognized she would then have to pay half of which to Lynch International and Zeichner, Ellman & Krause LLP.

116.    Cokus calculated she would thus receive no more than $750,000, before taxes, and told Mr. Pena this.

117.    Cokus told Mr. Pena that with this amount she could not at all make the drastic change in her lifestyle for which she had hoped: "Honestly, after talking to Nathan, I believe that if I get $750,000,before taxes, I'm lucky. Wait and see . . . I bet I'm right. Which is not going to make any drastic lifestyle change for me."

22

118.    Her e-mail correspondence with Mr. Pena, at this moment, shows her to be despondent and depressed over this:

(a)    "And, I don't have my hopes up for a lot of money" (e-mail, dated December 19, 2006, and sent by her at 9:56 P.M.);

(b)    "I don't think that I'm going to get as much as we expected at the beginning. But, it doesn't matter. As long as I can do OK, that's all that matters. I don't have kids that I have to worry about"(e-mail, dated December 19, 2006, and sent by her at 11:48 P.M. );

(c)    "I told you it wouldn't be any thing near what we thought. . . . It's what I was afraid of but expected to happen. . . . . Which is not going to make any lifestyle change for me . . . . Honestly, I don't think I can make many changes at all considering I really don't have a pension to speak of since my wages were frozen ten years ago. But, that's life, right. . . . I'm not trying to seem ungrateful by any means, but it's just a little disappointing. I had hoped to be able to make a substantial change in my lifestyle. Not the way I live, but where. This won't really allow that" (e-mail, dated December 20, 2006, and sent by her at 2:17 P.M.); and

(d)    "Well, I'm not sure of all the details but I expected to get next to nothing and I will (I believe ) get enough to be able to live. Perhaps a million" (e-mail, dated January 11, 2007, and sent by her at 3:44 P.M.)

119.    Cokus' mental health care records show she has a medical history of despondency and severe depression.

I.    **Cokus schemes to eliminate all evidence, in her possession,**

23

**showing she knew she contracted to pay Lynch International**
**12½% of the recovery she received from the <u>qui</u> <u>tam</u> lawsuit.**

120.    Her disappointment, with the portion of the recovery which the United

States allotted to her, led her to disavow the contract she had made with Lynch

International and Mr. Pena to pay them 12½% of her <u>qui</u> <u>tam</u> recovery – first, by

scheming to eliminate all evidence, in her possession, showing she knowingly and

freely contracted to pay them a percentage of the recovery which she received.

121.    Pursuant to her scheme, on December 20, 2006, Cokus told Mr. Pena,

in an e-mail, she had lost all her records relating to the <u>qui</u> <u>tam</u> lawsuit, thus she

did not have any records whatsoever to show she had agreed to pay anything to

Lynch International and Mr. Pena.

122.    Cokus told Mr. Pena: "I had everything stolen from my car so I don't

have one piece of paperwork.  In fact, I don't even know how much Nathan's firm

takes from this.......that was in the box, too."

123.    In another e-mail, on January 11, 2007, Cokus repeated what she said

to Mr. Pena, on December 20, 2006, telling him: "Remember I told you <u>I had all my</u>

<u>paperwork stolen from my car regarding all my cases</u>?  Well, I guess I purposely put

almost everything out of my mind because it's just too much.  But, I had absolutely

zero recollection of how much Nathan's law firm was getting (what percentage) and

<u>I completely forgot that you get 12.5%</u>??????  I don't even remember that at

all.......isn't that weird?????"

124.    Next, on January 6, 2007, Cokus told Mr. Pena, that on January 1,

24

2007, "my browser crashed and disappeared and with it all my email since 4/06."

125.    This is significant, because, first, included among the records she purportedly lost is her e-mail correspondence with Mr. Pena, in which she admits to her despondency over receiving the short-end of the settlement that the United States made with Bristol Myers-Squibb.

126.    And, second, among this purportedly lost correspondence is her calculation that she made in which she anticipated receiving a minimal $1½ million recovery and speculated, under the arrangement she made with Lynch International and Mr. Pena and the law firm, she would receive half of that – $750,000 – with the other half being allotted to them.

127.    Her admission, thus, shows her to be definitely aware that, under the contracts she signed with Lynch International and Mr. Pena and the law firm of Zeichner, Ellman & Krause LLP, she would receive 50% of the proceeds recovered from the United States, and Lynch International and Mr. Pena and the law firm would receive the other 50%, the former 12½% and the latter 37½%.

128.    After having told Mr. Pena she had lost all her records showing she had agreed to pay Lynch International and Mr. Pena 12½% of her recovery, she professed to him, in e-mails sent on January 11, 2007, that she had no knowledge whatsoever she had made such an agreement, telling him:

(a)    at 2:27 P.M., "I completely forgot that you get 12.5%?????? I don't even remember that at all . . . isn't that weird?????";

(b)    at 4:44 P.M., "Do you remember that you get 12.5%?  Why don't

25

I remember that at all?"; and

      (c)     at 8:07 P.M., "It bothers me when I can't remember things."

129.    An in an e-mail that same day, however, Cokus remembered that she had signed away to Mr. Pena, in the same contract, all her copyright and publication and media rights.

130.    She thus exploited here the training that she admitted to Mr. Pena, on May 24, 2001, she used, under similar circumstances, while in the employ of Bristol-Myers-Squibb – "<u>FORGET</u>", or in other words, "<u>lie</u>."

131.    In Cokus' May 24, 2001 response to Mr. Pena's list of facts for which he had prepared to have her verify and confirm the accuracy thereof, she stated: "<u>I feel very comfortable with everything stated here</u> . . . . 8. <u>When she has testified at depositions on behalf of the company she has been trained by outside law firms to FORGET (lie) under oath.  She was so proficient in her testimony (forgot many times) that the outside legal firm representing the corporation asked her to train others on giving depositions.</u>"

**J.    Cokus hires a new law firm and falsely states to it she has no knowledge of ever contracting to pay Lynch International 12½% of the recovery she receives from the <u>qui</u> <u>tam</u> lawsuit.**

132.    On or about September 20, 2007, Cokus instructed Zeichner, Ellman & Krause, LLP, that it should not distribute to Lynch International and Mr. Pena any of the proceeds she received from the <u>qui</u> <u>tam</u> lawsuit.

133.    Cokus told Zeichner, Ellman & Krause, LLP that she made no agreement whatsoever to pay Lynch International 12½% of the proceeds she

received from the qui tam lawsuit.

134.    Apparently believing she had eliminated all evidence, in her possession, to show she ever knew she contracted with Lynch International, she initially engaged Joel M. Friedman, Esquire, but then retained the law firm of Bochetto & Lentz, P.C., to aid and assist her to disavow her contract with Lynch International and to prevent the distribution to Lynch International and Mr. Pena of any percentage of the recovery she had received from the United States.

135.    Cokus did not disclose to Joel M. Friedman, Esquire, and Bochetto & Lentz, P.C. her already formed scheme, but concealed her scheme from them.

136.    Cokus did not disclose to Joel M. Friedman, Esquire, and Bochetto & Lentz, P.C. the July 13, 2001 contract she had signed along with Mr. Pena, but concealed the contract and her act of signing it from them.

137.    Cokus did not disclose to Joel M. Friedman, Esquire, and Bochetto & Lentz, P.C. her e-mail correspondence with Mr. Pena, but concealed this correspondence from them.

138.    But Cokus falsely stated to Joel M. Friedman, Esquire, and Bochetto & Lentz, P.C.:

(a)    she never contracted to pay Lynch International 12½% of the proceeds she received from the qui tam lawsuit;

(b)    her signature on any such contract is a forgery;

(c)    Mr. Pena "may have, unbeknownst to Cokus, slipped to Cokus the signature page [of the July 13, 2001 contract], which she may have unwittingly

27

signed";

    (d)    neither Lynch International nor Mr. Pena had performed any investigative services on her behalf for which she agreed to pay either one a percentage of any recovery she received arising out of, or related, to any claim made against Bristol-Myers Squibb;

    (e)    neither Lynch International nor Mr. Pena had performed any consulting services on her behalf for which she agreed to pay either one a percentage of any recovery she received arising out of, or related, to any claim made against Bristol-Myers Squibb;

    (f)    Zeichner, Ellman & Krause, LLP "secretly" prepared the July 13, 2001 contract for Mr. Pena and for him then to have her to sign;

    (g)    she did not know she had agreed that Mr. Pena would receive 12½% of the recovery from the quit tam lawsuit and that Zeichner, Ellman & Krause, LLP would receive 37½% of the recovery from the quit tam lawsuit; and

    (h)    Pena was a "runner" for Zeichner, Ellman & Krause, LLP "attempting to generate cases and litigation matters for them with the offer of sharing a percentage of whatever recovery was obtained."

139.    Joel M. Friedman, Esquire, and Bochetto & Lentz, P.C. relied on the false statements Cokus made to them.

140.    When the time came for the proceeds from Cokus' recovery to be distributed, Joel M. Friedman, Esquire, and Bochetto & Lentz, P.C., disavowed, on her behalf, the contract in which she agreed to pay Lynch International 12½% of

the recovery she received from the <u>qui tam</u> lawsuit.

141.    Joel M. Friedman, Esquire, and Bochetto & Lentz, P.C., thereafter, repeated Cokus' false statements to Mr. Pena and Zeichner, Ellman & Krause, LLP, including telling them that Cokus' signature on the contract is a forgery, and Bochetto & Lentz, P.C. later repeated the false statements, at Cokus' insistence, in court proceedings and with her under oath, including that "she may have unwittingly signed" the contract, but under no circumstances did she agree to pay either Lynch International or Mr. Pena a percentage of any recovery she received arising out of, or related, to any claim made against Bristol-Myers Squibb.

142.    Cokus thus engaged Joel M. Friedman, Esquire, and Bochetto & Lentz to aid and assist her, in her already formed scheme to commit fraud.

143.    Cokus' conduct is fundamentally inconsistent with the basic premises of the adversary system.

144.    Cokus' conduct was done with the intent to deprive Lynch International and Mr. Pena of the proceeds to which Cokus was contractually obligated to pay Lynch International.

145.    When Zeichner, Ellman & Krause LLP received Cokus' share of the proceeds from the settlement the United States made from Bristol-Myers Squibb, Bochetto & Lentz, P.C. compelled the law firm to place that portion of the proceeds which was allotted to Lynch International, $499,766.93, in escrow.

146.    And then Cokus renounced the contract she made with Mr. Pena, after she had insisted, in the first place, that Mr. Pena be compensated on a percentage

basis of her recovery.

147.   Cokus claimed the arrangement she made with Mr. Pena to be illegal, and, therefore, the agreement she had made with him is unenforceable.

148.   Cokus thus required Mr. Pena to undertake litigation, and incur unnecessary litigation costs and attorney's fees, in this Court, and in the United States District Court for the Southern District of New York, to secure for Lynch International and himself proceeds of the recovery that Cokus received and to which he is entitled.

### V. Claim for Relief

### Count I
(For Publication of Injurious Falsehood)

149.   Mr. Pena repeats and incorporates by reference the allegations contained in paragraphs 1 through 148 above as though the same were fully and completely set forth herein.

150.   Cokus made false statements, in writing and orally, to Joel M. Friedman, Esquire, Bochetto & Lentz, P.C. and Zeichner, Ellman & Krause LLP that are harmful to the interests of Lynch International and Mr. Pena and she is subject to liability for all pecuniary losses resulting to them because of her false statements.

151.   Cokus intended for publication of her false statements to result in harm to the interests of Lynch International and Mr. Pena.

152.   Cokus knew the statements she made to Joel M. Friedman, Esquire,

Bochetto & Lentz, P.C. and Zeichner, Ellman & Krause LLP to be false, or she acted in reckless disregard of the truth or falsity of such statements.

153.    Cokus intended to have her false statements to Joel M. Friedman, Esquire, Bochetto & Lentz, P.C. and Zeichner, Ellman & Krause LLP prevent distribution of the agreed-upon percentage of the proceeds from her recovery to Lynch International and Mr. Pena for which she was contractually obligated to pay to them.

**Count II**
(For Prima Facie Tort)

154.    Mr. Pena repeats and incorporates by reference the allegations contained in paragraphs 1 through 148 above as though the same were fully and completely set forth herein.

155.    Cokus made false statements to Joel M. Friedman, Esquire, Bochetto & Lentz, P.C. and Zeichner, Ellman & Krause LLP.

156.    Cokus knew the false statements she made to Joel M. Friedman, Esquire, Bochetto & Lentz, P.C. and Zeichner, Ellman & Krause LLP would injure Lynch International and Mr. Pena.

157.    Cokus made such false statements intentionally.

158.    Cokus' conduct is culpable and not in accord with community standards of right conduct, and it is without justification or serves no legitimate purpose.

159.    Cokus intended to cause and did cause Lynch International and Mr.

31

Pena injury and she is subject to liability for all pecuniary losses resulting to them because of her false statements.

160.   Lynch International and Mr. Pena suffered pecuniary losses because of Cokus' false statements.

## Count III
### (For Quantum Meruit and Unjust Enrichment)

161.   Mr. Pena repeats and incorporates by reference the allegations contained in paragraphs 1 through 148 above as though the same were fully and completely set forth herein.

162.   Cokus agreed to pay Lynch International and Mr. Pena for the investigative and consulting services they performed for her and which, at her insistence, they provided her.

163.   Cokus accepted the investigative and consulting services that Lynch International and Mr. Pena performed for her.

164.   Cokus has benefitted from their services and has been enriched thereby.

165.   Lynch International and Mr. Pena expected reasonable compensation for the investigative and consulting services they performed for.

166.   Cokus has refused to pay Lynch International and Mr. Pena the reasonable remuneration for their services to which she agreed.

167.   It is unjust under the circumstances to allow Cokus to retain the benefit of the investigative and consulting services she insisted Lynch International

32

and Mr. Pena perform for her and to be enriched thereby, without them receiving a reasonable remuneration.

## VI. Requests for Relief

WHEREFORE, Mr. Pena prays that the Court enter a judgement:

1.      finding, in Count I, Cokus to have made false statements harmful to the interests of Lynch International and Mr. Pena;

2.      finding, in Count II, Cokus to have intentionally caused injury to Lynch International and Mr. Pena;

3.      finding, in Count III, Cokus to have benefitted from and been enriched by the investigative and consulting services Lynch International and Mr, Pena performed for her at her insistence and, therefore, Cokus be required to pay Mr. Pena reasonable remuneration that is in excess of $500,000;

4.      awarding Mr. Pena, on Counts I and II, all his attorney's fees and costs, including those related to, or arising out of, any state and/or federal court action in which lawyers for Cokus have published, repeated or used her false statements to resist the right for which Lynch International and Mr. Pena have to receive the proceeds from the qui tam lawsuit to which Cokus had promised them;

5.      awarding Mr. Pena, on each count of his Complaint, direct and consequential damages, including loss of business and investment opportunities;

6.      awarding Mr. Pena, on Counts I and II of his Complaint, punitive damages;

7.      awarding Mr. Pena pre- and post- judgment interest;

8.    awarding Mr. Pena costs of suit, including litigation costs and reasonable attorney's fees; and

9.    awarding Mr. Pena such other relief as is just and proper.

## VII.  Jury Trial Demand

Plaintiff hereby demands a jury trial on all counts of the Complaint.

_____
ARNOLD I. KALMAN
Attorney Identification No. 17593
Law Offices of Arnold I. Kalman
245 South Hutchinson Street
Philadelphia, Pennsylvania 19107
Phone: 215-829-9613
Fax: 215-829-9619
E-mail:arnold.i.kalman@verizon.net

**Attorneys for Plaintiff, Octavio Pena**

**Dated: November 20, 2007**

34

# VERIFICATION

I, Octavio Pena, hereby state:

1.    I am the plaintiff named in the Complaint;

2.    I verify that the statements made in the foregoing Complaint in Civil Action are true and correct to the best of my knowledge, information and belief; and

3.    I understand that the statements in the Complaint are made subject to the penalties of 18 Pa. C. S. §4904 relating to unsworn falsification to authorities.

_____
**Octavio Pena**

**Dated: November 20, 2007**